IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

**CAMERON PAUL CROCKETT,**

     Petitioner,

v.                                   Civil Action No. **3:18CV139**

**HAROLD W. CLARKE,**

     Respondent.

## <u>MEMORANDUM OPINION</u>

Cameron Paul Crockett, a Virginia state prisoner proceeding *pro se*, brings this petition pursuant to 28 U.S.C. § 2254 ("§ 2254 Petition," ECF No. 1; "Amendment to § 2254 Petition," ECF No. 6)[1] challenging his conviction in the Circuit Court for the City of Virginia Beach, Virginia ("Circuit Court"). Crockett argues that he is entitled to relief on the following grounds:[2]

Claim One:    "Crockett is actually innocent." (§ 2254 Pet. 5.)

Claim Two:    "Trial counsel was ineffective for failing to investigate and present evidence involving the driver's seatbelt mechanism." (*Id.* at 7.)

Claim Three:  "Crockett's *Miranda*[3] rights were violated when police interrogated him in a custodial setting without advising him of his rights against self-incrimination." (*Id.* at 8.)

---

[1] Crockett filed his Amendment to § 2254 Petition within twenty-one days of the date of service of his § 2254 Petition, which was within the period of time in which he was permitted to amend as a matter of course. *See* Fed. R. Civ. P. 15(a)(1). When Crockett filed his Amendment to § 2254 Petition, Respondent had not yet filed his Motion to Dismiss, and Respondent's subsequent Motion to Dismiss addressed the claims in the § 2254 Petition and in the Amendment to § 2254 Petition. In addition to filing his § 2254 Petition and Amendment to § 2254 Petition, Crockett filed a Memorandum in Support of his § 2254 Petition. (ECF No. 1–1, at 1–156.)

[2] The Court employs the pagination assigned by the CM/ECF docketing system for citations to Crockett's submissions. The Court corrects the spelling, punctuation, and capitalization in the quotations from Crockett's submissions. Additionally, the Court omits the emphasis in the quotations from these submissions.

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Claim Four:      "Crockett's statements to police were involuntary." (*Id.* at 10.)

Claim Five:      "The Commonwealth violated *Brady v. Maryland*, 373 U.S. 83 (1963), by suppressing exculpatory evidence." (*Id.* at 12.)

Claim Six:       "The cumulative effect of the Commonwealth's *Brady* violations and of the ineffective assistance of counsel Crockett received at trial deprived him of a fair trial." (*Id.* at 14.)

Claim Seven:     "The Commonwealth violated *Batson v. Kentucky*, 476 U.S. 79 (1986), by striking two African-American women from the venire." (*Id.* at 16.)

Claim Eight:     "Crockett's prosecuting attorney harbored a conflict of interest that violated [Crockett's] federal constitutional right to a fair trial by an impartial prosecution." (Amendment to § 2254 Pet. 5.)

Respondent filed a Motion to Dismiss, asserting, *inter alia*, that Crockett's claims are procedurally defaulted and lack merit. (ECF No. 13.) Crockett filed a Response (ECF No. 19) and a Corrected Response (ECF No. 20). For the reasons set forth below, Respondent's Motion to Dismiss (ECF No. 13) will be GRANTED, Crockett's § 2254 Petition (ECF No. 1) will be DENIED, and the Amendment to § 2254 Petition (ECF No. 6) will be DISMISSED because Crockett's claims are procedurally defaulted and without merit.

## I. Procedural History

On May 26, 2011, a jury convicted Crockett of involuntary manslaughter. (ECF No. 15–1, at 1.) However, on May 27, 2011, the Circuit Court declared a mistrial because the jury could not agree on Crockett's punishment during the penalty phase of the trial. (*Id.* at 2.) On March 1, 2012, a second jury convicted Crockett of involuntary manslaughter. (ECF No. 15–2, at 1.) On March 5, 2012, Crockett failed to appear for the penalty phase of the trial. (ECF No. 15–3, at 1.) The Circuit Court proceeded with this phase, despite Crockett's absence, and the jury "fix[ed] [Crockett's] punishment at 5 years" of incarceration. (*Id.*)

After Crockett's failure to appear for the penalty phase of his trial, Crockett was charged with felony failure to appear. (*See* ECF No. 15–4, at 1.) On August 27, 2012, Crockett pled guilty to the charge of felony failure to appear. (*Id.*)

Subsequently, Crockett moved for a new trial on the involuntary manslaughter charge. (ECF No. 15–5.) The Circuit Court denied Crockett's motion for a new trial. (ECF No. 15–6, at 1.) The Circuit Court sentenced Crockett to aggregate term of ten years of incarceration, with two years suspended. (ECF No. 15–4, at 1; ECF No. 15–6, at 1.)

Crockett appealed his involuntary manslaughter conviction to the Court of Appeals of Virginia. *See Crockett v. Commonwealth*, No. 0119–13–1, 2014 WL 3510715, at *1 (Va. Ct. App. July 15, 2014). Crockett argued that the Circuit Court "erred in denying his motion for a new trial on the basis of newly discovered evidence and in denying his motion based upon *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986)." *Id.* On July 15, 2014, the Court of Appeals of Virginia affirmed the Circuit Court's rulings, holding that the Circuit Court "did not err in its several rulings on the motions for a new trial and the defendant's challenge based upon *Batson*." *Id.* at *4. Specifically, the Court of Appeals of Virginia found:

> The charge arose on December 28, 2008 when a car slammed into a tree in the 2100 block of Wolfsnare Road, Virginia Beach, killing Korte, who was in the front passenger seat. The defendant was also found in the car. Numerous residents of that area heard the sounds as the car slid out of control and struck the tree, but Pamela Patrick, Antoine Smith, and James Reid were the primary witnesses. They described seeing the car speed down Wolfsnare Road, lose control, and wreck. They explained what they observed about the car and its occupants immediately after impact. The police arrived at the scene about ninety seconds after the wreck.
> The Commonwealth maintained the defendant was the driver and the only other person in the car. The defendant maintained a third person, Jacob Palmer, was the driver and fled from the wreck without being seen by anyone at the accident scene. The factual issue at trial was the identity of the driver.
> The defendant's motion for a new trial was based on a claim of three instances of newly discovered evidence: expert evidence that the driver was wearing a seatbelt; allegedly exculpatory statements provided by the Commonwealth after the trial; and evidence of third party confessions. After

argument by counsel, the trial court noted in summary that the motion presented two scenarios of after-discovered evidence: a new expert opinion about the seatbelt and evidence of inculpatory statements made by a third party. The trial judge found that the expert opinion about the seatbelt mechanism could have been secured for use at the trial in the exercise of reasonable diligence. The court ruled that the evidence provided by the new expert opinion could have been available at trial and therefore was not a basis for a new trial.

The trial court then took evidence on the claim that two witnesses heard Palmer state that he was the driver. It found that one witness denied hearing Palmer make such a statement and that the other witness'[s] statement was vague. The court found the testimony implicating another driver to be suspect and unlikely to result in a different outcome. The trial court ruled the proffered evidence would not produce an opposite result at a new trial and denied the motion for a new trial.

The defense argument, as it pertained to the statements provided by the Commonwealth after the trial, was incorporated primarily into the broad argument for a new trial based on after-discovered evidence. These statements were used in conjunction with the other two assertions of after-discovered evidence to show the three instances of after-discovered evidence cumulatively were sufficient to meet the requirements for a new trial. To the extent that the three statements provided by the Commonwealth could also be the basis for a claim for a new trial based on *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L.Ed.2d 215 (1963), the trial court made no ruling. It did not decide if the statements were material or would have produced a different result had they been disclosed before trial.

In this appeal, the defendant first argues that the trial court erred in denying his motion for a new trial because the Commonwealth failed to disclose exculpatory evidence in a timely manner. The court made no ruling on the defendant's challenge to the extent it rested on a claim that the Commonwealth had violated *Brady*.

It is well settled that where the trial court does not rule on an objection, "there is no ruling for us to review on appeal." *Ohree v. Commonwealth*, 26 Va. App. 299, 308, 494 S.E.2d 484, 489 (1998). In this case, the trial court did not rule on any *Brady* challenge, and counsel never sought such a ruling. "Hence, the objection was not saved for our consideration." *Taylor v. Commonwealth*, 208 Va. 316, 324, 157 S.E.2d 185, 191 (1967).

In any case, the statements of Patrick, Smith, and Reid provided after the trial would not meet the *Brady* requirement of materiality. *See Workman v. Commonwealth*, 272 Va. 633, 644–45, 636 S.E.2d 368, 374–75 (2006) (finding that a conviction is reversed only if the evidence was material in the sense that the suppression of it undermined the confidence in the outcome of the trial). The statements offered minor variations in the details in their testimony but did not touch on the issue in dispute: was someone other than the defendant driving.

In this appeal, the defendant next argues the trial court erred in denying his motion for a new trial based upon after-discovered evidence that the driver's seatbelt was used. In *Hopkins v. Commonwealth*, 20 Va. App. 242, 456 S.E.2d 147 (1995) (*en banc*), this Court held:

> "The applicant bears the burden to establish that the evidence (1) appears to have been discovered subsequent to trial; (2) could not have been secured for use at the trial in the exercise of reasonable diligence by the movant; (3) is not merely cumulative, corroborative or collateral; and (4) is material, and such as should produce opposite results on the merits at another trial."

*Id.* at 249, 456 S.E.2d at 150 (quoting *Stockton v. Commonwealth*, 227 Va. 124, 149, 314 S.E.2d 371, 387 (1984)).

At all stages of this case, the defense was the defendant was not the driver. The defense had access to the car before defendant's trials. Prior to the sentencing hearing, the defendant obtained a new attorney and a new expert. The report prepared by the second expert only "suggests" that the driver's seatbelt was in use at the time of the accident. This opinion offered by the new expert could have been reached before trial by the exercise of reasonable diligence. The defendant had access to the car, and an expert examined it before his trial. The trial judge did not abuse his discretion in finding reasonable diligence would have produced the evidence and in denying a new trial based upon this after-discovered evidence.

In his third assignment of error, the defendant maintains the trial court erred in denying his motion for a new trial based upon evidence of a third party confession. The defendant contended that Palmer was the driver of the car. He maintained that two different witnesses overheard Palmer admit that he was the driver at the time of the wreck.

The defendant proffered that Shaun Hoover could testify that Palmer admitted to him that he was the driver of the car. However, at the hearing on the motion for a new trial, Hoover did not testify that Palmer drove the car. To the contrary, Hoover testified that Palmer never told him that he was driving the car.

The second witness at the hearing on the motion, Elizabeth Wales, testified that she knew Palmer from Cox High School, which they both attended. She overheard Palmer say, "I just got free. I thought I killed them both." Wales testified that Palmer also mentioned the name "Jack." Wales did not come forward with her evidence until June 2012, and she was unsure if she overheard the conversation in 2010 or 2011. She only came forward after she saw a statement that the defendant's girlfriend posted on Facebook, which maintained the defendant had been wrongly convicted.

At the conclusion of the evidence on the motion, the trial judge was troubled by Hoover's testimony, found that Wales' testimony was vague at best, and determined that Wales' testimony would not produce a different result at another trial.

Trial counsel was aware of the defendant's contention that Palmer was the driver prior to trial. At trial, the defendant called witnesses who saw Korte, Palmer, and the defendant at a party before the wreck with the intent to show Palmer disappeared from the party for a period of time. Defense counsel and his investigator spoke to Palmer prior to trial but elected not to call Palmer as a witness. The trial judge heard Wales' testimony and observed her demeanor and determined that her testimony was vague and was unlikely to produce a different result in another trial. A review of the record shows that the trial judge did not abuse his

discretion in ruling that the evidence was unlikely to produce an opposite result at another trial and in denying the motion for a new trial based upon after-discovered evidence.

In his last assignment of error, the defendant maintains the trial court erred in denying his motion based upon *Batson* because the Commonwealth used two peremptory strikes to remove two African-American women from the venire. The defendant argues the trial court erred by ruling that he failed to make a prima facie case of purposeful discrimination.

The Commonwealth struck two African-American women from the venire. There were a total of four or five African-Americans on the venire, and the defendant struck one African-American woman himself. The defendant objected, but he made no attempt at showing a pattern of discrimination. He stated simply that striking the two African-American women established a pattern. The trial judge found that there was no pattern of discrimination and overruled the defendant's objection.

"The fact that the prosecution has excluded African-Americans by using peremptory strikes does not itself establish such a prima facie case under *Batson.* A defendant also must identify facts and circumstances that raise an inference that potential jurors were excluded based on their race." *Johnson v. Commonwealth*, 259 Va. 654, 674, 529 S.E.2d 769, 780–81 (2000) (citations omitted); *see Juniper v. Commonwealth*, 271 Va. 362, 407, 626 S.E.2d 383, 412 (2006); *Yarbrough v. Commonwealth*, 262 Va. 388, 394, 551 S.E.2d 306, 309 (2001).

The fact the Commonwealth excluded African-Americans by using peremptory strikes did not establish a prima facie case of racial discrimination. The defendant made no attempt to identify facts and circumstances that would raise the inference that the Commonwealth struck the two females based upon their race. There is no evidence of purposeful discrimination by the Commonwealth in the jury selection process. Thus, the record supports the trial court's ruling that the defendant failed to make a prima facie showing of purposeful discrimination under *Batson.*

*Id.* at *1–4. Crockett then filed a petition for rehearing *en banc*, and the Court of Appeals of Virginia denied the petition on August 12, 2014. (ECF No. 15–7, at 1.)

Crockett appealed to the Supreme Court of Virginia, and on April 7, 2015, the Supreme Court of Virginia refused the petition for appeal. (ECF No. 15–8, at 1.) The Supreme Court of Virginia denied Crockett's petition for rehearing on October 15, 2015. (ECF No. 15–9, at 1.) Crockett then appealed to the United States Supreme Court, and on February 29, 2016, the United States Supreme Court denied his petition for a writ of certiorari. (ECF No. 15–10, at 1.)

On April 2, 2016, Crockett filed a petition for a writ of habeas corpus in the Circuit

Court.  (ECF No. 15–11, at 1–66; *see* ECF No. 15–13, at 3.)  On August 22, 2016, the Circuit

Court denied and dismissed Crockett's petition for a writ of habeas corpus.  (ECF No. 15–13, at

34.)  In denying Crockett's petition for a writ of habeas corpus, the Circuit Court summarized

Crockett's claims as follows:

I(A).   Crockett alleges a substantive violation of his constitutional privilege against self-incrimination;

I(B).   Counsel is alleged to have rendered ineffective assistance in failing to adequately investigate and present a motion to suppress the petitioner's statements on the basis that his constitutional privilege against self-incrimination was violated;

II(A).   Petitioner mounts a substantive attack upon the voluntariness of his confession;

II(B).   Counsel is alleged to have rendered ineffective assistance in failing to adequately investigate and present a motion to suppress the petitioner's statements on the basis that his statement to law enforcement was not voluntarily given;

III.   Counsel is alleged to have rendered ineffective assistance in failing to adequately investigate and present evidence related to the driver's seatbelt mechanism;

IV.   Counsel failed to interview Jacob Palmer and Tori Miranda, and failed to present testimony at trial from Palmer, Miranda, and Nicole Vaughan;

V(A).   Petitioner maintains the prosecution withheld material, exculpatory evidence or that which would be of benefit for impeachment purposes from the defense;

V(B).   Counsel rendered ineffective assistance in failing to preserve for appellate review the petitioner's substantive argument in reference to the alleged withholding of material, exculpatory evidence or that which would be of benefit for impeachment purposes;

VI.   The petitioner asserts a substantive claim alleging his actual innocence of the offense of involuntary manslaughter;

VII.   The petitioner raises a claim of cumulative prejudice resulting from his collective individual claims of ineffective assistance of counsel;

VIII.   The petitioner contends that the prejudice inherent in the alleged non-disclosures of the prosecution coupled with the claimed inadequacies of counsel served to prejudice him at trial.

(*Id.* at 3–4.)  Crockett appealed the Circuit Court's denial of his petition for a writ of habeas

corpus to the Supreme Court of Virginia.  (*See* ECF No. 15–14.)  The Supreme Court of Virginia

affirmed the Circuit Court's decision, "albeit for a different reason," holding that "although the circuit court correctly denied and dismissed Crockett's petition, the court relied on the wrong reasons for dismissing claims I(B), II(B), and III, which [were] the subject of Assignments of Error 1, 2 and 6." (*Id.* at 2.)

On February 28, 2018, Crockett timely filed the instant § 2254 Petition. (§ 2254 Pet. 1; ECF No. 15 at 5.) When Crockett filed his § 2254 Petition, he also filed a Motion for Discovery (ECF No. 1–1, at 142–152) and attached proposed Interrogatories (ECF No. 1–1, at 153–156). Subsequently, on April 6, 2018, Crockett filed his Amendment to § 2254 Petition, which contains present Claim Eight. (Amendment to § 2254 Pet. 1.) On April 6, 2018, Crockett also filed a Supplemental Motion for Discovery (ECF No. 7) and a Motion for Evidentiary Hearing on Claim Eight (ECF No. 8). Subsequently, Crockett filed a Motion for Evidentiary Hearing on Claims One and Two. (ECF No. 19, at 2–3.) Crockett also filed an "Objection to Referral of Case to Staff Attorney and Motion to Return Case to the Magistrate Judge or District Judge" ("Objection and Motion to Return Case," ECF No. 24).

## II. Exhaustion and Procedural Default

Before a state prisoner can bring a § 2254 petition in federal district court, the prisoner must first have "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). State exhaustion "is rooted in considerations of federal-state comity," and in Congressional determination via federal habeas laws "that exhaustion of adequate state remedies will 'best serve the policies of federalism.'" *Slavek v. Hinkle*, 359 F. Supp. 2d 473, 479 (E.D. Va. 2005) (some internal quotation marks omitted) (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 491–92 & n.10 (1973)). The purpose of exhaustion is "to give the State an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Picard v. Connor*, 404

U.S. 270, 275 (1971) (internal quotation marks omitted). Exhaustion has two aspects. First, a petitioner must utilize all available state remedies before the petitioner can apply for federal habeas relief. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 844–48 (1999). As to whether a petitioner has used all available state remedies, the statute notes that a habeas petitioner "shall not be deemed to have exhausted the remedies available in the courts of the State . . . if he has the right under the law of the State to raise, by any available procedure, the question presented." 28 U.S.C. § 2254(c).

The second aspect of exhaustion requires a petitioner to have offered the state courts an adequate "opportunity" to address the constitutional claims advanced on federal habeas. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (internal quotation marks omitted) (quoting *Duncan v. Henry*, 513 U.S. 364, 365–66 (1995)). "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Id.* Fair presentation demands that a petitioner present "both the operative facts and the controlling legal principles" to the state court. *Longworth v. Ozmint*, 377 F.3d 437, 448 (4th Cir. 2004) (internal quotation marks omitted) (quoting *Baker v. Corcoran*, 220 F.3d 276, 289 (4th Cir. 2000)). The burden of proving that a claim has been exhausted in accordance with a "state's chosen procedural scheme" lies with the petitioner. *Mallory v. Smith*, 27 F.3d 991, 994–95 (4th Cir. 1994).

"A distinct but related limit on the scope of federal habeas review is the doctrine of procedural default." *Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998). This doctrine provides that "[i]f a state court clearly and expressly bases its dismissal of a habeas petitioner's claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for

the dismissal, the habeas petitioner has procedurally defaulted his federal habeas claim." *Id.* (citing *Coleman v. Thompson*, 501 U.S. 722, 731–32 (1991)). A federal habeas petitioner also procedurally defaults claims when he or she "fails to exhaust available state remedies and 'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'" *Id.* (quoting *Coleman*, 501 U.S. at 735 n.1).[4] The burden of pleading and proving that a claim is procedurally defaulted rests with the state. *Jones v. Sussex I State Prison*, 591 F.3d 707, 716 (4th Cir. 2010) (citations omitted). Absent a showing of cause and prejudice or a fundamental miscarriage of justice, this Court cannot review the merits of a defaulted claim. *See Harris v. Reed*, 489 U.S. 255, 262 (1989).

Respondent moves to dismiss Crockett's Claims Three, Four, Five, and Eight, arguing, *inter alia*, that these claims are defaulted and barred from review here. (ECF No. 15, at 6–14.) The Court addresses each claim in turn.

In Claim Three, Crockett contends that his "*Miranda* rights were violated when police interrogated him in a custodial setting without advising him of his rights against self-incrimination." (§ 2254 Pet. 8.) In Claim Four, Crockett contends that his "statements to police were involuntary." (*Id.* at 10.) In Crockett's state habeas petition, Claim Three was presented as Claim I(A) and Claim Four was presented as Claim II(A). (ECF 15–11, at 21, 26; ECF No. 15–13, at 3.) The Circuit Court denied and dismissed Claim I(A), holding that pursuant to the rule in *Slayton v. Parrigan*, 205 S.E.2d 680, 682 (Va. 1974), "a claim of this nature may not be raised for the first time in habeas corpus review." (ECF No. 15–13, at 5.) Similarly, the Circuit Court

---

[4] Under these circumstances, even though the claim has not been fairly presented to the Supreme Court of Virginia, the exhaustion requirement is "technically met." *Hedrick v. True*, 443 F.3d 342, 364 (4th Cir. 2006) (citing *Gray v. Netherland*, 518 U.S. 152, 161–62 (1996)).

denied and dismissed Claim II(A), holding that Crockett could not raise such a claim "for the first time in habeas corpus review pursuant to the rule of *Parrigan*." (*Id.* at 6.) The Supreme Court of Virginia affirmed the Circuit Court's denial and dismissal of these claims. (ECF No. 15–14, at 2, 8.) The rule in *Slayton v. Parrigan* constitutes an adequate and independent state procedural rule when so applied. *See Clagett v. Angelone*, 209 F.3d 370, 379 (4th Cir. 2000); *Mu'Min v. Pruett*, 125 F.3d 192, 196–97 (4th Cir. 1997). Thus, Claims Three and Four are defaulted.

In Claim Five, Crockett argues that the Commonwealth suppressed exculpatory statements in violation of *Brady v. Maryland*. (§ 2254 Pet. 12.) Crockett presented this claim as Claim V(A) in his state habeas petition. (ECF No. 15–13, at 3.) The Circuit Court denied and dismissed Claim V(A), concluding, *inter alia*, that one portion of the claim had been raised on direct appeal and could not be raised again in habeas corpus review because the Court of Appeals of Virginia had concluded that Crockett had failed to present his *Brady* challenge to the Circuit Court and "where the trial court does not rule on an objection, 'there is no ruling for [the Court of Appeals of Virginia] to review on appeal.'" (ECF No. 15–13, at 6–7 (citing *Crockett*, 2014 WL 3510715, at *2)); *see* Va. Sup. Ct. Rule 5A:18 ("No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable the Court of Appeals to attain the ends of justice."). With respect to the second portion of Claim V(A), the Circuit Court concluded that *Slayton* barred this portion of the claim, and Crockett could not raise the claim for the first time in habeas corpus review. (ECF No. 15–13, at 8.) The Supreme Court of Virginia affirmed the Circuit Court's denial and dismissal of this claim. (ECF No. 15–14, at 2, 8.) With respect to the first portion of the claim, Virginia Supreme Court Rule 5A:18 governs appeals to

the Court of Appeals of Virginia and is "'virtually identical' to [Supreme Court of Virginia] Rule 5:25," which "constitutes 'an independent and adequate state procedural bar precluding [habeas] review of errors [not raised] at trial.'" *Kent v. Kuplinski*, 702 F. App'x 167, 169 (4th Cir. 2017) (alterations in original) (citations omitted). Similarly, as discussed above, the rule in *Slayton* constitutes an adequate and independent state procedural rule when so applied. *See Clagett*, 209 F.3d at 379; *Mu'Min*, 125 F.3d at 196–97. Therefore, Claim Five is also defaulted.[5]

In Claim Eight, Crockett contends that the "prosecuting attorney harbored a conflict of interest that violated his federal constitutional right to a fair trial by an impartial prosecution." (Amendment to § 2254 Pet. 5.) Crockett failed to raise this claim in his state habeas petition. (*See* ECF No. 15–11, at 1–66.) If Crockett now attempted to raise Claim Eight in a state habeas petition, it would be barred as successive pursuant to Va. Code. Ann. § 8.01–654(B)(2). The bar on successive petitions, which is set forth in Va. Code Ann. § 8.01–654(B)(2), constitutes an adequate and independent state procedural rule when so applied. *See Clagett*, 209 F.3d at 379; *Mu'Min*, 125 F.3d at 196–97. Thus, Claim Eight is defaulted.

Crockett concedes that Claims Five and Eight are defaulted. (ECF No. 19, at 6.) However, Crockett argues that Claims Three and Four are not defaulted because "the Supreme Court of Virginia clearly addressed and ruled on the merits of the *Miranda* and the voluntariness

---

[5] Moreover, to the extent that the Court could reach the merits of Claim Five, Crockett's claim regarding alleged *Brady* violations would fail on the merits. Specifically, the undisclosed evidence Crockett identified in Claim Five is detailed in the Court's discussion of Crockett's actual innocence claim (Claim One) and cumulative effect claim (Claim Six). Upon review of the evidence that Crockett contends the Commonwealth suppressed, the Court finds that none of the evidence identified is either as exculpatory or impeaching as Crockett suggests, or the identified evidence is not even exculpatory. Therefore, were the Court to reach the merits of Claim Five, the claim would fail on the merits because viewing the identified, undisclosed evidence as whole, the evidence was not material, as is required to establish a *Brady* violation.

challenges when it dealt with the prejudice prongs of the interrelated claims that counsel was ineffective for failing to pursue those challenges." (*Id.* at 79.)

The Supreme Court of Virginia affirmed the Circuit Court's decision denying and dismissing Crockett's state habeas petition "albeit for a different reason," explaining that "although the circuit court correctly denied and dismissed Crockett's petition, the court relied on the wrong reasons for dismissing claims I(B), II(B), and III." (ECF No. 15–14, at 2.) Claims Three and Four were presented as Claims I(A) and II(A), respectively, in Crockett's state habeas petition. (*See* ECF No. 15–13, at 3.) Contrary to Crockett's assertion that the Supreme Court of Virginia "ruled on the merits" of Claims Three and Four, the Supreme Court of Virginia's decision addressed only the Circuit Court's reasoning for Claims I(B), II(B), and III – all of which were ineffective assistance of counsel claims – and the Supreme Court of Virginia did not find any error in the Circuit Court's reasoning for denying and dismissing Claims I(A) and II(A), which are presented as Claims Three and Four here. Nevertheless, because Crockett presents a claim of actual innocence in Claim One, and because subscribing to Crockett's claim of actual innocence would permit the Court to consider the merits of his otherwise procedurally defaulted claims, the Court first addresses Claim One. *See Buckner v. Polk*, 453 F.3d 195, 199 (4th Cir. 2006) (citations omitted).

### III. Claim One – Actual Innocence

In Claim One, Crockett contends that he "is actually innocent." (§ 2254 Pet. 5.) Crockett describes this claim as "'freestanding' within [the] meaning of *Herrera v. Collins*, 516 U.S. 390 (1993)[]." (*Id.*) As an initial matter, it is unclear whether habeas petitioners may raise freestanding actual innocence claims.[6] *See McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013)

---

[6] With respect to whether a habeas petitioner may raise a freestanding claim of actual innocence, "Fourth Circuit authority on this issue is inconclusive and conflicting." *Hazel v.*

(citation omitted) ("[The Supreme Court] [has] not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence.").  Nevertheless, "[c]laims of actual innocence, whether presented as freestanding ones, or merely as gateways to excuse a procedural default, should not be granted casually."  *Wilson v. Greene*, 155 F.3d 396, 404 (4th Cir. 1998) (citations omitted).  Further, the Supreme Court has "described the threshold for any hypothetical freestanding innocence claim as 'extraordinarily high.'"  *House v. Bell*, 547 U.S. 518, 555 (2006) (quoting *Herrera*, 506 U.S. at 417 (finding that "whatever burden a hypothetical freestanding innocence claim would require," even a petitioner who "cast considerable doubt on his guilt—doubt sufficient to satisfy *Schlup*'s[7] gateway standard for obtaining federal review despite a state procedural default," would likely not satisfy it); *Teleguz v. Pearson*, 689 F.3d 322, 328 n.2 (4th Cir. 2012) (accord).

Here, the Court reviews Crockett's arguments under the more lenient standard for gateway actual innocence claims, because if Crockett satisfies this standard, the Court would be permitted to consider the merits of his otherwise procedurally defaulted claims.  Even under the more lenient standard for gateway actual innocence claims, Crockett may obtain review of his claims "only if he falls within the 'narrow class of cases . . . implicating a fundamental miscarriage of justice.'"  *Schlup*, 513 U.S. at 314–15 (alteration in original) (quoting *McCleskey v. Zant*, 499 U.S. 467, 494 (1991)).  *See also Teleguz*, 689 F.3d at 328 n.2 ("A petitioner seeking to address procedurally defaulted claims under *Schlup* must meet a less-stringent—though nevertheless rigorous standard than a petitioner who seeks relief on the basis of innocence alone.") (internal quotation and citation omitted).

---

*United States*, 303 F. Supp. 2d 753, 760 (E.D. Va. 2004) (citing *Royal v. Taylor*, 188 F.2d 239, 243 (4th Cir. 1999).

[7] *Schlup v. Delo*, 513 U.S. 298 (1995).

"A valid actual innocence claim 'requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.'" *Finch v. McKoy*, 914 F.3d 292, 298 (4th Cir. 2019) (quoting *Schlup*, 513 U.S. at 324). "Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." *Schlup*, 513 U.S. at 324. If a petitioner meets the burden of producing new, truly reliable evidence of his or her innocence, the Court then considers "'all the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial,'" and determines whether the petitioner has met the standard for a gateway claim of innocence. *House*, 547 U.S. at 538 (quoting *Schlup*, 513 U.S. at 327–28). The Court must then determine whether "it is more likely than not that the totality of the evidence would prevent any reasonable juror from finding him guilty beyond a reasonable doubt." *Finch*, 914 F.3d at 299 (internal quotation and citation omitted). "The Court need not proceed to this second step of the inquiry unless the petitioner first supports his or her claim with evidence of the requisite quality." *Hill v. Johnson*, No. 3:09CV659, 2010 WL 5476755, at *5 (E.D. Va. Dec. 30, 2010) (citing *Weeks v. Bowersox*, 119 F.3d 1342, 1352–53 (8th Cir. 1997); *Feaster v. Beshears*, 56 F. Supp. 2d 600, 610 (D. Md. 1999)).

Moreover, "actual innocence" means factual innocence and not just legal insufficiency. *See Calderon v. Thompson*, 523 U.S. 538, 559 (1998) (alteration in original) (citations and internal quotation marks omitted) ("[T]he miscarriage of justice exception is concerned with actual as compared to legal innocence."). Furthermore, with respect to claims of actual innocence,

The Supreme Court has instructed that, "when considering an actual-innocence claim in the context of a request for an evidentiary hearing, the District Court need not 'test the new evidence by a standard appropriate for deciding a motion for summary judgment,' but rather may 'consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence.'"

*Carter v. Commonwealth of Va.*, No. 3:09CV121–HEH, 2010 WL 331758, at *4 (E.D. Va. Jan. 26, 2010) (quoting *House*, 547 U.S. at 537).

### A.  <u>Summary of the Evidence Presented at Trial</u>

The jury heard the testimony from the following thirty-one individuals at trial:  John Korte, Sr., Antoine Smith, Pamela Patrick, James Reid, William Daniels, Holly Dickson, Kolden Dickson, Kenneth Buechner, Paul Bradley, James Dickey, George Marino, Fitz Wallace, Samantha Wetzler, Les Edinboro, Steven Powell, William Pritchard, Erick Smith, Thomas Kellogg, Jeff Menago, Forrest Godwin, Kevin Kelly, Karlene Carkhuff, Robert Bagnell, Joshua Reddy, Ammerrell Barretto, Beth Coulling, Christopher Maples, Reuben Koller, Helen Gornto, Will Von Stein, and Crockett.

### 1.  <u>Evidence Presented by the Commonwealth of Crockett's Guilt</u>

With respect to the evidence against Crockett that was introduced at trial, overwhelming evidence existed to support the jury's verdict.

First, John Korte, Sr., testified that he was the father of the victim, Jack Korte.  (Feb. 28, 2012 Tr. 247.)  Mr. Korte testified that Jack was living at home on December 28, 2008, and on that day, Jack left the house at 9:00 p.m.  (Feb. 28, 2012 Tr. 248–49.)  Mr. Korte indicated that that was the last time he saw Jack alive.  (Feb. 28, 2012 Tr. 249.)

Next, Antoine Smith testified that on December 28, 2008, she was walking on Wolfsnare Road and her attention was drawn by a "house that had this very elaborate Christmas decorations and music."  (Feb. 28, 2012 Tr. 256–57.)  Ms. Smith testified that "[she] saw the light turn green

up on the top of Wolfsnare, and [she] heard this car like accelerating as it was coming down the hill." (Feb. 28, 2012 Tr. 257.) Ms. Smith also testified that the vehicle "came down the hill and like it slammed on brakes," and "[t]he car sp[un] maybe three -- two to three times." (Feb. 28, 2012 Tr. 257.) Further, Ms. Smith testified that the car went in between two parked cars, "turned sideways, and hit the tree." (Feb. 28, 2012 Tr. 257–58.) She stated after the car hit the tree, "neighbors ran outside." (Feb. 28, 2012 Tr. 258.) When asked if she saw anyone get out of the car, Ms. Smith responded: "No, I did not." (Feb. 28, 2012 Tr. 259.)

Pamela Patrick testified that she lived on Wolfsnare Road, and that she had lived at the same address on Wolfsnare Road for twelve years. (Feb. 28, 2012 Tr. 276–77.) Ms. Patrick testified that on December 28, 2008, at approximately 11:00 p.m. or 11:15 p.m., she was at home and "was sitting at [her] computer." (Feb. 28, 2012 Tr. 277.) Ms. Patrick stated that she heard a "really loud noise" and then she "went to the front door to look." (Feb. 28, 2012 Tr. 279.) Ms. Patrick stated that she then went outside and looked to see "where the noise was coming from." (Feb. 28, 2012 Tr. 280.) Ms. Patrick "saw a car sliding sideways going really fast." (Feb. 28, 2012 Tr. 280.) As the car was sliding sideways, Ms. Patrick thought that the car "was going to hit something," and she "told [her] kids to call 911." (Feb. 28, 2012 Tr. 281.) Ms. Patrick then heard the impact of the vehicle. (Feb. 28, 2012 Tr. 282.) Ms. Patrick did not immediately see what the car had hit; instead, she first saw a woman on the sidewalk looking across the street. (Feb. 28, 2012 Tr. 282.) Ms. Patrick then also looked across the street and saw the car "up against the tree." (Feb. 28, 2012 Tr. 282.) Ms. Patrick testified that once she saw the vehicle in the front yard across the street, "[she] went across the street. [Her] son was on the phone to 911, and they were asking how many people were in the car; and [she] was across the street and touched the leg of the boy who was in the front -- in the front window." (Feb. 28, 2012 Tr. 284.)

When asked if "once [she] located the vehicle," she "rush[ed] to the car," Ms. Patrick responded: "Yes, I went there. Yes." (Feb. 28, 2012 Tr. 284.) Ms. Patrick explained that she was "[w]alking quickly" to the car. (Feb. 28, 2012 Tr. 284.) When asked if she saw anyone get out of the car, Ms. Patrick stated: "No." (Feb. 28, 2012 Tr. 284.) With respect to the person or persons Ms. Patrick saw in the vehicle, Ms. Patrick stated that she was able to see only one person and the way that person's "legs were laying, . . . they were on top of the driver's seat because they were right in the window." (Feb. 28, 2012 Tr. 286.) Ms. Patrick also testified that "[h]e was curved around and his -- the upper part of his body was in the rear window." (Feb. 28, 2012 Tr. 308.) When asked if the person's legs were down in the pedal area of the driver's seat, she responded: "No." (Feb. 28, 2012 Tr. 309.) When asked how long it took for the police to arrive at the scene, Ms. Patrick stated that it was "[a] minute or two" after she had been at the car. (Feb. 28, 2012 Tr. 287.) When asked if she had given "information to 911 in which [she] described the person that [she] saw with the legs at the window and curved in the back window as the one in the backseat," Ms. Patrick testified that she would not deny saying that, but she did not remember the conversation. (Feb. 28, 2012 Tr. 311–13.)

James Reid testified that on December 28, 2008, he lived on Wolfsnare Road. (Feb. 28, 2012 Tr. 321.) Mr. Reid testified that he was "[j]ust about getting ready for bed," and he heard screeching tires. (Feb. 28, 2012 Tr. 322.) Mr. Reid stated that he heard "the screeching and then the slam," and about "thirty, thirty-five seconds" after hearing the slam, he got to the car. (Feb. 28, 2012 Tr. 323.) When asked if he had previously testified that the amount of time that had passed before he got to the car was "a minute and five seconds," Mr. Reid stated: "I can't recall; but if that's what I said, I guess I said that." (Feb. 28, 2012 Tr. 329.) When asked whether he could see the car as he was going outside, he stated: "No. No, I could not directly see the car;

but I could see where, you know, the -- where it was -- the area where it was located." (Feb. 28, 2012 Tr. 323–24.) When asked what he saw when he arrived at the car, Mr. Reid stated that he saw "[a] car upside a tree, it was heavily damaged, and [he] saw a gentleman in the -- in the car." (Feb. 28, 2012 Tr. 324.)

As to the position of the person that he saw in the car, Mr. Reid stated: "When I came up to the car, the driver's seat was smashed all the way down, and he was in the backseat facing upward." (Feb. 28, 2012 Tr. 324.) Mr. Reid also stated that "roughly about his whole body" was in the backseat. (Feb. 28, 2012 Tr. 324.) When asked if any portion of the person's body was not in the backseat, Mr. Reid stated: "That would be his feet, some of his feet, you know, up on top of the seat laid back, up that way that I recall." (Feb. 28, 2012 Tr. 324.) When asked if he was referring to "the front seat laid back," Mr. Reid responded: "Yes, ma'am." (Feb. 28, 2012 Tr. 325.) When asked if he recalled seeing his neighbor, Ms. Patrick, at the car, he stated: "I don't recall seeing her." (Feb. 28, 2012 Tr. 326.) When asked about the lighting in the area, Mr. Reid stated that the lighting is "[h]orrible." (Feb. 28, 2012 Tr. 328.)

William Daniels testified that on December 28, 2008, he was living on Wolfsnare Road. (Feb. 28, 2012 Tr. 340.) Mr. Daniels stated that at that time he was living with "Kolden and Holly Dickson." (Feb. 28, 2012 Tr. 341.) Mr. Daniels stated that just before the accident, "Holly was asleep, and Kolden and [Mr. Daniels] were both on [their] computers" in the living room, which is in the front of the house. (Feb. 28, 2012 Tr. 341.) Mr. Daniels heard "[a] long screech" and "then it sounded like an airplane crash in the front yard." (Feb. 28, 2012 Tr. 341.) Mr. Daniels stated that he looked for his keys because he thought someone may have hit his car, and then when he got outside, he saw a "white car" that "appeared to be wrapped around a tree." (Feb. 28, 2012 Tr. 342.) When asked about the position of the person's body that he saw on the

driver's side of the car, Mr. Daniels stated that it was "[f]lat like on the -- between the front seat and the backseat." (Feb. 28, 2012 Tr. 344.) Mr. Daniels also stated that "[t]he legs" were in the front seat. (Feb. 28, 2012 Tr. 344.) Mr. Daniels did not see the person wearing a seatbelt. (Feb. 28, 2012 Tr. 351.) When asked how much time had passed between the impact and when Mr. Daniels was "out the door," Mr. Daniels responded: "Within thirty seconds. I mean, we were about to go to the store, you know. I had to put my shoes on; but, I mean, other than that, you know, I went out, told my buddy, I said, Hey, call 911, he called 911, and we went out." (Feb. 28, 2012 Tr. 345.) When asked if he saw anyone run away from the area, Mr. Daniels stated: "No, ma'am." (Feb. 28, 2012 Tr. 346.) When asked if anyone was at the vehicle from the neighborhood when he went outside, Mr. Daniels indicated that his neighbor, James Reid, was there. (Feb. 28, 2012 Tr. 354.)

Holly Dickson testified that on December 28, 2008, she lived on Wolfsnare Road. (Feb. 28, 2012 Tr. 356.) Ms. Dickson testified that prior to the accident, she was asleep, and the "loud screeching noise" drew her attention. (Feb. 28, 2012 Tr. 357.) Ms. Dickson testified that she then "jumped out of bed and came down the hall," and "heard [her] husband on the phone with 911." (Feb. 28, 2012 Tr. 357.) Ms. Dickson then "stepped outside" and saw "a car wrapped around a tree in [her] front yard." (Feb. 28, 2012 Tr. 357.) Ms. Dickson stated that "[she] immediately walked up to the car," and saw a person "laying across the vehicle and he appeared to be passed out." (Feb. 28, 2012 Tr. 358.) Ms. Dickson described the position of this individual's body as follows: "His feet were roundabout where the steering wheel would be[,]" and "his body was across the driver's seat, and his arm was back touching the back of -- behind the backseat." (Feb. 28, 2012 Tr. 358.) When asked how much time had passed between the time she heard the loud noise and when she went outside, Ms. Dickson stated: "A minute, two

minutes." (Feb. 28, 2012 Tr. 359.) Ms. Dickson testified that James Reid was at the car when she went outside. (Feb. 28, 2012 Tr. 361.)

Kolden Dickson testified that on December 28, 2008, he lived on Wolfsnare Road. (Feb. 28, 2012 Tr. 365.) Mr. Dickson testified that prior to the accident, he was in the living room, which is at the front of the house, "[l]ooking at Facebook on the computer." (Feb. 28, 2012 Tr. 365.) Mr. Dickson stated that "the sound of tires screeching down the street for several seconds" drew his attention, and "[he] thought there was an accident about to happen." (Feb. 28, 2012 Tr. 366.) Mr. Dickson testified that after he heard the impact, he looked outside and saw "a car wrapped around a tree in [his] front yard." (Feb. 28, 2012 Tr. 366.) When asked if he saw anyone get out of the car or walk away from the car, Mr. Dickson stated: "No, ma'am." (Feb. 28, 2012 Tr. 367.) When asked how much time had passed between when he saw the car and when he went outside to the car, Mr. Dickson stated: "Two to four minutes." (Feb. 28, 2012 Tr. 367.)

Mr. Dickson testified that he "saw someone laying there on top of the driver's seat." (Feb. 28, 2012 Tr. 368.) Mr. Dickson also testified that "[t]he headrest would be about middle back and the rest of their lower body was on the driver's seat[,]" and "the seat . . . looked like it had just flattened out in the wreck." (Feb. 28, 2012 Tr. 368.) When asked if Mr. Dickson knew what had happened in the car between the first time he looked outside until the time he went outside to the car, he responded that he did not. (Feb. 28, 2012 Tr. 374.) When asked if there is a wooded area behind his house and the other houses in the area, he responded that "[i]t's about a hundred yards between [his] house and the initial edge of the woods." (Feb. 28, 2012 Tr. 374-75.)

Next, Officer Kenneth Buechner testified.  (Feb. 28, 2012 Tr. 382.)  Officer Buechner testified that he works as a police officer with the Virginia Beach Police Department.  (Feb. 28, 2012 Tr. 383.)  Officer Buechner testified that on December 28, 2008, he was dispatched to a single-vehicle accident with injuries on Wolfsnare Road.  (Feb. 28, 2012 Tr. 383.)  Officer Buechner testified that when he arrived at the scene, he saw "a white vehicle that had struck a tree on the passenger side of the vehicle."  (Feb. 28, 2012 Tr. 384.)

Officer Buechner stated that when he arrived at the vehicle, it initially appeared that there was one person in the vehicle, but upon closer inspection, "there were two."  (Feb. 28, 2012 Tr. 388.)  Officer Buechner testified that "[he] dealt with Mr. Crockett first."  (Feb. 28, 2012 Tr. 388.)  With respect to Mr. Crockett's position in the vehicle, Officer Buechner testified that "[h]e was on what remained of the driver's side of the vehicle in the front seat[,]" "[h]is feet were under the steering wheel[,] [and] [h]is waist was where the center console would be."  (Feb. 28, 2012 Tr. 389.)  Officer Buechner stated that "[t]he seat had broken.  He wasn't in what would be considered a seated position in the seat, but he was still in the area."  (Feb. 28, 2012 Tr. 389–90.)  Officer Buechner also stated that Mr. Crockett's head was in the rear part of the vehicle. (Feb. 28, 2012 Tr. 401.)  Officer Buechner testified that as he was dealing with Mr. Crockett, "[t]here was a strong odor of alcoholic beverage coming from the car."  (Feb. 28, 2012 Tr. 393.)  When asked if Officer Buechner observed Mr. Crockett wearing a seatbelt, Officer Buechner stated:  "I don't recall one."  (Feb. 28, 2012 Tr. 398.)  Officer Buechner testified that Mr. Crockett was initially unconscious, and as Mr. Crockett regained consciousness, he started to move around in the vehicle.  (Feb. 28, 2012 Tr. 390.)

Officer Paul Bradley testified that he works as a police officer with the Virginia Beach Police Department.  (Feb. 28, 2012 Tr. 411–12.)  Officer Bradley testified that on December 28,

2008, he responded to an accident on Wolfsnare Road.  (Feb. 28, 2012 Tr. 412.)  Officer Bradley

testified that as he was responding to the accident, he did not see anyone running or walking

down the street.  (Feb. 28, 2012 Tr. 413.)  When Officer Bradley arrived at the scene, he went to

the driver's side of the vehicle "to assist [and] render aid," and he saw a person in the driver's

seat "actively struggling against the other officers that were already on scene."  (Feb. 28, 2012

Tr. 414.)  Officer Bradley testified that as the person on the driver's side was moving around, he

saw that there was "a person in the passenger area of the vehicle.  So instead of rendering aid to

the person that was in the driver area, [he] tried to render aid to the person in the passenger area."

(Feb. 28, 2012 Tr. 414–15.)  Officer Bradley testified that the person in the passenger area "had

some involuntary like eye and mouth movements, but he was not responsive."  (Feb. 28, 2012

Tr. 417.)  Officer Bradley also testified that "[i]t was close to the time that rescue had arrived is

when [the involuntary movements] all stopped."  (Feb. 28, 2012 Tr. 417.)  As to the position of

the person's body on the driver's side, Officer Bradley testified that "his legs were in the front

driver area of the vehicle," and the "top part" of his body was in the rear seat.  (Feb. 28, 2012

Tr. 420–21.)

   James Dickey testified that he works as a paramedic with the City of Virginia Beach, and

that he was working as a paramedic on December 28, 2008.  (Feb. 28, 2012 Tr. 443–44.)  Mr.

Dickey testified that when he arrived at the accident scene, he went around the vehicle to check

for a pulse on the individual he later learned was named Jack, and when "[he] checked for a

pulse inside of the neck, carotid, there was no pulse."  (Feb. 28, 2012 Tr. 445–46.)  When asked

if Mr. Crockett consumed any alcohol at the scene of the accident, Mr. Dickey stated:  "Not in

front of me."  (Feb. 28, 2012 Tr. 447.)  When asked about the position of the person on the

driver's side of the vehicle, Mr. Dickey agreed that "[t]o the best of [his] recollection" that

person's legs were "over the top of the back of the front seat." (Feb. 28, 2012 Tr. 450.) When asked if the person on the driver's side of the vehicle was wearing a seatbelt, Mr. Dickey stated that when he was on the scene, the person was not wearing a seatbelt. (Feb. 28, 2012 Tr. 452.)

George Marino testified that on December 28, 2008, he was employed with the Virginia Beach Fire Department. (Feb. 28, 2012 Tr. 455.) Mr. Marino testified that when he arrived at the accident scene, his responsibility was extrication. (Feb. 28, 2012 Tr. 456.) Mr. Marino stated that as to the person on the passenger side of the vehicle, Jack Korte, there were no extrication methods taken at the scene "[b]ecause he was pronounced dead by the EMS worker." (Feb. 28, 2012 Tr. 456–57.) Mr. Marino stated that the vehicle was taken "[t]o the fire station" for extrication. (Feb. 28, 2012 Tr. 457.) Mr. Marino testified that the extrication took "longer than what it normally takes." (Feb. 28, 2012 Tr. 458.) Mr. Marino stated:

> We had to remove the roof of the vehicle, cut the A, B, and C posts. We had the dash row pulled forward. We had to remove quite a bit of things inside the vehicle. The front seat and the dash were rolled over on top of him, so we had to actually physically pull him out from the wreckage.

(Feb. 28, 2012 Tr. 458.) When asked the position of the deceased individual, Mr. Marino stated: "He was on the passenger side." (Feb. 28, 2012 Tr. 458–59.) When asked if the passenger was wearing a seatbelt, Mr. Marino indicated that he did "not recall." (Feb. 28, 2012 Tr. 464.)

Officer Fitz Wallace testified that he works as a police officer with the Virginia Beach Police Department. (Feb. 28, 2012 Tr. 466.) Officer Wallace stated that he first came in contact with Crockett "[a]t Sentara Virginia Beach General Hospital Emergency Room" on December 28, 2008. (Feb. 28, 2012 Tr. 466.) Officer Wallace testified that when he saw Crockett, "[t]hey had cut his clothes away," and "the only thing that he had on was a pair of boxers." (Feb. 28, 2012 Tr. 467.) Officer Wallace also testified that he "noticed [Crockett] had a strong odor of alcoholic beverage on his breath." (Feb. 28, 2012 Tr. 468.) Officer Wallace indicated that he

spoke with Crockett about whether Crockett had consumed any alcohol that evening, and Crockett told Officer Wallace that "he had drank a forty." (Feb. 28, 2012 Tr. 469.) Officer Wallace testified that he spoke with Crockett regarding his involvement in a traffic accident, and that "[Crockett] said he didn't know anything about a traffic accident. He said he knew something about a traffic incident." (Feb. 28, 2012 Tr. 470.) When Officer Wallace asked Crockett what kind of car he drove, Crockett indicated that he drove a "1998 Honda Accord." (Feb. 28, 2012 Tr. 470.) When Officer Wallace asked if there was anything mechanically wrong with the vehicle prior to Crockett driving it that night, Crockett had "stated no." (Feb. 28, 2012 Tr. 470.)

Officer Wallace testified that he interviewed Crockett again, and at that time, he performed a series of field sobriety tests. (Feb. 28, 2012 Tr. 471.) After performing several field sobriety tests, Officer Wallace placed Crockett under arrest. (Feb. 28, 2012 Tr. 471–74.) Officer Wallace read Crockett his *Miranda* rights, and Crockett agreed to continue speaking with Officer Wallace. (Feb. 28, 2012 Tr. 474–75.) When Officer Wallace asked Crockett if there was anyone else in the vehicle with him, Crockett "stated no." (Feb. 28, 2012 Tr. 475.) When Officer Wallace asked Crockett if he knew "who Jack was," Crockett indicated, "[t]hat's my friend." (Feb. 28, 2012 Tr. 475.) Officer Wallace testified that he again asked if anyone else was in the car, and "[Crockett] continued to tell [him] no." (Feb. 28, 2012 Tr. 476.) Officer Wallace testified that when he asked whether Jack Korte had been in the vehicle with Crockett, Crockett "said yes." (Feb. 28, 2012 Tr. 476.) When Officer Wallace asked Crockett what he thought "Jack's condition was," Crockett stated that "[h]e should be in the same condition as [Crockett]." (Feb. 28, 2012 Tr. 476.) Officer Wallace told Crockett that Mr. Korte had not survived the accident, and Crockett responded "[t]hat figures." (Feb. 28, 2012 Tr. 476.) When asked if

Officer Wallace observed any injuries on Crockett's body that "would be consistent with him having been belted at the time of the accident or the time of impact," Officer Wallace indicated that he had not observe any such injuries. (Feb. 28, 2012 Tr. 491.)

Dr. Samantha Wetzler testified that she works as "a medical examiner for the Commonwealth of Virginia." (Feb. 28, 2012 Tr. 502–03.) Dr. Wetzler was qualified to testify as an expert in forensic pathology. (Feb. 28, 2012 Tr. 504.) Dr. Wetzler testified that she did not go to the crash scene because medical examiners do not go to the crash scene "unless [the police] think it's so confusing [she] wouldn't understand the injuries just by looking at the body." (Feb. 28, 2012 Tr. 505.) Dr. Wetzler testified that based on her examination, as well as her medical training and expertise, she determined that the cause of death for Jack Korte was "blunt trauma to the head, the chest, and the pelvis status post motor vehicle accident." (Feb. 28, 2012 Tr. 508.) Dr. Wetzler indicated that she recorded the personal effects that were with the body, and she did not find any money or other items in the pockets of the clothing that she received. (Feb. 28, 2012 Tr. 511.) When asked if the majority of the fatal injuries that Jack sustained were primarily on the right side, Dr. Wetzler stated: "Correct." (Feb. 28, 2012 Tr. 511.)

Dr. Les Edinboro testified that in December 2008 he worked as "the forensic toxicology supervisor for the Department of Forensic Science in Richmond, Virginia." (Feb. 28, 2012 Tr. 519.) Dr. Edinboro was recognized as an expert in the field of forensic toxicology. (Feb. 28, 2012 Tr. 520.) Dr. Edinboro testified that Crockett's blood alcohol content was "somewhere between .14 percent and .15 percent." (Feb. 28, 2018 Tr. 527.) Dr. Edinboro stated that he based this number on "a hospital blood draw." (Feb. 28, 2012 Tr. 531.) When asked if "one forty-ounce beer a couple hours prior" would "equate to a .14 or .15 percent BAC," Dr. Edinboro stated: "It would not." (Feb. 28, 2012 Tr. 527.) Dr. Edinboro explained: "That amount of

alcohol was equivalent to the alcohol that would be in at least two and a half forty-ounce beers."

(Feb. 28, 2012 Tr. 528.)

### 2.   Crockett's Defense at Trial – A Third-Party Driver

Steven Powell testified that he works as a private investigator.  (Feb. 29, 2012 Tr. 552.) Mr. Powell stated that he had worked as a private investigator for twenty years, and that prior to working as a private investigator, he worked for twenty years with the Norfolk Police Department.  (Feb. 29, 2012 Tr. 553.)  Mr. Powell stated that John Hooker, Crockett's prior counsel, hired him.  (Feb. 29, 2012 Tr. 554.)  Mr. Powell testified that as part of his investigative duties in this case, he interviewed a number of witnesses, including Mr. Daniels.  (Feb. 29, 2912 Tr. 554.)  When Mr. Powell asked Mr. Daniels what he had seen when he got to the crashed vehicle, Mr. Daniels had "said there was one person in the front seat and one guy in the backseat."  (Feb. 29, 2012 Tr. 557.)

William Pritchard testified that he works as "a licensed land surveyor in the Commonwealth of Virginia."  (Feb. 29, 2012 Tr. 560.)  Mr. Pritchard was received as an expert in survey.  (Feb. 29, 2012 Tr. 561.)  Mr. Prichard testified that he had surveyed "certain areas of Wolfsnare Road to determine whether one could see a traffic light at the intersection of Great Neck and Wolfsnare from the point of 2125 Wolfsnare Road."  (Feb. 29, 2012 Tr. 561.)  When asked if "from Cambridge Road [you can] see with the line of sight down to the stoplight at Great Neck and Wolfsnare," Mr. Pritchard responded:  "No, sir."  (Feb. 29, 2012 Tr. 564.)  Mr. Pritchard explained:

> Well, it's just the curvature of the road where it's taking a left -- there is no line of sight from here to here because of all the buildup and everything, the trees -- the street is taking like a twenty-two degree bend turn to take about an eleven degree bend back.  So it's what we call a reverse curve.

(Feb. 29, 2012 Tr. 565.)

Erick Smith testified that he works with Mr. Pritchard, and he worked as the project manager for the survey of whether "a traffic light could be seen down at the intersection of Wolfsnare and Great Neck." (Feb. 29, 2012 Tr. 571–72.) When asked about his confidence in the accuracy of the survey, Mr. Smith testified: "It is accurate to the standard -- the requirements from the [applicable standard]." (Feb. 29, 2012 Tr. 573.)

Officer Thomas Kellogg testified that he works as a police officer with the City of Virginia Beach. (Feb. 29, 2012 Tr. 574.) Officer Kellogg testified that he worked as the lead investigator for the accident that occurred on Wolfsnare Road on December 28, 2008, which involved Crockett. (Feb. 29, 2012 Tr. 575.) Officer Kellogg was shown renderings of the accident path, and when asked if one of the renderings showed "the car coming eastbound down Wolfsnare Road beginning to make a veer over to the westbound lane," Officer Kellogg responded: "Yes." (Feb. 29, 2012 Tr. 578–80.) When asked what the lines in one of the renderings were based on, Officer Kellogg stated: "Tire marks left from the car moving sideways. The vehicle actually goes over grass, over concrete of the driveway, back into the grass, and then comes to final resting against the tree." (Feb. 29, 2012 Tr. 580–81.)

Officer Jeff Menago testified that he works as a Master Police Officer with the City of Virginia Beach. (Feb. 29, 2012 Tr. 588.) Officer Menago testified that on December 28, 2008, he was assigned to the fatal accident crash team. (Feb. 29, 2012 Tr. 589.) Officer Menago stated that in terms of investigating the accident, "[he] operated the total station on the scene of that incident," which is "like an instrument, a theodolite data collector which shoots angles and distances to reproduce a scale diagram of the crash scene." (Feb. 29, 2012 Tr. 590.) When asked if he knew what instructions were given to the forensics team as to their work at the scene

of the accident, Officer Menago indicated that he did not, and that "[he] simply operated the theodolite." (Feb. 29, 2012 Tr. 591.)

Officer Forrest Godwin testified that he works as a police officer with the Virginia Beach Police Department. (Feb. 29, 2012 Tr. 593.) Officer Goodwin testified that on December 28, 2008, and December 29, 2008, he was assigned to the fatal crash team, and on these dates, he was involved in investigating a fatal accident on Wolfsnare Road. (Feb. 29, 2012 Tr. 593–94.) Officer Godwin stated that his role involved looking at the scene with Officer Kellogg and determining "what evidence there was to collect." (Feb. 29, 2012 Tr. 594–95.) When asked if upon inspection of the scene, Officer Godwin observed that the driver side window was open, Officer Goodwin stated: "Yeah. The window was opened as you see it there [in the photograph]." (Feb. 29, 2012 Tr. 598.) Officer Godwin also testified that the photographs of the scene showed that the driver's side airbag had deployed from the steering wheel. (Feb. 29, 2012 Tr. 601.) Further, Officer Godwin testified that another photograph depicted "a jacket of some sort" behind the car. (Feb. 29, 2012 Tr. 603.) When asked if the "airbag was cut out of the car so that it could be potentially processed," Officer Godwin, stated: "I don't know. My personal knowledge[;] I don't know." (Feb. 29, 2012 Tr. 605.)

Kevin Kelly testified that he works as a forensic technician with the City of Virginia Beach. (Feb. 29, 2012 Tr. 608.) Mr. Kelly testified that on February 12, 2009, he was asked to remove the driver's side airbag from a 1998 Honda Accord in relation to an accident that occurred on December 28, 2008. (Feb. 29, 2012 Tr. 608–09.) Mr. Kelly testified that after he removed the airbag, he "sealed [the airbag] up," and "brought it to Property and Evidence and vouchered it." (Feb. 29, 2012 Tr. 609.) When asked if he had received any instructions to have the airbag sent to the lab for testing, Mr. Kelly indicated that he had not been given such

instructions. (Feb. 29, 2012 Tr. 609–10.) Mr. Kelly also testified that when he removed the airbag, the car had been, and was in, an open air parking lot. (Feb. 29, 2012 Tr. 615–16.)

Karlene Carkhuff testified that she had known Crockett for "[a]pproximately thirteen to fifteen years." (Feb. 29, 2012 Tr. 617–18.) Ms. Carkhuff testified that Crockett's mother, Gail, was "like [Ms. Carkhuff's] sister." (Feb. 29, 2012 Tr. 619.) Ms. Carkhuff testified that on December 28, 2008, she was living in Maryland, but after she learned of the events of December 28, 2008, she came down to Virginia Beach. (Feb. 29, 2012 Tr. 618–19.) Ms. Carkhuff testified that on January 7, 2009, she and Ms. Crockett went to the police compound lot to recover property being held by the police. (Feb. 29, 2012 Tr. 619–20.) Ms. Carkhuff testified that she and Ms. Crockett went with Officer Kellogg to the vehicle on the compound lot, and she observed "a black wallet on the passenger seat rear of the car" and "a sweatshirt kind of rolled up like a pillow." (Feb. 29, 2012 Tr. 623.) Ms. Carkuff also observed a beer bottle in the "[p]assenger side front." (Feb. 29, 2012 Tr. 625.) Ms. Carkhuff stated that they "were not allowed to take anything from the inside of the cab of the vehicle, but [they] were allowed to take items that belonged to Cameron from the trunk, his personal effects, college books, karaoke mic. Basketball was in the car." (Feb. 29, 2012 Tr. 625–26.) When asked if there was any money or change in the car or any "recently purchased goods," Ms. Carkhuff indicated that there were no such items in the car. (Feb. 29, 2012 Tr. 627.) When asked if Crockett was a cigarette smoker or whether he typically wore his seatbelt, Ms. Carkhuff responded, "Never," to both questions. (Feb. 29, 2012 Tr. 629.)

Robert Bagnell testified that before he retired, he worked with the Portsmouth Police Department as a crime scene investigator for over fifteen years, and that before that position, he had worked as a detective in the military. (Feb. 29, 2012 Tr. 633–34.) Mr. Bagnell also testified

that he had been "certified by the Department of Criminal Justice Services as a subject matter expert on dealing with crime scene investigation, evidence recovery, crime scene and forensic photography." (Feb. 29, 2012 Tr. 635.) When asked "how an airbag is ordinarily processed at the scene," Mr. Bagnell stated:

> The airbag would be -- is very, very important because it's a DNA -- recovery for DNA. So you would take an airbag and you would preserve it in paper. I would also, if I had the ability to put a sheet of paper down, put the airbag on it, put a sheet of paper on top and roll it up in case there was any hairs and fibers from the activation on it. The airbag would then be in my sole care and custody, controlled. It would be packaged up and placed on a police voucher. And then it would be placed in Property and Evidence with request for a laboratory examination to go to the Department of Forensic Science Laboratory for testing for DNA to try to develop a DNA profile from it.

(Feb. 29, 2012 Tr. 639–40.) When asked at what point in time the airbag should be removed, Mr. Bagnell testified that it should be removed "[e]ither at the scene or very closely to the scene." (Feb. 29, 2012 Tr. 640–41.) Mr. Bagnell also testified that he would "want to go to the hospital" and document any injuries sustained by, or particulate matter on, the person who is the suspected driver. (Feb. 29, 2012 Tr. 642.) Mr. Bagnell testified that as part of the initial crime scene investigation, "once that vehicle is secured and moved to a location that you can safely process it as a crime scene, it should be processed." (Feb. 29, 2012 Tr. 643.) Mr. Bagnell explained that processing the crime scene means:

> Any type of evidence that would be in there. If I had any open containers in it, I would take those for evidence. If fingerprint and DNA evidence, the steering wheel, the gearshift knobs, I would look at those to see if they were good for DNA. If they were good for DNA, I would maybe take a sample from that. We call it touch evidence. Perhaps a surface that was smooth, it would be more viable for recovery of latent fingerprints. I would process that for latent fingerprints.

(Feb. 29, 2012 Tr. 643–44.) Mr. Bagnell stated that he would "also be looking for any type of blood or body fluid from the activation of an airbag or the collision itself so [he] could take the blood or body fluids which would be good for DNA analysis and getting a DNA profile to be

compared." (Feb. 29, 2012 Tr. 644.) When asked if he had any knowledge about what the officers knew when they responded to the accident scene, such as any statements by the defendant or statements from eyewitnesses, Mr. Bagnell indicated that he did not. (Feb. 29, 2012 Tr. 648–49.)

Joshua Reddy testified that on December 28, 2008, he was living with Kevin Rondorff in an apartment "[i]n Bancroft Hall" in Virginia Beach. (Feb. 29, 2012 Tr. 652, 654–55.) Mr. Reddy testified that on December 28, 2008, he and Mr. Rondorff hosted a party at their apartment. (Feb. 28, 2012 Tr. 656–57.) When asked how he knew Crockett, Mr. Reddy indicated that he had known Crockett since middle school. (Feb. 28, 2012 Tr. 657.) Mr. Reddy indicated that he also knew Jack Korte. (Feb. 29, 2012 Tr. 657.) Mr. Reddy testified that he saw Crockett and Mr. Korte arrive at the party and that he did not see any alcohol in their possession. (Feb. 29, 2012 Tr. 658.) Mr. Reddy testified that Crockett and Mr. Korte stayed at the party "[p]robably no more than half an hour to an hour," but he did not see them leave. (Feb. 29, 2012 Tr. 658.)

Mr. Reddy indicated that he also knew Jacob Palmer. (Feb. 29, 2012 Tr. 659.) When asked if Mr. Palmer was missing from the party at any point, Mr. Reddy stated: "I did not see him for about half an hour, maybe a little bit longer." (Feb. 29, 2012 Tr. 660.) When asked if the period of time that Mr. Palmer was missing could have been longer, Mr. Reddy stated: "It could have been, but I think it was under an hour." (Feb. 29, 2012 Tr. 660–61.) When asked if "Mr. Palmer express[ed] an intention to [Mr. Reddy] about going to the store," Mr. Reddy stated: "He asked me if I needed anything from the store." (Feb. 29, 2012 Tr. 662.) Mr. Reddy testified that he told Mr. Palmer that he did not need anything from the store. (Feb. 29, 2012 Tr. 662.)

When counsel asked Mr. Reddy if he saw Mr. Palmer leave with Crockett and Mr. Korte, Mr. Reddy indicated that he had not.  (Feb. 29, 2012 Tr. 664.)

When asked if "at some point later [Mr. Reddy was] in the back bedroom and Jacob [Palmer] came up to [him]" and "everybody was sort of confused because Jack and Cameron hadn't been back yet," Mr. Reddy stated:  "Right."  (Feb. 29, 2012 Tr. 664–65.)  When asked if "at some point [Mr. Reddy] [had] to verify that [he was] not driving the vehicle on the night of the accident" because the following day he had called in sick to work, Mr. Reddy responded, "Yes."  (Feb. 29, 2012 Tr. 666.)  Mr. Reddy indicated that he had called in sick because he was hungover.  (Feb. 29, 2012 Tr. 666.)  When asked if he was driving the vehicle, Mr. Reddy stated: "No, ma'am."  (Feb. 29, 2012 Tr. 666.)

Ammerrell Barretto testified that on December 28, 2008, she attended the party that was held at Josh Reddy's and Kevin Rondorff's apartment.  (Feb. 29, 2012 Tr. 671.)  Ms. Barretto indicated that she knew both Crockett and Mr. Palmer, but she had not known Jack Korte.  (Feb. 29, 2012 Tr. 670–71.)  When asked if she recalled that Mr. Palmer had come back to the party and it "was unusual when he came back," Ms. Barretto stated:  "Yeah.  He just seemed like -- he was asking about Cameron and Jack, if, you know, anyone had seen them or heard from them or -- and he just seemed really like weird and sketchy about it."  (Feb. 29, 2012 Tr. 672–73.)  Ms. Barretto also stated that "[h]e was breathing kind of heavy."  (Feb. 29, 2012 Tr. 673.)  When asked how long Mr. Palmer was gone from the party, Ms. Barretto indicated that she did not recall.  (Feb. 29, 2012 Tr. 674.)  When asked about her use of the word "sketchy" when describing Mr. Palmer's behavior, Ms. Barretto stated that "[i]t was just weird like how he was just asking about them."  (Feb. 29, 2012 Tr. 674.)

Officer Beth Coulling testified that she works as a "firefighter/medic with the City of Virginia Beach." (Feb. 29, 2012 Tr. 676.) Officer Coulling testified that on December 28, 2008, she worked at the fatal accident on Wolfsnare Road. (Feb. 29, 2012 Tr. 677.) Officer Coulling testified that at the accident scene, she was instructed to assist as Crockett was brought to the ambulance. (Feb. 29, 2012 Tr. 679.) Officer Coulling indicated that as the ambulance was travelling to the hospital, she asked Crockett some basic questions. (Feb. 29, 2012 Tr. 680.) Officer Coulling testified that "[h]e answered [her] questions when [she] asked him." (Feb. 29, 2012 Tr. 681.) When asked if Crockett was able to recall the accident, Officer Coulling stated: "To the best of my knowledge, my memory, I think he did. But he did ask a couple of times what had happened, things like that." (Feb. 29, 2012 Tr. 681.) When asked if these answers would be consistent with a head injury, Officer Coulling stated: "It is a potential, yes." (Feb. 29, 2012 Tr. 681.)

Dr. Christopher Maples testified that he works as an emergency medicine physician. (Feb. 29, 2012 Tr. 683.) Dr. Maples testified that on the night of December 28, 2008, and the early morning of December 29, 2008, he was employed as "a resident in emergency medicine" and he was practicing in Virginia Beach. (Feb. 29, 2012 Tr. 685.) Dr. Maples testified that on the night in question, he received "a patient by the name of Cameron Crockett." (Feb. 29, 2012 Tr. 685.) When asked if Dr. Maples observed any visible head injuries when examining Crockett, Dr. Maples stated that "[he] noted that [Crockett's] head was atraumatic, meaning there was no trauma that [Dr. Maples] could visualize." (Feb. 29, 2012 Tr. 689.) Dr. Maples also indicated that Crockett "had a normal exam of his neck," and there was no indication of "any particular impact or trauma or blunt trauma to the neck." (Feb. 29, 2012 Tr. 689–90.) When

asked if "there [were] any injuries consistent with [Crockett's] chest striking a steering wheel or an airbag or any blunt surface," Dr. Maples stated: "Not that I found." (Feb. 29, 2012 Tr. 691.)

Dr. Maples testified that Crockett "did have a laceration to the back of his left hand." (Feb. 29, 2012 Tr. 691.) Dr. Maples also testified that "there was some discussion as to whether or not [Crockett] had an altered level of consciousness, a decreased level of consciousness initially. All of it seemed to have quickly resolved by the time he got to the emergency room." (Feb. 29, 2012 Tr. 693.) With respect to any internal injuries, Dr. Maples stated that a CT scan of Crockett's abdomen and pelvis revealed "a small right pulmonary contusion," which is "a bruise on the lung." (Feb. 29, 2012 Tr. 694.) Dr. Maples also stated that Crockett had "pneumothorax," explaining that Crockett "had a very small one on the left side of his lung, which is really air in the lung where it doesn't belong." (Feb. 29, 2012 Tr. 694.) Dr. Maples agreed that this was "consistent with a traumatic injury being in an automobile, being thrown about." (Feb. 29, 2012 Tr. 695.) Dr. Maples also agreed that when evaluating whether Crockett had head trauma, he had reported that Crockett "follows all commands, alert and appropriate," and that Crockett's "mood, memory, affect, and judgment [were] normal." (Feb. 29, 2012 Tr. 698.) When asked if "someone [can] have amnesia for an event and still be alert and follow commands," Dr. Maples responded: "Yes." (Feb. 29, 2012 Tr. 698–99.)

Dr. Reuben Koller testified that he works as a clinical psychologist. (Feb. 29, 2012 Tr. 701.) Dr. Koller testified that he specializes in "[b]ehavioral medicine and forensic psychology." (Feb. 29, 2012 Tr. 702.) When asked if his work included the "evaluation of the memory and recollection of an individual who's been in a traumatic event," Dr. Koller stated: "Yes." (Feb. 29, 2012 Tr. 703–04.) Dr. Koller was tendered, without objection, "as an expert in the field." (Feb. 29, 2012 Tr. 705.) Dr. Koller indicated that he had not examined Crockett in person, and

had not formed "any specific opinions or specific diagnosis with respect to him as an individual." (Feb. 29, 2012 Tr. 705.) Dr. Koller agreed that "[i]f someone has undergone the experience of a traumatic event," it can "affect their memory and recall for that event." (Feb. 29, 2012 Tr. 707.)

Helen Gornto testified that she works as "loss prevention for the Shell station" located "at Great Neck Road and First Colonial." (Feb. 29, 2012 Tr. 709.) Ms. Gornto testified that on December 28, 2008, which was a Sunday, the Shell station operated "from 7:00 a.m. to 11:00 p.m." (Feb. 29, 2012 Tr. 711.) Ms. Gornto stated that if anyone had gone to the Shell station after 11:00 p.m. that day it would have been closed. (Feb. 29, 2012 Tr. 711.) When asked if on December 28, 2008, the Shell station sold "cigarette rolling papers or so-called blunt rolling papers," Ms. Gornto stated: "Yes, we did." (Feb. 29, 2012 Tr. 711–12.)

Will Von Stein testified that he works as "the manager at Beach Robo, Inc.," which is "located at 2456 Virginia Beach Boulevard." (Feb. 29, 2012 Tr. 715.) Mr. Von Stein testified that the store operates "24/7" and that the store had those same hours on December 28, 2008. (Feb. 29, 2012 Tr. 716.) Mr. Von Stein also testified that the store carries "blunt wrappers for rolling of blunt cigarettes," and that these products were available on December 28, 2008. (Feb. 29, 2012 Tr. 716–17.)

Next, Crockett testified on his own behalf. (Feb. 29, 2012 Tr. 718.) When asked about the year, make, and model of the vehicle involved in the accident, Crockett stated that it was a "1998 Honda Accord. It was a coupe, two door." (Feb. 29, 2012 Tr. 722.) When asked if he was the driver of the car at the time of the accident, Crockett stated: "Absolutely not." (Feb. 29, 2012 Tr. 723.) Crockett stated that on Sunday, December 28, 2008, he and Jack had played basketball in the afternoon, and later that same day, around 8:00 pm. or 9:00 p.m., Crockett "picked [Jack] up at his house." (Feb. 29, 2012 Tr. 725–27.) Crockett stated he and Jack

planned "[t]o hang out at [Crockett's mother's] house." (Feb. 29, 2012 Tr. 727.) Crockett testified that "[j]ust past 10:00," he and Jack left the house, explaining:

> Well, we had thought when we'd gotten to the house my mother was asleep because it was a Sunday. It was a work night for her. We were in my room, and we had just each opened a bottle of Steel Reserve forty-ounce malt liquor bottles. And we heard her door open and she was outside. So at that juncture we didn't want to get caught drinking at my house and decided to go somewhere else.

(Feb. 29, 2012 Tr. 728.) Crockett stated that he and Jack then went to Kevin Rondorff's apartment. (Feb. 29, 2012 Tr. 729.) When asked about the alcohol percentage of a Steel Reserve beer, Crockett stated: "It's more than usual. I'm pretty sure it's between seven and eight percent." (Feb. 29, 2012 Tr. 729.) Crockett stated that he had "[a] couple of sips" before he left his mother's house. (Feb. 29, 2012 Tr. 230.) Crockett testified that when he and Jack arrived at Mr. Rondorff's apartment, he and Jack sat and talked in the parking lot for "about a half an hour or forty-five minutes," and they were "speed drinking or chugging while [they] were in the car." (Feb. 29, 2012 Tr. 731–32.) Crockett stated that he and Jack each had one forty-ounce Steel Reserve bottle, and they split a third bottle. (Feb. 29, 2012 Tr. 732.)

When asked about Jacob Palmer, Crockett stated: "He's a friend of mine. I coached him in basketball, I believe the year before this incident." (Feb. 29, 2012 Tr. 733.) Crockett testified that he received a text from Mr. Palmer at 10:45 p.m. (Feb. 29, 2012 Tr. 735–36.) Crockett responded to Mr. Palmer as follows: "I told him that we were there, and I asked him to come down to show us which apartment exactly it was." (Feb. 29, 2012 Tr. 736.) When asked how long Crockett had stayed at the party, Crockett stated: "Not very long at all. I would say anywhere in the vicinity of five to fifteen minutes. Probably closer to ten." (Feb. 29, 2012 Tr. 739.) Crockett testified that Mr. Palmer initiated a conversation "about smoking a blunt."

(Feb. 9, 2012 Tr. 741.)  Crockett stated that Mr. Palmer had marijuana.  (Feb. 29, 2012 Tr. 741.)

When asked if either he or Jack had any money, Crockett stated: "No."  (Feb. 29, 2012 Tr. 741.)

Crockett testified that they decided to get blunt papers for the marijuana, and Crockett

"told [Mr. Palmer] to take [Crockett's] car and use [Crockett's] gas as [Crockett's and Mr.

Korte's] contribution to the blunt."  (Feb. 29, 2012 Tr. 742.)  When asked why Crockett did not

drive his own car, Crockett stated:  "I knew I was too intoxicated to drive and so was Jack."

(Feb. 29, 2012 Tr. 743–44.)  When asked if "from this point on do you have an uninterrupted

specific and coherent memory of all the events that occurred between that point and when you

were in the hospital," Crockett responded:  "No, it's not entirely coherent."  (Feb. 29, 2012

Tr. 744.)  Crockett stated that after he gave the car keys to Mr. Palmer, "the next real coherent

memory [he has] is actually waking up in the hospital on the gurney as Officer Wallace told us

and being -- conducting an interview with him at 12:17 a.m. that night."  (Feb. 29, 2012 Tr. 744.)

Crockett testified that between "holding the keys out and the time of waking up in the

emergency room," he has three pieces of memory, which came back to him in the weeks after his

release from the hospital.  (Feb. 29, 2012 Tr. 745.)  First, Crockett stated:

> My mother and I were driving back from Old Dominion. . . .  And at that point we
> were on Great Neck Road, and we went back down towards our house.  And we
> passed the light at Great Neck and Wolfsnare, at which point, just looking at it, you
> know, it struck me almost kind of like a flashback.  And I remembered going the
> other way, actually going towards the Boulevard in this memory, Virginia Beach
> Boulevard, and I'm sitting in the backseat angled like this somewhat towards Jack.
> So I'm looking and talking -- looking at and talking to Jack in the backseat, not
> necessarily in any one seat, more like in the center towards the right because I
> wasn't seatbelted.  I was just kind of sitting back there.  And I remember looking
> down at my phone and texting and not being able to really see what I was texting.
> And I remember looking up and seeing that light, that same light at Great Neck and

Wolfsnare. We were stopped there. And the driver asked us, Jack and I, Where you guys trying to go, then? I remember those words very specifically.

(Feb. 29, 2012 Tr. 746–47.) When asked "if you had gone to the Shell station to get blunt wrappers at eleven o'clock that night -- or after eleven -- . . . and it was closed and you were going to the Robo or Citgo on Virginia Beach Boulevard, would you have taken the Great Neck Road route that you've just mentioned," Crockett responded: "Yes. We would have gone all the way up on Great Neck and taken a right at the Boulevard." (Feb. 29, 2012 Tr. 747.) Next, Crockett testified:

> Almost immediately after I was -- obviously I was pretty shocked at being struck with a flashback of that nature. And I was thinking more and more about it, and I was deep in my own mind and thinking more and more about it trying to unfold the events to see if I could remember anything after having been struck with that. And I had a very similar memory. I'm essentially seated in the same position in the backseat in the center towards the right with that same angle, towards Jack. And I remember doing the same thing, looking down and texting and feeling intoxicated and not being able to read it very easily. At that point I remember looking out to my left and seeing that we were parked. And I recognized where we were. It was the Beach Robo, what is now known as the Citgo gas station. I remember looking out and seeing the gas pumps to my immediate left and seeing the tiny little store they have there. You can't actually walk in it and purchase things. It's a little window. And I remember seeing that and then turning back and talking to Jack briefly.

(Feb. 29, 2012 Tr. 747–48.) When asked if the "Robo or Citgo station [was] a second choice place that [he] had used before to buy blunt wrappers," Crockett stated: "Yes. Because it was open twenty-four hours a day. It was convenient for the fact that the Shell had been closed." (Feb. 29, 2012 Tr. 748.)

When asked if he "ever saw the face of the driver that is driving in these memories," Crockett stated:

> No. Because things that I'm looking at -- well, in the first one, I'm angled towards Jack; so I see part of the person's body, but his face is looking forward. And I'm not looking at him, so I can't see his face. And in the second one the driver's not in the car. I'm assuming he's outside. I couldn't see anyone, and I'm

just looking out halfway intoxicated and recognizing where I was.  So I couldn't
see the face at that point either.

(Feb. 29, 2012 Tr. 748–49.)  When asked "who is the last person you offered your keys to before

you left [the apartment]," Crockett responded:  "Jacob Palmer."  (Feb. 29, 2012 Tr. 749.)

Crockett testified that his text records from the night in question "corroborate and confirm" that

he was texting at the times from his memories.  (Feb. 29, 2012 Tr. 749.)  Crockett stated that

between 11:06 p.m. and 11:12 p.m., his text records show that four text messages went back and

forth, explaining that "[he] had initiated the first text, a text came back in to [him], [he] sent one

back out, and [he] [has] the last one in at 11:12."  (Feb. 29, 2012 Tr. 750–51.)

> Crockett testified that the third memory is "not quite as clear as the other two," stating:

> > Well, essentially this memory is actually before we physically got in the car
> > and left the party.  Jack and myself were on the passenger side of the car, and I
> > remember someone asked me for a jacket, although I can't say who.  I don't
> > remember the person's face.  And I also remember telling Jack to take the front seat
> > because he was taller than me.  And being a two-door coupe, I was trying to
> > accommodate him with his height.

(Feb. 29, 2012 Tr. 751–52.)  Crockett stated that he had "multiple jackets and sweatshirts" in his

car, and "[m]ost of the clothing was in [his] trunk."  (Feb. 29, 2012 Tr. 752.)  When asked if he

remembered giving the person a jacket, Crockett stated:  "Not physically handing it to anyone,

no."  (Feb. 29, 2012 Tr. 752.)  After being shown a photograph of the accident scene that

depicted an item behind the car, Crockett explained that the item was "a jacket of [his]."  (Feb.

29, 2012 Tr. 752.)  When asked if he remembers wearing that jacket on the night in question,

Crockett stated:  "No."  (Feb. 29, 2012 Tr. 753.)  When asked if the jacket is the one "[he]

believe[s] [he] gave to someone else who asked for one," Crockett responded:  "Yes, sir."  (Feb.

29, 2012 Tr. 753.)

When asked about the "first thing" that Crockett recalled when his memory picks up at the emergency room, Crockett stated:

> It was really kind of shocking in the memory considering that I had no recollection of the events immediately prior to that. I remember waking up on the gurney being in that C collar that he explained and really being restricted as far as movement is concerned. I remember feeling pain in the right side of my ribs.

(Feb. 29, 2012 Tr. 758.) Crockett also stated: "I remember Officer Wallace telling me he's going to conduct an interview. That was more or less immediately after this memory picks up." (Feb. 29, 2012 Tr. 759.) When asked about the "state of [his] mental faculties in terms of clearness of memory at that time," Crockett stated: "I didn't even know why I was in the hospital at the time, much less why an officer was speaking to me at that time." (Feb. 29, 2012 Tr. 759.) Crockett explained that Officer Wallace had asked questions about Crockett's vehicle, which triggered Crockett into thinking that something had happened with a car. (Feb. 29, 2012 Tr. 761.) When asked if Crockett's statements to Officer Wallace – such as Crockett stating, "I mean, did I hit someone, or -- I mean?" – were meant to convey that he was driving the car, Crockett responded:

> No, I was not. I was trying to find out what happened because, as you read, I asked him numerous times, I was in an accident? I was in an accident? In what sense? I was trying to find out what had transpired, and he wouldn't tell me. So I just threw a guess out, I mean, did I hit someone? Did I, you know, did I hit something? I didn't know what the deal was, so I was trying to find out from him the nature of the accident.

(Feb. 29, 2012 Tr. 763–64.) When asked why Crockett told Officer Wallace that nobody was in the car with him, Crockett stated: "I couldn't even recall the accident; therefore, I could not tell who was with me. I said there's no one with me because I didn't know what had happened. I didn't know who was with me at that juncture." (Feb. 29, 2012 Tr. 764–65.)

When asked about the statements that he had made after he was put under arrest for DUI regarding the fact that no one was in the vehicle with him, Crockett indicated that at that point, he still did not have any recall as to what had happened. (Feb. 29, 2012 Tr. 765.) When asked about his statement – "That figures" – upon learning that Jack had died in the accident, Crockett stated: "Well, I remember rolling over in the hospital bed when he told me that to face against him before I said it. And I remember saying it because it figured I'd be left here and Jack would be the one to pass." (Feb. 29, 2012 Tr. 768.)

When asked about the wallet that Ms. Carkhuff described as being in the backseat, Crockett indicated that it was his wallet. (Feb. 29, 2012 Tr. 769.) When asked if he had his wallet with him that night, Crockett stated: "Yes." (Feb. 29, 2012 Tr. 769.) Crockett indicated that at a later time, he was permitted to look inside the wallet, and there was no money in the wallet. (Feb. 29, 2012 Tr. 770.) When asked if there was "any money in it when you were at Bancroft Hall [at the party]," Crockett responded: "I had no money on me." (Feb. 29, 2012 Tr. 770.)

Crockett testified regarding his cell phone records, Mr. Palmer's cell phone records, and Mr. Korte's cell phone records. Crockett testified that he received a text message and a phone call from Mr. Palmer at 10:45 p.m., and this "was when [Mr. Palmer] was trying to ascertain [Crockett's and Mr. Korte's] whereabouts to see if [they] were at the party yet." (Feb. 29, 2012 Tr. 777–78.) Crockett also testified that there is an outgoing text message from Mr. Palmer's cell phone to Mr. Reddy's cell phone at around 11:06 p.m. or 11:07 p.m. (Feb. 29, 2012 Tr. 778–79.) Crockett indicated that as far as he knew, at 11:06 p.m., he had left the party because "the maximum amount of time [Crockett and Mr. Korte] stayed was fifteen minutes and [Crockett] arrived at 10:50." (Feb. 29, 2012 Tr. 778.) Crockett testified that at 11:43 p.m., Mr.

Rondorff texted Mr. Palmer. (Feb. 29, 2012 Tr. 779.) Crockett also testified that at 11:19 p.m., there was a phone call from Mr. Palmer to Crockett. (Feb. 29, 2012 Tr. 781.) Further, Crockett testified that "[he] believe[s] at 11:25 p.m. the records read, which is also a call from Palmer to [Crockett]." (Feb. 29, 2012 Tr. 781.) Crockett stated that there was another call from Palmer to him at 3:10 a.m. (Feb. 29, 2012 Tr. 782.) Additionally, Crockett testified that at 12:02 a.m., Mr. Palmer texted Mr. Rondorff; at 12:54 a.m., Mr. Reddy called Mr. Palmer; and at 2:06 a.m., Mr. Palmer called Mr. Rondorff. (Feb. 29, 2012 Tr. 786.) Crockett also testified that there were two calls from Mr. Palmer to Mr. Reddy at 3:19 a.m. (Feb. 29, 2012 Tr. 786.) Crockett stated: "The final text is at 6:29 in the morning from Palmer to myself." (Feb. 29, 2012 Tr. 787.)

Crockett testified that on January 8, 2009, the day after he was released from jail, he had a meeting with Mr. Palmer. (Feb. 29, 2012 Tr. 788.) When asked what Crockett had told Mr. Palmer in response to any questions or comments from Mr. Palmer, Crockett stated: "Well, I told him that someone else was driving my car." (Feb. 29, 2012 Tr. 791.)

When asked if he smoked cigarettes, Crockett stated: "No, sir." (Feb. 29, 2012 Tr. 798.) Crockett indicated that he knew that Mr. Palmer smoked cigarettes, that Mr. Palmer typically smoked "Pall Mall" cigarettes, and that the color of the box was "[b]lue typically." (Feb. 29, 2012 Tr. 799.) When asked about a text message between himself and Mr. Korte, in which Crockett stated, "Word. Rondo said ten. Shall two pregame and scoop another," Crockett agreed that the word "pregame" typically means "drinking before actually getting to the party," but "[i]t depends on who you're asking. People have different definitions for it." (Feb. 29, 2012 Tr. 803.) Crockett explained that "scoop another" meant picking up Mr. Korte. (Feb. 29, 2012 Tr. 804.) When asked if "two pregame" meant "two pregame beers," Crockett stated: "I don't know what pregaming a beer means." (Feb. 29, 2012 Tr. 804.) When asked if in the text

messages, Crockett referred to himself as "one," Crockett responded: "Yes." (Feb. 29, 2012 Tr. 805.)

When asked how long after the accident he had his memory flashes, Crockett testified that "[i]t was about two or three weeks later." (Feb. 29, 2012 Tr. 805.) When asked if he had any flashbacks when he met with Mr. Palmer on January 8, 2009, Crockett stated: "Not flashbacks. But by that point in time I had recalled, as Mr. Sacks described it, the coherent memory of offering him my keys." (Feb. 29, 2012 Tr. 806.) When asked whether Crockett got the alcohol that he and Mr. Korte were drinking before or after he picked up Mr. Korte, Crockett stated: "I believe it was afterwards on a route to my house." (Feb. 29, 2012 Tr. 809.) When asked about prior testimony in which Crockett had indicated that he and Mr. Korte thought they were "invincible," Crockett stated: "Not literally speaking; but yes, we thought we were more or less above -- . . . . reality." (Feb. 29, 2012 Tr. 815.) When asked if feeling invincible meant "not capable of being hurt, not capable of being harmed, not capable of being in trouble," Crockett responded: "Not necessarily that. I mean, to an extent, yes. But for the most part we just felt that we were above reality to a certain extent. Jack and I frequently had, you know, conversations and we thought that we were just kind of a breed apart." (Feb. 29, 2012 Tr. 815–16.)

When asked whether at the hospital, he had asked Officer Wallace "where it happened" or "if Jacob Palmer was okay," Crockett responded: "No. Because I did not recall at the time that anyone was with me." (Feb. 29, 2012 Tr. 816–18.) When asked if Crockett had accused Mr. Reddy of being the driver of the car, Crockett stated: "I personally did not accuse Josh Reddy, no." (Feb. 29, 2012 Tr. 818–19.)

**B.    Crockett's New Evidence of Innocence[8]**

      **1.    Counsel's Conversation with Pamela Gillespie and the Affidavit of Pamela Gillespie**

In support of Crockett's actual innocence claim, he first discusses (i) counsel's notes regarding a conversation with Pamela Gillespie, a juror from Crockett's first trial ("Juror Gillespie"), which ended in a mistrial after the jury failed to reach a consensus at the sentencing phase of the trial, and (ii) an affidavit from Juror Gillespie.  (ECF No. 1–1, at 27 (citing State Habeas Exs. 145, 419).)

Counsel's notes regarding his conversation with Juror Gillespie are dated June 11, 2011. (State Habeas Ex. 145, at 1.)  Counsel's notes are handwritten and consist of sentence fragments describing his conversation with Juror Gillespie.  (*Id.*)  Due to the cursory nature of these notes, and the fact that the handwriting is difficult to decipher, the Court does not attempt to summarize the notes here.  In Juror Gillespie's affidavit, she states:

> 1.    I, Pamela Gillespie, served as a juror on Cameron Crockett's 2011 involuntary manslaughter trial.
> 2.    After we could not arrive at a unanimous agreement regarding Mr. Crockett's sentence, we were discharged from service.
> 3.    Following this discharge, I could not sleep at night not knowing what happened afterwards or what might have happened to Mr. Crockett.  I felt

---

[8] In his Memorandum in Support of his § 2254 Petition, Crockett references the exhibits discussed in this section.  The Court has reviewed these exhibits, and in discussing the exhibits, the Court refers to each exhibit by the number assigned in the Circuit Court's state habeas proceeding ("State Habeas Exhibit").  The State Habeas Exhibits are in twenty-two bound volumes in the state court records, and here, Crockett submitted electronic copies of his State Habeas Exhibits on a CD, which he identifies as "Disc One."  (ECF No. 1–2, at 1 (explaining that Disc One includes copies of the "[S]tate [H]abeas [E]xhibits (435 in all").)  The State Habeas Exhibits are not paginated; however, the Court includes citations to page numbers by designating the first page of each exhibit as page one and counting each subsequent page. Crockett also submitted exhibits with his present § 2254 Petition ("Federal Habeas Exhibits") on a CD, which he identifies as "Disc Two."  (*See id.*)  Additionally, Crockett attached several additional exhibits to his Response to Respondent's Motion to Dismiss.  (ECF Nos. 19–1 through 19–5.)  The Court has reviewed all of the materials in the record, and the Court's determinations in this action are based on the Court's thorough review of the record.  *See Finch*, 914 F.3d at 298 (district court *must* consider "all the evidence" regardless of its admissibility).

horrible about how everything went and I had residual doubt about the young man's guilt. I decided to call Mr. Sacks, Cameron's attorney, not long after we were discharged to see what had happened.

4.     During this conversation, I gave Mr. Sacks some insight into our deliberative process. I told Mr. Sacks that the jury really struggled, but that ultimately, Mr. Crockett's statement to police was *the* determining factor in our verdict of guilty. As soon as we heard Mr. Crockett ask if he had hit someone, it was as if a light switch went off. Prior to that, we were leaning the other way.

5.     We were also somewhat concerned about the fact that no evidence whatsoever was presented as to the cause of the accident. All we knew was that the road was wet and the driver lost control of the vehicle.

6.     All of the above statements are true, honest, and correct.

(State Habeas Ex. 419, at 1–2.) The affidavit, dated October 14, 2015, is notarized, and includes the following notary's oath: "This day personally appeared before me, the undersigned Notary Public in and for Virginia Beach, Virginia, Pamela Gillespie, who after first being duly sworn, deposed and said that the facts contained in the foregoing instrument are true and correct." (*Id.* at 2.)

Crockett argues that "[Juror] Gillespie's affidavit shows that the case was quite close in the jury's eyes," and "[a]ccording to her recollection of the deliberations, it was Mr. Crockett's statements to police that sank the defense in 2011." (ECF No. 1–1, at 27–28.) Crockett claims that "[w]ere it not for their admission into evidence, the first jury would have acquitted Mr. Crockett." (*Id.* at 28.) However, despite Crockett's arguments regarding his likely acquittal in his first trial, Crockett fails to articulate, and the Court fails to discern, how Crockett is able to conclude from *one* juror's statements that the entire jury would have acquitted him.

Furthermore, as noted above, the Supreme Court has explained that to be credible, three types of "new reliable evidence" may support a petitioner's allegations of innocence. *Schlup*, 513 U.S. at 324. These include "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Id.* Juror Gillespie's

affidavit and counsel's notes regarding his conversation with Juror Gillespie do not constitute any of the three above-listed types of evidence.

### 2. "Crockett's Known Habit of Letting Others Drive His Car While He Was Intoxicated"

As support for his actual innocence claim, Crockett next contends that "[s]everal years prior to the accident, Mr. Crockett received a citation in Virginia Beach for underage possession of alcohol," and "[h]e received this ticket under circumstances that, ironically, reflect just how plausible it is that he let someone else drive his car on the night of the accident." (ECF No. 1–1, at 28 (citing State Habeas Ex. 1, at 7).) Crockett references his own affidavit as support for this assertion.

As relevant to Crockett's assertion regarding the similarities of the two incidents, in his affidavit, he states:

> The only criminal charge of which I had been convicted (excepting traffic violations) prior to this incident was a misdemeanor underage possession of alcohol charge. To the best of my recollection, this happened in 2006. I believe my mother still has the canary carbon copy of the summons issued to me from this matter. I was issued this ticket in relation to an incident in which a friend of mine, Brandon Liptak, was pulled over on Independence Boulevard near the hospital for driving errantly. Importantly, he was driving my car as I was in the backseat. Much like on December 28, 2008, I had given him my keys because while I was intoxicated, he had only consumed, if I recall correctly, one beverage. My friends Parker Young and Ashlynn Cannon were also in the car at this time and all of us received tickets. I had never been arrested prior to December 29, 2008 and had certainly never been in police custody before.

(State Habeas Ex. 1, at 7.) The affidavit is dated April 1, 2016. (*Id.* at 20.) The affidavit is notarized, and includes the following notary's oath: "This day personally appeared before me, the undersigned Notary Public in and for Tazewell County, Virginia, Cameron Crockett, who after first being duly sworn, deposed and said that the facts contained in the foregoing instrument are true and correct." (*Id.*)

With respect to this portion of Crockett's affidavit, in his Memorandum in Support of his § 2254 Petition, he contends:

> Granted, the nature of this juvenile offense doesn't exactly paint a pretty picture of Mr. Crockett's partygoing behavior as a youth, but that is not what matters here. What matters is how this incident clearly shows the way Crockett routinely acted whenever he had a chance to drive drunk: he chose the less reckless option of letting a clearer-headed friend drive his car instead.

(ECF No. 1–1, at 28.)

As an initial matter, Crockett's affidavit does not qualify as the sort of new reliable evidence described by the Supreme Court. *See Schlup*, 513 U.S. at 324; *Perry v. Virginia*, No. 3:13CV327–HEH, 2013 WL 4590619, at *4 (E.D. Va. Aug. 28, 2013) (concluding that defendant's post-conviction declaration of innocence could not support a claim of actual innocence); *McGivery v. Johnson*, No. 3:10CV455–HEH, 2011 WL 1838874, at *5 (E.D. Va. May 13, 2011). To accept such commonplace self-serving statements and declarations of innocence would ignore the Supreme Court's admonition that the quality of evidence necessary to support a claim of actual innocence "is obviously unavailable in the vast majority of cases." *Schlup*, 513 U.S. at 324; *see Calderon*, 523 U.S. at 559 (emphasizing that new reliable evidence of innocence is a "rarity").[9] Crockett fails to articulate, and the Court fails to discern, how Crockett is able to conclude from *one* instance in which he allowed someone else to drive his car when he was drunk that this is "the way Crockett *routinely* acted whenever he had a chance to drive drunk." (ECF No. 1–1, at 28 (emphasis added).).

---

[9]  Moreover, Crockett was aware of this prior conviction throughout his first and second trials, thus it is not new information. *Cf. United States v. Lawhorne*, 29 F. Supp. 2d 292, 304–05 (E.D. Va. 1998) ("[e]ven if the defendant is in possession of the evidence before trial, but does not realize its relevance, the result is the same: the evidence is not 'newly discovered'").

### 3. Possible Testimony from Defense Witnesses Josh Reddy and Ammerrell Barretto

Next, Crockett contends that "[w]hen trial counsel questioned defense witnesses Josh Reddy and Ammerrell Barretto at trial, he neglected to elicit testimony from each of them that was important in the context of what they had told the jury." (ECF No. 1–1, at 29.)

Crockett claims that "Reddy had given a pre-trial interview in which he clarified that when Jacob Palmer approached him at the party to ask if he needed anything from the store, Reddy saw him walk over from where Mr. Crockett and Mr. Korte were standing." (*Id.* (citing State Habeas Ex. 389).) Crockett also claims that "[t]his would have further tended to establish that Crockett, Korte, and Palmer were all having a conversation about going to the store at that time as Crockett testified." (*Id.*)

State Habeas Exhibit 389, which Crockett cites as support for his claim regarding Mr. Reddy's possible testimony, consists of the defense investigator's notes from interviews with Mr. Reddy. (State Habeas Ex. 389, at 1–3.) Mr. Reddy did not provide the statements under oath. (*See id.*) The defense investigator reported that Mr. Reddy had stated that he and Kevin Rondorff shared a condo, and that they had held a party on the night in question at their condo. (*Id.* at 1.) The investigator also reported the following:

> Josh said he did not have any injuries as some rumors had suggested. He said that rumor was all out of whack. He said Jacob asked him if he needed anything from the store, that Cameron and Jack were going. He did not see Jacob Palmer go with Cameron and Jack. He did not see who got in the car when they left. He did not see Cameron or Jack with any drinks. He could not recall Jacob's whereabouts around the time of the accident. He said he did not know about the accident until the next day at noon on the news. The night of the party Josh said Palmer was texting him and calling both Josh and Kevin. He was not sure what the texts or phone calls were about and said he did not see Jacob at the party at the time of those texts and phone calls were made.

(*Id.* at 1–2.)  When asked why "Palmer [was] texting [him] or calling [people] at the party," Mr. Reddy stated:  "I don't know.  Maybe because we could not hear with the noise.  Kids do that at parties."  (*Id.* at 2.)

Additionally, Crockett claims that "with Barretto, she had given an interview in which she stated that she heard Palmer say he was 'going for a smoke' just before he left the party." (ECF No. 1–1, at 29 (citing State Habeas Ex. 385).)  Crockett argues that "[o]bviously, this would have strongly corroborated Crockett's testimony that they all left the party to smoke a blunt together."  (*Id.*)  State Habeas Exhibit 385, which Crockett cites for his claim regarding Ms. Barretto's possible testimony, consists of the defense investigator's notes from an interview with Ms. Barretto.  (State Habeas Ex. 385, at 1–2.)  Ms. Barretto did not provide her statements under oath.  (*See id.*)

In Ms. Barretto's interview with the defense investigator, the investigator reported, *inter alia*:

> She stated that she heard someone say that Jacob Palmer wanted to go to the store called Robo Station but did not know why he wanted to go.  This was the time she said when Cameron and Jack left.
> 　　Palmer told Kevin that he was going out for a smoke.  She said he was gone for an unusual amount of time and that when he came back Kevin asked him what took him so long to smoke.  She did not see Palmer leave nor did she see Cameron and Jack leave.  When Palmer returned to the party he was asking where Cameron and Jack were.  Did anyone see them.  Ammerell said that Kevin told her he thought Jacob went with Cameron and Jack to the store although he did not see them leave.

(*Id.*)

As an initial matter, the statements of Mr. Reddy and Ms. Barretto to which Crockett refers are from the defense investigator's interview summaries and there is no indication that the statements were made under oath, let alone penalty of perjury.  *See Price v. Rochford*, 947 F.2d 829, 832 (7th Cir. 1991) (refusing to consider documents verified in such a manner to avoid the

penalty of perjury); *Hogge v. Stephens*, No. 3:09CV582, 2011 WL 2161100, at *2–3 & n.5 (E.D. Va. June 1, 2011) (treating statements sworn to under penalty of perjury, but made upon information and belief, as "mere pleading allegations") (quoting *Walker v. Tyler Cty. Comm'n*, 11 F. App'x 270, 274 (4th Cir. 2001)).

Furthermore, setting aside issues regarding the reliability of this evidence, Crockett misstates the information contained in State Habeas Exhibits 389 and 385. Specifically, Crockett argues that Mr. Reddy's pre-trial statements support Crockett's trial testimony, stating that "Crockett, Korte, and Palmer were all having a conversation about going to the store at that time." (ECF No. 1–1, at 29.) However, Crockett neglects to mention that the pre-trial interview notes reflect that Mr. Reddy also stated that "Jacob asked him if he needed anything from the store, that Cameron and Jack were going. He did not see Jacob Palmer go with Cameron and Jack." (State Habeas Ex. 389.) Rather than support Crockett's innocence claim, such a statement tends to show Crockett's guilt because Mr. Reddy reported only that Mr. Palmer had indicated "Cameron and Jack were going" to the store, not Mr. Palmer. (*See id.*)

Similarly, with respect to Ms. Barretto's statements, Crockett concludes that because Ms. Barretto heard Palmer say he was "going for a smoke," "[o]bviously, this would have strongly corroborated Crockett's testimony that they all left the party to smoke a blunt together." (ECF No. 1–1, at 29 (citing State Habeas Ex. 385).) However, such a conclusion is *not* obvious because Ms. Barretto indicated only that "Palmer told Kevin that he was going out for a smoke." (State Habeas Ex. 385.) There is no indication as to whether Mr. Palmer intended to smoke a cigarette or marijuana, and there is no indication that Mr. Palmer intended to smoke with any other individuals. (*See id.*) As such, Crockett's arguments regarding the potential testimony of Mr. Reddy and Ms. Barretto does not significantly bolster his actual innocence claim.

### 4. "Palmer's Reckless Driving Habits and History of Escaping Trouble by Hiding Out in the Wolfsnare Woods"

Crockett claims that "[a]t one point during the pretrial investigation, the defense stumbled across evidence regarding Jacob Palmer's driving habits on Wolfsnare Road." (ECF No. 1–1, at 29.) Crockett claims that "[o]ne Mr. Griff, a retired Virginia Beach Sheriff's Deputy, remembered Jacob Palmer specifically because he had a penchant for speeding on Wolfsnare Road." (*Id.*) Crockett contends that State Habeas Exhibit 376 shows that "Mr. Griff actually told Palmer 'several times to slow down before he kills someone, and even talked to his mom about it.'" (*Id.* (citing State Habeas Ex. 376).)

State Habeas Exhibit 376 consists of three separate pages: (i) an e-mail from "IC" to "AMS," with the subject, "Crockett witness: William Von Stein," (ii) an internet printout with the title, "Jacob Palmer's Photos – Profile Pictures" and a photo, and (iii) a page with four lines of handwritten notes, stating *inter alia*, "Shown to Don – Neg." (State Habeas Ex. 376, at 1–3 (omitting Mr. Von Stein's work phone number and cell phone number from the subject line of the e-mail).) The e-mail states, in sum:

> He is the manager at the Citgo Gas Station and does not know why he is subpoenaed. He was not working that night [and] knows nothing. He also said that Don Harrison moved back to New York and will not be in Court. Don was there that night but does not remember anything.
> Mr. Von Stein again told me about the Retired Sheriff, Mr. Griff, who said he remembers the boy and he was always speeding in the neighborhood (Wolfsnare). He told . . . the boy several times to slow down before he kills someone, and even talked to his[] mom about it. Mr. Griff used to do security at the VB Psychiatric Hospital.
> I thanked Mr. Von Stein for the call, told him I'd advise you of this, and that only you can decide whether we can excuse him or not.
> Please advise.

Thanks.
IC

(*Id.* at 1.)

Crockett further claims that "[d]efense investigator Alan Donker also discovered evidence showing that Palmer had used the dark hideaways on Wolfsnare Road to hide from police before." (ECF No. 1–1, at 29 (citing State Habeas Ex. 379).) As support for this assertion, Crockett cites State Habeas Exhibit 379, which consists of three e-mails between Crockett's counsel and at least one defense investigator. (State Habeas Ex. 379, at 1.) Crockett argues that State Habeas Exbibit 379 shows that:

> Palmer's then-girlfriend[,] Kathleen Fisher[,] told Donker about a time when Palmer and a friend were both drunk at the 7–11 on the corner of Wolfsnare and First Colonial Road when the store manager got wind of their condition and called police. Palmer fled from 7–11 and ran down Wolfsnare Road to hide. Palmer called Fisher to pick him up, but he had run home before she could get to him.

(ECF No. 1–1, at 29.) Crockett also argues that "Palmer's home, of course, was only a run through the woods away from Wolfsnare Road." (*Id.* (citing State Habeas Exhibit 433).) As support for this assertion, Crockett cites State Habeas Exhibit 433, which he describes as "Satellite Imagery Maps of Wolfsnare Road Area." ("Master Exhibit List" for State Habeas Exhibits.) Crockett contends:

> In much the same way that Mr. Crockett's history of letting others drive his car objectively informs how he was inclined to act on the night of the accident, so too does Palmer's history of driving irresponsibility and hiding out on Wolfsnare Road inform how he was likely to act on that same night.

(ECF No. 1–1, at 29–30.) However, Crockett's argument regarding Mr. Palmer's alleged habit of driving recklessly and hiding in the woods off Wolfsnare Road suffers from many of the same issues as Crockett's argument regarding his "history of letting others driving his car." *Id.* Specifically, the statements to which Crockett refers are summaries of secondhand information,

and there is no indication that any of the individuals made such statements while under oath, let alone penalty of perjury. *See, e.g.*, *Price*, 947 F.2d at 832; *Hogge*, 2011 WL 2161100, at *2–3 & n.5. Additionally, Crockett fails to articulate, and the Court fails to discern, how Crockett can determine from *one* individual's statement how Mr. Palmer routinely drove on Wolfsnare Road and whether Mr. Palmer routinely ran home from Wolfsnare Road.

### 5. Pamela Patrick's Call to 911

Crockett next argues that "[a]t trial, Wolfsnare Road resident Pamela Patrick testified that she 'wouldn't deny' having made a call to 911 in response to the accident in which she called Mr. Crockett 'the one in the backseat.'" (ECF No. 1–1, at 30.) Crockett contends that "[e]ven so, she tried to distance herself from this characterization of her testimony," and "[t]he introduction of the audio from her 911 call would have favorably resolved all dispute regarding where Mr. Crockett was first found in the vehicle, for she absolutely did describe him as defense counsel suggested." (*Id.* (citing State Habeas Exhibit 429, titled "CD – 911 Audio (Pamela Patrick) (12/28/08)").)

Crockett argues that "[s]uch a contemporaneous illustration of Crockett's positioning would have been powerful evidence for the defense; one of the second trial jurors even swore in her affidavit that the 911 call would have caused her to acquit." (*Id.*) However, as Crockett himself recognizes, the jury heard information about the 911 call because Ms. Patrick testified that "she 'wouldn't deny' having made a call to 911 in response to the accident in which she called Mr. Crockett 'the one in the backseat.'" (*Id.*) Furthermore, Crockett fails to articulate, and the Court fails to discern, how Crockett is able to conclude from *one* juror's statements that the entire jury would have acquitted him.

## 6. <u>Affidavit of Jeremy Stafford</u>

Crockett claims that the affidavit of Jeremy Stafford shows that "[r]oughly a couple days after the accident, one Shaka Valley, came through the drive-thru at Hardee's where Stafford was working and the two men started talking about the recent accident. Valley told Stafford at one point that 'Cameron and two others left the party to get some beer.'" (*Id.* (citing State Habeas Exhibit 422).)

Crockett cites State Habeas Exhibit 422 as support for this assertion. (*Id.* (citing State Habeas Exhibit 422).) State Habeas Exhibit 422 consists of (i) one page of interview notes from the defense investigator's interview with Jeremy Stafford and (ii) one page that includes Jeremy Stafford's signature, a notary public's signature and stamp, and the following typed statement: "I, Jeremy Stafford, hereby attest that the attached interview was conducted by Mr. Donker, Private Investigator on 4/22/2010. The statement is true and accurate. Shaka Valley did tell me that Cameron and 2 others left the party together the night of the accident. 12/28/2008." (State Habeas Exhibit 422, at 1–2.)

The defense investigator's notes from his interview with Jeremy Stafford state, in sum:

> I started the interview by explaining I was there to talk to him about the night of the party on Dec. 28, 2008.
> Jeremy was not at the party but stated that he knew Cameron for about four years. He heard about the accident the next day over the phone by a friend Nick Wengler and by Shaka Valley. He did not hear of any injuries to Josh Reddy. He stated that he thought Cameron never wore his seat belt.
> Jeremy stated that a couple of days after the party Shaka Valley came through the drive [thru] at Hardee's where he works and Shaka told him that Cameron and two others left the party to get some beer. He did not know or would not say who the other two were. He said Shaka would talk to me and that he and

Cameron had tried to call Shaka after this encounter but he hung up the phone after he answered and was silent.

Jeremy stated that he would testify in court if he were needed.

(*Id.* at 1.)

Crockett argues:

What makes this evidence intriguing is when the exchange between Valley and Stafford took place. Specifically, it came at a time when Mr. Crockett had just been remanded to jail. There was not yet any chatter on the streets of third-person involvement. There was only what was on the news declaring Mr. Crockett the driver in a purportedly cut-and-dried case. This timing therefore strongly reinforces the value of what Jeremy Stafford heard.

(ECF No. 1–1, at 30.) However, although Mr. Stafford signed and notarized the defense investigator's notes, the notes are simply a summary of the investigator's interview with Mr. Stafford and there is no indication that the interview was conducted under the penalty of perjury. *See, e.g.*, *Price*, 947 F.2d at 832; *Hogge*, 2011 WL 2161100, at *2–3 & n.5. Additionally, Mr. Stafford did not attend the party, and his statement was a secondhand recitation of what another individual had reported to Mr. Stafford.

### 7.    <u>Jacob Palmer's Statements</u>

Crockett next argues:

Throughout the course of this case, Jacob Palmer has given quite a few statements to investigators and to others regarding his activities on the night of the accident. These statements have proven both highly inconsistent and highly incriminating. In fact, each time that Mr. Palmer has spoken to someone about his involvement in the accident, his story has changed in some material way or another. Moreover, certain components of his version of events are demonstrably false.

(ECF No. 1–1, at 30–31.) Crockett contends that "[a]ll of Palmer's flip-flopping and false exculpatory statements constitute probative evidence of his guilt as well as a consciousness of guilt. They are thus a very important part of the actual innocence inquiry in this case." (*Id.* at 31 (internal citation omitted).) Further, Crockett claims:

> The fact alone that [Palmer] changed some significant portion of his story every time he told it is enough to create a reasonable suspicion of guilt. But Palmer's amphibian narrative doesn't stand by itself; it stands juxtaposed with all the other evidence in this case that implicates him in the accident, accentuating just how damaging his inconsistencies are.

(*Id.* at 34 (citations omitted).) From these alleged inconsistencies, Crockett argues:

> What looms largest, Palmer's blatant lies betray his guilty conscience. There can only be one reason why he would lie about where he was at the time of the accident: he lied because the truth is that he was behind the wheel of Crockett's car. Likewise, there can only be one reason why he would lie about how he first heard news of the accident: he lied because the truth is that he found out the hard way when he slammed Crockett's car into that tree on Wolfsnare Road, killing one and leaving another for dead.

(*Id.*)

As to the inconsistencies in Mr. Palmer's statements, Crockett first claims that Mr. Palmer's statements as to when he left the party on the night of the accident are inconsistent. (ECF No. 1–1, at 30–31.) As support for this assertion, Crockett cites to State Habeas Exhibits 197 and 390. (*Id.* (citing State Habeas Ex. 197, 390).) State Habeas Exhibit 197 consists of e-mails between the defense investigator and Crockett's mother, identified in the e-mails as "Gail." (State Habeas Ex. 197.) The e-mails discuss possible questions to ask Mr. Palmer at a follow-up interview. (*Id.*) State Habeas Exhibit 390 consists of an interview between Mr. Palmer and the defense investigator, which is dated April 20, 2009, and notes from three other interviews of Mr. Palmer. (State Habeas Ex. 390, at 1–4.) Of the three other interviews with Mr. Palmer, the notes from two of the interviews are not dated and it is not clear by whom Mr. Palmer was interviewed. (*Id.* at 3.) As to the third interview, the notes indicate that a "[p]hone interview was conducted with Jacob Palmer by P. Munley" on January 17, 2012. (*Id.* at 4.)

Crockett vastly overstates the inconsistencies in Mr. Palmer's statements regarding when he left the party. Specifically, in Mr. Palmer's April 20, 2009 interview with the defense

investigator, there is no mention of when Mr. Palmer left the party. (*Id.* at 1–2.) Although the interview notes contain no reference to when Mr. Palmer left the party, Crockett submits the e-mails between his mother and the defense investigator, which show that in response to a question from Crockett's mother as to whether the defense investigator asked Mr. Palmer when he left the party, the defense investigator stated: "Sorry, he did say he was at the party all night. Don[']t know why that wasn[']t in the statement." (State Habeas Ex. 197, at 2.) As to the notes from the three other interviews, in the first interview, the notes indicate that "Jacob remained at the apartment;" in the second interview, the notes indicate that he "slept over. He left around 8-8:30 am to go to his girlfriend's house;" and in the third interview, the notes indicate that about a month prior to the interview, a young woman had told Mr. Palmer that he had driven her and another young woman home at around 6:00 a.m. or 7:00 a.m. and "Palmer said he had no recollection of this until Annie told him about it – 1 month ago." (State Habeas Ex. 390, at 3–4.) Also in the third interview, the notes indicate that at "[a]bout 8:30 am – Palmer went to girlfriend's house." (*Id.* at 4.)

Crockett next claims that Mr. Palmer's statements as to when he learned about the accident are inconsistent. (ECF No. 1–1, at 32.) Crockett claims that at one interview, Mr. Palmer stated that he received a text from Crockett's brother about the accident, and in another interview, Mr. Palmer stated that he received such a text from one of the party hosts. (*Id.* (citations omitted).) Crockett also claims that Mr. Palmer was inconsistent as to whether he saw anyone leave the party with Crockett and Mr. Korte. (*Id.*) Crockett cites to State Habeas Exhibit 390 as support for this claim. (State Habeas Ex. 390, at 3–4.) As noted above, State Habeas Exhibit 390 includes notes from four interviews with Mr. Palmer. The notes from one of the interviews indicate that "[n]o one else left with Jack and Cameron," and the notes from the

second interview indicate that "[h]e couldn't see the front door, so he's unsure if anyone else left with them." (*Id.*) Crockett also claims that Palmer made inconsistent statements to "his ex, Kathleen Fisher, and another young woman by the name of Tonya Hess." (ECF No. 1–1, at 31 (citing State Habeas Ex. 387; Federal Habeas Ex. 1).)

Although Crockett argues that there is only one reason for Mr. Palmer's alleged inconsistent statements—that Mr. Palmer was the driver of the vehicle—as discussed above, Crockett vastly overstates the inconsistencies in Mr. Palmer's statements. The Court fails to discern how minor inconsistencies in Mr. Palmer's statements support Crockett's conclusion that Mr. Palmer was driving the vehicle.

### 8. "Jacob Palmer's Confession"

Crockett next discusses evidence that he labels "Jacob Palmer's Confession." (*Id.* at 35.) As support for this claim, he references the "Tori Miranda evidence" and the "testimony of Elizabeth Wales." (*Id.*) As discussed below, neither the "Tori Miranda evidence" nor the "testimony of Elizabeth Wales" reliably establishes that Mr. Palmer confessed to being the driver.

### a. "The Tori Miranda Evidence"

Crockett first discusses the "Tori Miranda evidence," explaining,

> Prior to the second trial, defense counsel received a tip that Jacob Palmer had confessed his guilt in this matter to his girlfriend at the time, Nicole Vaughan. . . . This evidence presented itself in the form of a young woman named Tori Miranda, who did not know Cameron Crockett or Jack Korte, but did know Palmer and was best friends with Nicole Vaughan back in the summer of 2011 when all of this was unfolding.

(*Id.*) Crockett claims that "Palmer told Vaughan 'that he was involved and that he was driving the car,' and Vaughan then confided in her best friend Miranda by sharing this revelation." (*Id.* (citations omitted).) Crockett states that "Tori Miranda signed an affidavit on December 24,

2015 reiterating her willingness to testify to the information she had previously given to Al

Donker [the defense investigator]." (*Id.* (citing State Habeas Ex. 409).) In Ms. Miranda's

affidavit, which Crockett submits as State Habeas Exhibit 409, Ms. Miranda states:

> Sometime in 2011, towards the end of the school year just before the summer break, my friend Nicole Vaughan told me about some remarks her then-boyfriend Jacob Palmer had recently made to her. According to Nicole, Jacob told her that he was involved in this case and that he was driving the car. At the time Nicole told me this, she and I were best friends.

(State Habeas Ex. 409, at 1.)[10]

### b. "The Testimony of Elizabeth Wales"

Crockett next discusses Elizabeth Wales's testimony at the December 17, 2012 hearing

on Crockett's motion for a new trial. (ECF No. 1–1, at 35.) Crockett describes Ms. Wales's

testimony as follows:

> In June of 2012, when Mr. Crockett was still in Guatemala, a young woman named Elizabeth Wales reached out to Alexia Decker, Mr. Crockett's ex-girlfriend, and informed her of some disturbing statements made by Jacob Palmer that she had heard the year before. At the time, Decker was serving as the administrator for a "Wrongly Convicted Cameron Crockett" social media site. Wales, who like Tori Miranda did not know Crockett or Korte, came across this site and realized that what she had previously heard Palmer talking about was in fact related to this case.

(*Id.* (internal citations omitted).)

In Ms. Wales's testimony at the December 17, 2012 hearing on Crockett's motion for a

new trial, she testified that while she was a student at Cox High School, she had a photography

class with Jacob Palmer. (Dec. 17, 2012 Tr. 70–71.) Ms. Wales testified that during the

photography class, students were permitted to leave the classroom and take pictures in the halls.

---

[10] Crockett also submits an audio recording with his instant § 2254 Petition, which he describes as "Miranda audio." (ECF No. 1–1, at 35; Disc Two.) The Court notes that the audio recording contains much background noise, and appears to include a conversation between Ms. Miranda, Crockett's mother, and the defense investigator. (*See* Disc Two.) The information contained in the "Miranda audio" is consistent with Ms. Miranda's written affidavit.

(Dec. 17, 2012 Tr. 73.)  Ms. Wales stated that during one of the times that she was in the hallway, she saw that "Jacob was talking to a female.  At the time [Ms. Wales] had no idea who she was."  (Dec. 17, 2012 Tr. 75.)  Ms. Wales later learned it was Jacob Palmer's girlfriend, Nicole Vaughan.  (Dec. 17, 2012 Tr. 75–76.)  Ms. Wales testified:

> He was talking to her about this and I heard him say -- I guess it was close to a case that they had just had.  And he was like, I just got free.  And he was like, I thought I killed them both.  And then he went on talking about how he had -- was just going to go about his life and live like he had done nothing.

(Dec. 17, 2012 Tr. 76.)  Ms. Wales stated that "[h]e mentioned Jack's name but he did not say a last name and he did not mention Cameron."  (Dec. 17, 2012 Tr. 76.)

When Crockett's counsel asked Ms. Wales the date of the conversation that she had overheard, she had stated that it was either 2010 or 2011.  (Dec. 17, 2012 Tr. 73.)  When asked again as to the date of the conversation, Ms. Wales stated that it was in 2010.  (Dec. 17, 2012 Tr. 74.)  When asked a third time, Ms. Wales also stated that it was in 2010.  (Dec. 17, 2012 Tr. 75.)  Subsequently, after the describing the conversation, Ms. Wales was asked a fourth time about the date of the conversation and about how confident she was regarding the year of the conversation.  (Dec. 17, 2012 Tr. 76–77.)  The following exchange then occurred:

A      I believe the 2010 to 2011 school year because --
Q      Okay.  So May of what year?
A      2011.
Q      Okay.  So when you were saying 2010 what did you mean?
A      That was the beginning of my first year of photography which was not when it was.  Because I was dating somebody then and I was not dating somebody during this case.  That's the only reason I remembered.
Q      Okay.  So you heard this the latter part of May of what year?
A      2011.
Q      Are you confident about that?
A      Yes.

Q        Without any question?
A        Yes.  Yes.

(Dec. 17, 2012 Tr. 77.)

### c.        Summary of the Evidence Regarding "Jacob Palmer's Confession"

As an initial matter, Ms. Wales presented her testimony to the Circuit Court during the December 17, 2012 hearing on Crockett's motion for a new trial, which the Circuit Court denied. Given that the Circuit Court evaluated Ms. Wales's testimony and "resolved issues like witness credibility, which are 'factual determinations,'" for this Court "to overturn [the] state court's credibility judgments, the state court's error must be stark and clear." *Sharpe*, 593 F.3d at 378 (citations omitted); *see id.* at 380 (citations omitted) (explaining that when considering the petitioner's claim for a new trial based on "new evidence of actual innocence," "[t]he only appreciable respect in which the state court's legal analysis differed from *Schlup* was that the court itself evaluated the evidence, rather than attempting to predict the reaction of hypothetical jurors to that evidence").  Crockett fails to articulate, and the Court fails to discern, any such error with respect to Ms. Wales's testimony and the Circuit Court's credibility determinations about that testimony.

Further, Crockett overstates the conclusiveness of Ms. Miranda's and Ms. Wales's statements and testimony.  For example, in his Memorandum in Support of his § 2254 Petition, Crockett neglects to mention Ms. Wales's initial uncertainty as to the date of the conversation she overheard.  Instead, Crockett claims "Wales explained that she witnessed the conversation between Palmer and Vaughan in late May 2011," and Ms. Wales was "confident in this timeframe."  (ECF No. 1–1, at 36.)  Crockett further claims that Ms. Wales's testimony "strongly suggests that Palmer made these statements after the May 26, 2011 guilty verdict in Crockett's

trial," but before the "mistrial at sentencing." (*Id.*) Based on Crockett's conclusion regarding

the date of the conversation, he argues:

> Considering the temporal alignment between when Wales overheard Palmer's remarks and when Crockett's trial underwent such an extraordinary turn of events, there is no better explanation for what Palmer said and the way he said it. In light of these unique circumstances, Wales's testimony can be nothing other than the truth.

(*Id.*) Additionally, Crockett claims:

> What is more important, though, is how the accounts of Miranda and Wales mutually reinforce one another from a temporal standpoint when set side by side. That is, while the defense discovered Miranda and Wales at different times, there is ample reason to believe that what Vaughan told Miranda was borne of the same incident that Wales witnessed between Vaughan and Palmer.

(*Id.* at 37.)

However, despite Crockett's argument that the overheard conversation must have

occurred in May 2011, Crockett mischaracterizes Ms. Wales's testimony at the December 17,

2012 hearing. As discussed above, Ms. Wales testified that she was not sure of the exact date,

and it was only after she was asked a fourth time as to her confidence regarding the year, that

Ms. Wales testified that the conversation occurred in 2011. (*See, e.g.*, Dec. 17, 2012 Tr. 76–77.)

Therefore, although Crockett argues that "the accounts of Miranda and Wales mutually reinforce

one another from a temporal standpoint," and he concludes that this means their statements must

be true, such a conclusion is not a certainty. (ECF No. 1–1, at 37.) Specifically, even if Ms.

Miranda and Ms. Wales learned of, or overheard, a conversation in which Mr. Palmer discussed

"a case" and driving a car, due to the vagueness of their testimony (neither identifies the specific

"case" involved, the date of the "case," or all of the people involved in the "case"), their

testimony does not establish that Mr. Palmer did in fact confess to being the driver. As such,

Crockett's arguments regarding their testimony does not significantly bolster his actual innocence claim.

### 9. "Witness Statements Disclosed Prior to the 2012 Motion for a New Trial"

Crockett contends that "[i]n December 2012, some nine months after Crockett was convicted, the Commonwealth disclosed two witness statements to the defense for the first time. These statements could have been used at trial to buttress the defense's theory of the case and impeach the Commonwealth's sole purported eyewitness." (*Id.* at 38.) Crockett then summarizes the statements of Pamela Patrick and Antoine Smith, and although not specifically articulated by Crockett, it appears that these are the two witnesses to which he refers.

#### a. Statement of Pamela Patrick

Crocket contends that "[p]olice interviewed Pamela Patrick on the night of the accident," and "[i]n this interview, Patrick described her initial efforts to find the crash site in greater detail than she did in her trial testimony." (*Id.*). Crockett claims that "[m]ost importantly, she clarified what she said to Antoine Smith when she stopped to talk to her before she located the wreck. Patrick asked Smith, 'You weren't in that car, were you?'" (*Id.* (citing State Habeas Ex. 251).)

Crockett cites State Habeas Exhibit 251 as support for this assertion regarding Pamela Patrick's statements. (*Id.* (citing State Habeas Ex. 251).) State Habeas Exhibit 251 consists of Pamela Patrick's responses on a "Crash Witness Information & Statement" form dated December 28, 2008, and a transcript of "a taped interview between MPO Dean Godwin and Pamela Patrick." (State Habeas Exhibit 251, at 1–3.) In Pamela Patrick's responses to the questions on the "Crash Witness Information & Statement" form, she estimated that the vehicle was driving "[a]pprox[imately] 60 mph" before the crash, and that she "saw car at high rate of speed skid and slide sideways." (*Id.* at 1.)

64

In her interview with MPO Dean Godwin, Pamela Patrick stated, *inter alia*:

> Yes, I was sitting in the, my living room ah right by the front door. And I heard a car coming at a really high rate of speed. So I got up to look out and when I did the car was turned sideways I believe the front of the car was pointed towards me and he was sliding real fast. And I turned around to tell the kids to call 911 I knew he was gonna hit something. When I turned around and I heard him hit, but I didn't know what he hit. And when I looked out I was looking to see if he had hit some cars on the street and then I saw him you know up against the tree.

(*Id.* at 2.) The officer asked Pamela Patrick what she did then, and she stated: "Ah, ran over to the car and told the kids to call 911." (*Id.*) When asked if she saw anyone else, Pamela Patrick responded: "Ah, we were looking to see if anybody else was in there because the people at 911 were asking how many people and we did not see the passenger. It was, it was kinda dark. And you could, I never saw the passenger." (*Id.*) When asked how much time had passed between the crash and when the first officer arrived, Pamela Patrick stated that "it was probably 2 minutes, maybe 3." (*Id.* at 3.) When asked if she saw "anybody else walking around the vehicle coming from the vehicle or anything else," she stated:

> No, I saw the other lady the other witness she ah when I came out she was hysterical and I didn't really know what was going on. And I said are you okay? I said you weren't in the car were you? And she said no she was walking down the street heard them coming got up on the sidewalk and then she told me she had seen them also slide. But she was really shaken up and I couldn't figure out what was going on.

(*Id.*) Crockett argues:

> Patrick was the first person to respond to the scene of the crash. The time it took her to reach the car was a crucial factor in determining whether the true driver could have fled the scene before anyone got there. It was also a factor that was contested at trial for that very reason. While Patrick said in her preliminary hearing testimony that it took her 'about a minute' to get to the vehicle, at trial she disputed that it took that long. Patrick's belief that someone could have exited the vehicle in the time that it took her to get outside as shown by her question to Smith, would have erased all controversy over whether the driver had sufficient time to get away. Indeed, nothing could have more resoundingly resolved this pivotal point in favor of the defense than the first responder's belief in the heat of the moment that a random bystander might have been an occupant of the vehicle that had just

crashed. This would have been telling evidence in the hands of the defense, and it cuts in favor of actual innocence today.

(ECF No. 1–1, at 39.) Crockett also argues that Ms. Patrick's initial statement to the police could have been used to impeach her testimony at trial. (*Id.* at 38.)

As an initial matter, Crockett vastly overstates the inconsistencies in Ms. Patrick's trial testimony and her initial statement. Further, the information in Ms. Patrick's initial statement, such as Ms. Patrick stating that she "ran over to the car" (State Habeas Exhibit 251, at 2), and that the police arrived "probably 2 minutes, maybe 3" after the accident (*id.* at 3), is hardly consistent with Crockett's tale that a third party had time to crawl through the window of the crashed vehicle and flee the scene without any neighbors or police seeing the third party.

### b. Statement of Antoine Smith

Crockett states that "Antoine Smith was also interviewed by police on the night of the accident." (ECF No. 1–1, at 39.) Crockett claims that "[h]er statement reveals significant inconsistencies with her trial testimony," and "[t]hese inconsistencies bear on her observations of the events surrounding the accident" and "diminish her credibility as well as the reliability of what she claimed to have seen that night." (*Id.*)

Specifically, Crockett contends that "[i]n Ms. Smith's pretrial statement, she told police that she saw the car slide into the tree." (*Id.* (citing State Habeas Ex. 252).) Crockett claims that "[t]his is a sharp break from her trial testimony, where she swore she saw the car spin around three times before it hit the tree." (*Id.*) Crockett also claims that "Ms. Smith's police statement also differs from her trial testimony regarding how attentive of an eyewitness she was to the accident." (*Id.*) Crockett contends that "[i]n her police statement, Smith characterized the car as having taken her by surprise just before it came speeding towards her." (*Id.* (citing State Habeas Ex. 252).) Crockett asserts: "She states she heard the car before she saw it and that she jumped

out of the street and onto the sidewalk right as the car shot by." (*Id.*) Crockett argues that "[a]t trial, however, Smith testified that the light at Wolfsnare and Great Neck Road was what initially drew her attention to the car and that she visually tracked it from there all the way up to where it collided with the tree." (*Id.*)

Crockett argues:

> These discrepancies would have provided the defense with the tools for what should have been a grilling cross-examination of Antoine Smith. They would have raised the question in the minds of the jury: If Smith is as sure about things that are both demonstrably false and highly inconsistent with her original statement as she is about not seeing anyone run from the scene, how much confidence can really be placed in her as the solitary eyewitness in this case, especially when the scene was so dark and she admitted to not keeping her eyes on the car after it crashed anyway?

(*Id.* at 40.) Crockett also argues:

> Smith's testimony about the car spinning three times is truly bizarre when contrasted with what she told police originally and with what the evidence shows the car actually did, which was simply slide into the tree. It is so bizarre that it defies explanation, for something like that is not the kind of thing that grows fuzzy over time or that a person would "misremember." Smith's testimony about watching the car from a stoplight that was patently impossible for her to see was similarly farfetched and detached from her police statement, not to mention it conveyed the false impression that she 'saw it all' when she actually saw very little either before or after the accident. The bottom line here is that these wild discrepancies would have enshrouded the entirety of her testimony in a cloud of doubt.

(*Id.*)

As support for his assertion regarding Antoine Smith's statements, Crockett cites State Habeas Exhibit 252, which consists of Antoine Smith's responses on a "Crash Witness Information & Statement" form dated December 29, 2008, and a transcript of "a taped interview between MPO Dean Godwin and Antoine Smith." (State Habeas Ex. 252, at 1–6.)

In Antoine Smith's responses to the questions on the "Crash Witness Information & Statement" form, she estimated that before the crash, the vehicle was driving "60–70 mph very

fast." (*Id.* at 1.) With respect to where she was located when the crash occurred, Antoine Smith stated: "Walking in street until I heard car coming – looking at car." (*Id.*) In her interview with MPO Officer Goodwin, Antoine Smith stated, *inter alia*: "I was ah walking down Wolfsnare Road and I stopped to look at ah Christmas display that was playing music and flashing reindeers and all that." (*Id.* at 2.) Antoine Smith further stated:

> I was stopped there for ah few minutes. As I proceeded to walk I heard a car coming down Wolfsnare round the ben[d] at a high speed. So I got up on the sidewalk as I got up on the sidewalk the guy was proceeding down the street he hit on his brakes he turned sideways he hit the curb and came up on the grass and slid and hit a tree.

(*Id.*) When asked how much time had passed between when the accident and the arrival of the first emergency vehicle, Antoine Smith stated that "[i]t was all of maybe, 3 minutes maybe." (*Id.* at 4.)

With respect to Crockett's arguments regarding Ms. Smith's testimony and prior statements, Crockett neglects to address that Ms. Smith's credibility was already an issue at his trial, and the defense presented evidence at trial from a survey of Wolfsnare Road, which appears to have been conducted, in part, to disprove Ms. Smith's claim that she could see an intersection with a stoplight. Moreover, Crockett mischaracterizes Ms. Smith as the "solitary eyewitness." Specifically, even if Ms. Smith's trial testimony was not considered, several other individuals, all of whom lived on Wolfsnare Road, testified that they either heard or saw the crash, and looked outside, or went outside, shortly after the crash. Therefore, contrary to Crockett's assertion that the prosecution's case relied heavily on Ms. Smith's testimony, and even disregarding Ms. Smith's testimony, overwhelming evidence existed of Crockett's guilt. Therefore, Crockett's arguments regarding Ms. Smith's testimony does not significantly bolster his actual innocence claim.

10.    **"Evidence Uncovered in 2014 Civil Litigation"**

Crockett next argues that "evidence uncovered in 2014 civil litigation" supports his actual

innocence claim.  (ECF No. 1–1, at 40.)  Crockett explains:

> In 2014, the lead investigator in Mr. Crockett's case sued his mother, Gail
> Crockett, for defamation after she filed a complaint against him with Internal
> Affairs alleging that he failed to follow policy and procedure during his
> investigation of the accident.  While this civil action was pending, Ms. Crockett
> issued a subpoena duces tecum for the entire police investigative file and received
> several items of evidence that were previously unknown to the defense.

(*Id.*)  Crockett claims that "[t]his evidence could have been used to impeach the damaging

testimony of the first officer to arrive on the scene of the crash," and "[i]t also could have been

used to impugn the thoroughness and good faith of the police investigation."  (*Id.* at 40–41.)

Crockett then summarizes the "Responding Officers' Memoranda" and "Statements From

[William] Daniels and Dickson Couple," which the Court assumes forms the evidence

"uncovered in [the] 2014 Civil Litigation."  (*Id.* at 41.)

a.    **Memoranda from the Responding Officers**

Crockett states:  "The police file contained three memoranda authored by Officers

Buechner, Clark, and Bradley."  (*Id.* (citing State Habeas Exs. 246–48).)  Crockett cites State

Habeas Exhibits 246, 247, and 248 as the memoranda in question.  (*Id.* (citing State Habeas

Exs. 246–48).)

State Habeas Exhibit 246 is Officer K. R. Buechner's "Inter-Office Memorandum" to

MPO T. Kellogg, which is dated December 29, 2008.  (State Habeas Ex. 246, at 1–2.)  In the

Inter-Office Memorandum, Officer Buechner states:

> At approximately 2316 I was dispatched to an accident with occupants
> pinned inside in the 2100 block of Wolfsnare Rd.  I was the first unit to arrive on
> scene, and parked my vehicle on the east side of the accident.  I could see a white
> Honda had left the roadway, struck a tree and was wrapped around the tree on the
> passenger's side.  When I approached the scene, I could immediately smell alcohol

coming from the vehicle. I could see one individual, later identified as Cameron Crockett, laying on top of several interior parts of the vehicle at an angle that placed his lower half where the driver's compartment would be. His body was positioned so that his head and shoulders were in the back seat behind the passenger's seat. Upon closer inspection, I could see another body underneath Mr. Crockett. The passenger had been forced underneath . . . Mr. Crockett, and his head was resting against the driver's thigh and stomach. The passenger was unconscious; however he still appeared to be breathing. . . .

As I reached in, the driver started moving around. I told the driver to stop moving because he may have a head injury and that he was hurting his buddy. Mr. Crockett became more animated and started actively resisting any assistance. . . . Both I and Officer Clerk attempted to hold Mr. Crockett stationary to prevent further injury to himself, and especially to the passenger who was still unconscious. Mr. Crockett started to make statements such as, "get off me." When we informed him he was in an accident and he may have a head injury he stated, "we're cool, get off me."

Mr. Crockett began actively fighting with us, and struck Officer Clark several times while he was attempting to hold C-spine and prevent further injury. I noticed that Mr. Crockett was kicking his legs around inside the vehicle while he was fighting, and I could see he was repeatedly kneeing the passenger in the head and sitting on his head. I was able to gain control of his left arm and pin it to the truck with my leg and it took both hands to restrain his other arm from striking Officer Clark. We held him in this position until rescue arrived, at which time we released Mr. Crockett who began pushing himself out of the vehicle. Several Officers, including myself, had to restrain him and hold him down against the back board and he was handcuffed to the back board to prevent him from getting up.

(*Id.*)

State Habeas Exhibit 247 is Officer J. Clark's "Inter-Office Memorandum" to MPO T.

Kellogg, which is dated December 29, 2008. (State Habeas Ex. 247, at 1–2.) In the Inter-Office

Memorandum, Officer Clark states:

On 12/28/08 at 2316 hours I responded to assist on an accident with injuries in the 2100 block of Wolfsnare Rd. I was the second officer on scene at 2318 hours. Officer Kenneth Buechner had arrived on scene shortly before I had. Myself and Officer Buechner approached the vehicle from the rear. The vehicle, which was on the north side of Wolfsnare Rd., was wrapped around a tree and had extensive damage to it. I observed a strong odor of alcoholic beverage coming from inside the passenger compartment of the vehicle.

I immediately observed Mr. Cameron Crockett laying across the driver side portion of the vehicle. The lower half of his body was on the driver's seat and his upper abdomen was in the back seat of the vehicle. Mr. Crockett was unconscious when myself and Officer Buechner first observed him. Mr. Crockett's body was

on top of another body which was laying across the front passenger seat and the back right passenger seat of the vehicle.

Myself and Officer Buechner climbed on top of the vehicle's trunk and reached into the passenger compartment of the vehicle to render aid to Mr. Crockett and to the other passenger through the smashed out rear window. As I began to perform C-Spine on Mr. Crockett, he became combative with myself and Officer Buechner. . . .

. . . .

With the assistance of several other officers and rescue personnel, we were able to restrain Mr. Crockett and place him safely on a back board. Mr. Crockett was secured and immediately transported to Sentara Virginia Beach General Hospital. Myself, Officer Bradley, and Officer Buechner responded there as well to be treated for blood exposure. Myself and Officers Bradley and Buechner also stood by with Mr. Crockett until MPO W. Wallace arrived on scene.

(*Id.*)

State Habeas Exhibit 248 is Officer P.D. Bradley's "Inter-Office Memorandum" to MPO

T. Kellogg, which is dated December 29, 2008. (State Habeas Ex. 248, at 1–2.) In the Inter-

Office Memorandum, Officer Bradley states:

On 12/28/08 at 2316, a crash . . . was reported in the 2100 blk of Wolfsnare Rd. It was listed as being a single vehicle crash with injuries and a pin situation. I use[d] a BE command on my KDT to place myself enroute to the crash. I was the Third Officer on the scene of the crash. I observed a white Honda Accord that had crashed into a tree. The car st[r]uck the tree on the passenger side of the vehicle. As I got on the scene, I saw Officers K. Buechner and J. Clark on the trunk of the car. They were trying to render aid to subjects in the car. Cameron Crockett was in the driver area of the vehicle and had been pushed back where he was in the upper part of his body was in the rear seat area of the vehicle. Mr. Crockett was actively struggling with the other officers as the[y] attempted to perform C-spin[e] on him. I went to the driver window (the glass was smashed out) to reach in and hold Mr. Crockett's legs still. As I got close to the vehicle I could smell a strong odor of alcoholic beverage in the car.

At this time I noticed that there was a passenger in the vehicle. The passenger was still in the front seat of the vehicle so that his head was at the waist area of Mr. Crockett. I then attempted to perform C-spin[e] on the passenger of the vehicle. The passenger was unconscious but had involuntary responses of his mouth moving. As Mr. Crockett struggled, he would lift his body up and down and cause the passenger's head to move several times in all directions. Mr. Crockett would also hit the passenger's head with his legs when he was being removed from the car by medical staff. Shortly after medical staff arrived on scene is when the passenger involuntary mouth movements stopped.

Medical staff informed me that the passenger was deceased and I diverted my attention to Mr. Crockett. Mr. Crockett was still being active in resisting assistance. I took hold of his left hand as medical staff had him strapped to a back board. He pulled his hand in to his body to try and free my grip. When he was placed on the gurney, I put his hand in a hand cuff and attached it to the gurney. He was then placed into an ambulance and transported to Virginia Beach General Hospital.

(*Id.*)

Crockett argues that as "[r]elevant here, [the memoranda] discuss the officers' observations of Mr. Crockett's position in the vehicle." (ECF No. 1–1, at 41.) Crockett also argues:

These descriptions are exculpatory because not one of them says that Crockett's feet were under the steering wheel when the officers arrived. This is in obvious tension with Officer Buechner's testimony to the contrary, which the prosecution leaned on heavily in summation. 3/1/12 Tr. at 838, 894. Had the defense been able to impeach Buechner with his prior inconsistent statement, the sting from his testimony would have been mollified and the prosecution wouldn't have been able to capitalize on it in closing argument.

(*Id.*) Further, Crockett argues that the memoranda "are important to actual innocence because they show that Buechner's most harmful testimony is unreliable and probably the result of coaching given that it evolved all too conveniently over time in favor of the prosecution." (*Id.* (citation omitted).)

At trial, Officer Buechner testified that Crockett's position in the vehicle was as follows: "He was on what remained of the driver's side of the vehicle in the front seat[,]" "[h]is feet were under the steering wheel[,] [and] [h]is waist was where the center console would be." (Feb. 28, 2012 Tr. 389.) Officer Buechner also stated that "[t]he seat had broken. He wasn't in what would be considered a seated position in the seat, but he was still in the area[.]" (Feb. 28, 2012 Tr. 389–90.) Further, Officer Buechner stated that Mr. Crockett's head was in the rear part of the vehicle. (Feb. 28, 2012 Tr. 401.) Crockett is correct that three above-listed memoranda do

not indicate whether Crockett's feet were under the steering wheel. However, this information further supports Crockett's guilt because the detailed descriptions of the bodies in the front of the vehicle are inconsistent with Crockett's tale that a third party was also in the driver's compartment at the time of the crash.

**b.**      **Statements of William Daniels[11] and "the Dickson Couple"**

Crockett contends that "[t]he police file also contained documents from [William] Daniels, Kolden Dickson, and Holly Dickson. (ECF No. 1–1, at 41 (citing State Habeas Exs. 263–65.) Crockett claims that "[e]ach witness explained in their statements that they did not see a seatbelt on Mr. Crockett. They also added that they could not imagine how he could have been wearing one given his position in the vehicle." (*Id.*) Crockett argues that "[t]he statements are significant because they clash with the lead investigator Kellogg's preliminary conclusion, made approximately three months prior, that Mr. Crockett was the belted driver in this accident." (*Id.*)

In support of Crockett's arguments, he cites State Habeas Exhibits 263, 264, and 265. (*Id.* (citing State Habeas Exs. 263–65).) State Habeas Exhibit 263 consists of Mr. Daniels's responses on a "Crash Witness Information & Statement" form dated March 11, 2009, and a transcript of a taped interview between MPO Thomas Kellogg and William Daniels, Jr. (State Habeas Ex. 263, at 1–9.) In his interview with MPO Kellogg, Mr. Daniels stated, *inter alia*, that the crash occurred in his front yard, and the "long screech" drew his attention to the possibility of a crash. (*Id.* at 4.) When asked what he did after he heard the crash, Mr. Daniels stated:

> Ah, I opened the door and we saw ah what appeared to be a Honda Accord, a white Honda Accord ah, wrapped around one of the trees in their front yard. And ah, the um passenger side was you couldn't see the passenger side it almost looked like it was cut in half. Um, we did see what appeared to be the driver um, because

---

[11] At trial, Mr. Daniels identified himself as William Daniels. (*See* Feb. 28, 2012 Tr. 340.)

he was stretched out across the ah driver's seat and ah across the back of the ah back seat. Ah and there was no window [w]here the window shattered.

(*Id.* at 5.) When asked if he could tell whether the driver was wearing a seatbelt, Mr. Daniels stated: "I don't think he was wearing a seat belt. If he was wearing his seat belt he would have been in the driver's seat not lying over the top of it." (*Id.*) When asked whether "[t]he seat that this individual was in ah, would have been the driver's seat his lower extremities," he replied, "Yes sir." (*Id.*) When asked how much time had passed between when he heard the crash and when he was out in the yard, Mr. Daniels estimated that it was approximately "30 seconds." (*Id.* at 7.) When asked if he saw anyone get out of the car, Mr. Daniels responded, "No sir." (*Id.*) When asked if he had observed anything, such as "a path of blood or someone passed out on the sidewalk or in the road," that would have made him believe there had been any other persons in the vehicle, Mr. Daniels responded, "No sir." (*Id.* at 8.)

State Habeas Exhibit 264 consists of Holly Dickson's responses on a "Crash Witness Information & Statement" form dated March 11, 2009, and a transcript of a taped interview between MPO Thomas Kellogg and Ms. Dickson. (State Habeas Ex. 264, at 1–7.) When filling out the "Crash Witness Information & Statement" form, Ms. Dickson described the facts as follows:

> I was awoken from sleep to a screeching sound – I then heard a crash. I immediately got up and saw my husband in the living room on the phone with 911. I walked outside and saw a car wrapped around a tree in my yard. I went to the driver's window [and] looked in. The driver was laying from the front seat to the back. His legs were across the front seat and his arm was draped across the back dashboard. I heard him making a sound like he was snoring and he appeared to be passed out. I asked a neighbor who had already been there if there was a passenger – he pointed out the passenger's chest – it was beside the driver but I couldn't see the rest of him. I could only see the t-shirt of the boy. I also walked around the entire car.

(*Id.* at 2.)  In the interview with MPO Kellogg, when asked how much time had passed when she had walked outside after hearing the crash, Ms. Dickson stated:  "I would say no more than a minute."  (*Id.* at 5.)  When asked if she saw anyone exit the car or running from the scene, Ms. Dickson responded, "No."  (*Id.*)  When asked if "the gentleman laying in the front seat and across the back," whom she observed when she was on the driver's side of the vehicle, had a seatbelt on, Ms. Dickson stated:  "I didn't look at the seat belt.  Um, if he had it on it probably would have broken because he was up above the seat.  Because the other boy was I guess pushed under him it appeared."  (*Id.*)  When asked to describe the position of "the person in the front laying across the back" in "as much detail as possible," Ms. Dickson stated:  "Okay, ah when I'm looking in the window his foot was right where the steering wheel would be and the corner of the window."  (*Id.* at 6–7.)

State Habeas Exhibit 265 consists of Kolden Dickson's responses on a "Crash Witness Information & Statement" form dated March 11, 2009, and a transcript of a taped interview between MPO Thomas Kellogg and Mr. Dickson.  (State Habeas Ex. 265, at 1–10.)  In the interview with MPO Kellogg, when asked what drew his attention to the crash, Mr. Dickson stated, *inter alia*:

> There was a loud screech of tires very loud.  Loudest I've ever heard in a car accident.  Um, it was several seconds long it was so long in fact I was looking at my roommate and we're looking at each other like what haven't we heard a crash yet.  Literally had time to comment between the sound of the tires and the impact. . . .  So I told my roommate you know get up you look out the door so he opened the door as he opened the door I looked out we saw ah a small foreign like a Nissan small type of car like that just wrapped around the tree.  And I said tell me what you see I went to call 911.  He said he didn't see anybody moving he didn't see any people.  Um, at that point I said, I was still talking to 911 I said well go out there and see what's going on. . . .

(*Id.* at 5.)  Mr. Dickson also stated:  "[F]rom the point of the impact to looking out the front door I would say less than 20 seconds [passed].  I would actually say less than 10 or 15 seconds."

(*Id.*)  When asked if he saw anyone get out of the car when he initially looked outside, Mr.

Dickson responded:  "No sir not at all.  There wasn't any movement."  (*Id.* at 6.)  When asked if

he saw anyone running from the scene, Mr. Dickson responded:  "Not at all."  (*Id.*)  When asked

to describe the position of the individual that he had observed on the driver's side of the vehicle,

Mr. Dickson stated, *inter alia*:

> Looked like the seat was over flexed and you know stretched so far it was lying
> flat.  And it was broken and ah from what I remember his [blank space] would have
> been where the head rest was and his legs would have draped from the head rest
> towards the steering wheel.  That much of his leg his lower part would have been
> over the driver seat as it was laying flat from his butt down to his seat.  Slightly at
> a diagonal and the upper body would have been laid over the head rest toward the
> back seat laid into the back seat.  And his arms draped probably about beside him.

(*Id.* at 8.)  When asked whether this individual was wearing a seat belt, Mr. Dickson stated:  "I

don't remember seeing the seat belt . . . ."  (*Id.* at 9.)  When asked to describe the damage to the

car, Mr. Dickson described it as "[w]rapped around the tree" and "in the shape of a horseshoe."

(*Id.*)

Crockett argues that "[h]ad the defense been privy to these [witnesses'] statements, it

could have attacked the police investigation for taking so long to stumble across this exculpatory

contrast in the evidence."  (ECF No. 1–1, at 41.)  Crockett claims that "[William] Daniels and

the Dickson couple were available to police all along but were not interviewed until months after

the crash."  (*Id.*)  Crockett argues that "[t]he police investigation would have appeared

presumptuous and inadequate for not having discovered exculpatory evidence before Mr.

Crockett was charged so swiftly with aggravated involuntary manslaughter."  (*Id.* at 41–42.)

Crockett claims:

> Disparaging the investigation in these ways would have exemplified for the
> jury how the police's tunnel-vision approach would have allowed for the wrong
> man to be . . . charged in this matter.  It also would have sapped the overall

credibility of the Commonwealth's case, built as it was upon a hastily constructed and shaky foundation.

(*Id.* at 42.)

However, Crockett vastly overstates the exculpatory nature of the initial statements of Mr. Daniels, Ms. Dickson, and Mr. Dickson. Based on the Court's review of the trial testimony of Mr. Daniels, Ms. Dickson, and Mr. Dickson, which is summarized above, it appears that their trial testimony was largely consistent with their initial statements. Further, at trial, the parties extensively examined the position of Crockett's body in the vehicle and whether he was wearing a seatbelt. Moreover, Mr. Daniels, Ms. Dickson, and Mr. Dickson gave initial statements regarding the position of the bodies in the front area of the vehicle that are *not* consistent with Crockett's tale that a third party also fit in the driver's compartment at the time of the crash. The initial statements further show how quickly the witnesses arrived at the vehicle, which cuts against Crockett's take that a third party had time to flee the scene without any neighbors or police seeing the third party.

### 11. "The Deliberate Suppression of the Antoine Smith and Kenneth Buechner Statements"

Crockett claims that "the Commonwealth deliberately suppressed the Antoine Smith and Kenneth Buechner statements" (ECF No. 1–1, at 42), and "[t]his misbehavior therefore shines an informative light on the actual innocence inquiry, for it reveals that the prosecution knew just how close the case was and how much of an impact the suppressed evidence would likely have made on the outcome of the trial" (*id.* at 43).

As support for his claim, Crockett cites State Habeas Exhibits 291, 292, and 398. (*Id.* at 42 (citing State Habeas Exs. 291, 292, 398).) State Habeas Exhibit 291 is a "Supplemental Request for Exculpatory Evidence" submitted by Crockett's counsel in his state criminal

proceedings, requesting, *inter alia*, "[a]ny and all evidence, statements, summaries of statements, or other information which indicates that Jacob Palmer or Antoine Smith have made inconsistent statements at different times about any subject matter relevant to the instant prosecution" and "[a]ny and all evidence or other information which in any way impeaches the credibility of Jacob Palmer or Antoine Smith as witnesses." (State Habeas Ex. 291, at 1.) State Habeas Exhibit 292 contains the Commonwealth's "Supplemental Response to Motion for Discovery," in which the Commonwealth indicated that it was "unaware of any new discovery production which has developed since the previous trial" and was "not aware of any new exculpatory evidence which has developed since the previous trial." (State Habeas Exhibit 292, at 1.)

Crockett also cites State Habeas Exhibit 398, arguing that "when the prosecution responded to the defense's original motion for discovery back in 2009, it disclosed what was an edited version of Officer Buechner's memorandum," which Crockett claims "was redacted to specifically cut out the officer's description of Mr. Crockett's position in the vehicle." (ECF No. 1–1, at 42 (citing State Habeas Ex. 398).) State Habeas Exhibit 398 is a portion of Officer Buechner's "Inter-Office Memorandum" to MPO T. Kellogg dated December 29, 2008. (State Habeas Ex. 398, at 1.)

Although Crockett argues that the Commonwealth's "misbehavior" shows "just how close the case was" (ECF No. 1–1, at 43), the information in the initial statements from witnesses and police officers, such as Antoine Smith and Kenneth Buechner, does not significantly bolster Crockett's claim of innocence. Specifically, as explained above in greater detail, rather than supporting Crockett's actual innocence claim, the information in these statements further supports his guilt because the statements include detailed descriptions of the positions of the bodies in the front of the vehicle and the short amount of time that passed between the accident

and when neighbors and police arrived at the scene. This information is *not* consistent with Crockett's tale that a third party was also in the driver's compartment at the time of the accident and that the third party had time to flee from the vehicle without anyone seeing the third party.

### 12. "The Driver's Side Airbag"

Crockett claims that "[a]bout a month before the second trial, defense counsel and defense investigator Donker went to view the driver's side airbag in the [Virginia Beach Police Department]'s property & evidence locker. Donker saw a stain on the bag that appeared to be blood." (*Id.* (citing State Habeas Ex. 417).) Crockett further claims that "[t]he Commonwealth told the defense at this point that the airbag was 'not productively testable,'" (*id.* (citing State Habeas Exs. 161, 163, 166–67, 296, 394, 415, 425)), and "[i]n the face of multiple requests to identify what forensic procedure was used to arrive at this conclusion, the Commonwealth has never answered these inquiries" (*id.*). As support for his claim, Crockett cites State Habeas Exhibits 161, 163, 166, 167, 296, 394, 415, and 425. (*Id.* (citing State Habeas Exs. 161, 163, 166–67, 296, 394, 415, 425).)

### a. State Habeas Exhibit 161

State Habeas Exhibit 161 consists of several e-mails between Crockett and a paralegal at Crockett's counsel's firm. (State Habeas Ex. 161, at 1–3.) The e-mails are from January 2012. (*Id.*) As relevant here, Crockett sent a "Draft Motion To Compel," which *inter alia*, requested that the Commonwealth provide "[d]ocumentary evidence of some sort that some forensic

authority, . . . determined the driver's airbag to be 'untestable', as was indicated to Defense counsel on January 4th." (*Id.* at 1.)

### b.    <u>State Habeas Exhibit 163</u>

State Habeas Exhibit 163 includes an e-mail from Crockett to a paralegal with his counsel's firm, which is dated February 5, 2012, stating, *inter alia*, "[p]lease find attached a draft motion to compel firmly requesting 8 separate responses from the Commonwealth on pending issues, with one additional motion to be made by the Defense challenging the admissibility of the Commonwealth's Supplemental Discovery Responses from January 11th, 2012." (State Habeas Ex. 163, at 1.) State Habeas Exhibit 163 also includes a document titled, "February 6th, 2012 Motion To Compel," which appears to be the draft motion that is referenced in the February 5, 2012 e-mail. (*Id.* at 2–4.)

### c.    <u>State Habeas Exhibits 166 and 167</u>

Similarly, State Habeas Exhibits 166 and 167 are e-mails. (State Habeas Exs. 166–67.) State Habeas Exhibit 166 consists of an e-mail from the defense investigator to Crockett and his counsel dated February 15, 2012, and Crockett's response to the e-mail dated February 16, 2012. (State Habeas Ex. 166, at 1–2.) State Habeas Exhibit 167 is an e-mail from the Commonwealth's Attorney to Crockett's counsel, dated February 17, 2012, stating in sum: "Andrew: Attached please find a copy of the P&E voucher for the airbag. A formal response pleading is forthcoming, but I wanted to get this to you as soon as possible. Enjoy the long weekend." (State Habeas Ex. 167, at 1.)

### d.    <u>State Habeas Exhibit 296</u>

State Habeas Exhibit 296 contains a motion filed in the Circuit Court on February 9, 2012, titled "Defendant's Motion to Compel Supplemental Production of Discovery and

Potentially Exculpatory Evidence." (State Habeas Ex. 296, at 1–2.)  The motion requests, *inter alia*, that the Commonwealth produce "[t]he identity of the person who determined that the airbag was not productively testable for DNA or other forensic evidence (whom the Commonwealth has previously promised to identify)."  (*Id.* at 1.)

  e.  <u>**State Habeas Exhibit 394**</u>

  State Habeas Exhibit 394 contains a letter from Crockett's counsel to Crockett, dated December 29, 2014.  (State Habeas Ex. 394, at 1.)  In the letter, counsel stated:

> Thank you for your letter of December 14, 2014, containing your questions regarding who in the prosecution determined that the airbag was "not productively testable," and on what grounds such a determination was made.
>
>  I do recall one of the prosecutors advising me that the airbag was "not productively testable" for the recovery of trace evidence (DNA, hairs, blood, etc.), and the reason given was that it had been exposed to the elements too long to be so tested.
>
>  I do not recall any more specifics regarding your inquires, but I do not believe that any more specifics were given to me.

(*Id.*)

  f.  <u>**State Habeas Exhibit 415**</u>

  State Habeas Exhibit 415 contains the notarized affidavit of Robert F. Bagnell, dated November 5, 2015, and an addendum to the affidavit.  (State Habeas Ex. 415, at 1–19.)  The affidavit states:  "All of the statements in this affidavit are honest and true to the fullest extent of my knowledge."  (*Id.* at 18.)  The notarized addendum, dated February 2, 2016, contains the following notary's oath:  "This day personally appeared before me, the undersigned Notary Public in and for the State of Virginia, Robert F. Bagnell, who after first being duly sworn, deposed and said that the facts contained in the foregoing instrument are true and correct."  (*Id.* at 20.)

In his affidavit, Mr. Bagnell describes his involvement in Crockett's case as follows:

> Between March and April of 2009, Mr. Alan Donker first asked me if I could possibly assist him with a suspicious case out of Virginia Beach. Mr. Donker and I used to serve together on the Portsmouth Police Force, and he had been hired as a private investigator for what I later learned was the Cameron Crockett case. I told Mr. Donker I would be happy to help him . . . . I did not officially become involved in the Crockett matter until November of 2010, when I went to view the accident vehicle in the Virginia Beach impound lot with Mr. Crockett, Ms. Crockett, and Mr. Crockett's attorney, Mr. Andrew Sacks.

(*Id.* at 2–3.) As relevant to Crockett's claims regarding the driver's side airbag, Mr. Bagwell states:

> First I must reiterate the importance of the air bag from an evidence stand point; the air bag is a factory sealed system, the deployment of which includes an extremely high temperature high enough to destroy any possible trace DNA belonging to an installer. The surface of the air bag is rough and highly textured which is especially conducive to the recovery of Biological Material (sufficient to develop a DNA profile) from an air bag deployment.
>
> In 2008 (and remaining in 2015) there is no technique to simply observe an air bag and determine there is no biological matter present from which a DNA profile could be developed; that is not to imply that there are some biological samples that are in fact visible to the unaided eye. It is impossible to simply view an[] air bag, or for that matter any artifact and positively determine the[re] is no biological matter present of which a DNA profile could be developed.
>
> There are procedures that can be considered as "presumptive" that are utilized in the "field." One such test is to determine if blood (only blood) evidence is present is the utilization of "Luminol", which was the only field test reagent approved (2008) for use by the Virginia Department of Forensic Science Laboratory, and was in fact provided to law enforcement agencies by the aforementioned laboratory. . . .
>
> The other "field" analysis is to view the artifact using a Forensic Laser, a Forensic Light Source (sometimes referred to as an Alternate Light Source) or in some instances utilizing a high range ultraviolet lamp. . . .
>
> In the event that either of these tests/analysis were conducted which for any reason, could be responsible for the degrading of biological material so as to preclude a DNA profile from being developed would be considered as possibly exculpatory in nature.
>
> That the Commonwealth indicate[s] that an unknown (to the defense) individual determined that there was no biological material suitable to the development of a DNA profile is unsatisfactory and requires further scrutiny to include issues pertinent to Discovery.
>
> As has previously discussed the development of a DNA profile is considered unique characteristic evidence and that a profile of someone other than

Mr. Crockett would be proof that Mr. Crockett was not the operator of the vehicle at the time of the collision and as such would not only be subject to Discovery but would be exculpatory to the extent as to disqualify Mr. Crockett as a suspect.

(*Id.* at 19.)

g.      **State Habeas Exhibit 425**

State Habeas Exhibit 425 consists of eighty-one pages of documents, which Crockett describes as the "Preservation of Airbag Under § 19.2–270.4:1 File." (State Habeas Ex. 425; Master Ex. List.) The documents include, *inter alia*, a Virginia Beach Police Department Case Report that lists two items (described as a "multi color smoking devi[c]e containing Marijuana residue" and a "driver air bag"), which are being held "for investigative purposes" as related to the December 28, 2008 incident. The documents also include copies of various filings in the Circuit Court regarding Crockett's attempts in 2015 to ensure that the evidence in his case remained preserved. (State Habeas Ex. 425, at 1–81.)

h.      **Summary of Evidence Identified by Crockett as Related to the Driver's Side Airbag**

Crockett references several State Habeas Exhibits as support for his claim that evidence related to the driver's side airbag supports his actual innocence claim. However, upon review of the State Habeas Exhibits that Crockett cites, the identified evidence consists largely of e-mails between Crockett and his counsel (or counsel's paralegal), or between Crockett's counsel and the Commonwealth's Attorney. None of this evidence has any direct connection to Crockett's actual innocence claim.

Instead, Crockett argues that this evidence shows that the Commonwealth acted improperly with respect to the driver's side airbag. Crockett submits the affidavit of Robert F. Bagnell as support for this assertion. Crockett claims that "CSI expert Robert F. Bagnell's habeas affidavit instructs that it is impossible to determine whether a piece of evidence is

'testable' for purposes of possible DNA analysis based solely on a naked-eye inspection." (ECF No. 1–1, at 43 (citing State Habeas Exhibit 415, at 19).) Crockett further claims that "[a]s Bagnell explains, the only way to determine if the evidence is 'testable' is to conduct one of several presumptive 'field tests,' including for example the use of a forensic laser or a reagent like Luminol." (*Id.*) Crockett contends that "[w]ith this affidavit in hand, it is clear that the Commonwealth is not telling the defense everything it did to the airbag." (*Id.*) Crockett argues that "[t]here are three possible scenarios here." (*Id.*)

> One, perhaps the Commonwealth really does believe it properly determined that the airbag was 'not productively testable' without using any presumptive testing. . . .
> Two, the prosecution might have conducted presumptive testing on the airbag that returned no 'testable' material, but failed to disclose what this testing was. . . .
> Three, the prosecution might have been able to conduct substantive testing on the airbag only to learn that the results weren't a match to Mr. Crockett's DNA profile, leading to their concealment.

(*Id.* at 43–44.) Further, Crockett argues:

> In any event, this is what we do know for sure thanks to Mr. Bagnell: the airbag is the only DNA evidence in this case, and there is more to what became of it than the Commonwealth is letting on. Its refusal to divulge what testing it performed on evidence of such unparalleled importance is unacceptable. Whatever it is that the prosecution is hiding, it must be exculpatory somehow or another. For this reason, granting discovery on this issue would be sure to strengthen [Crockett's] actual innocence claim as well as his *Brady* claim.

(*Id.* at 44.)

However, although it is clear that Crockett disagreed with the Commonwealth's determination that the driver's side airbag was not testable, Crockett's *argument* that the Commonwealth "is hiding" something that "must be exculpatory somehow or another," is not evidence of his innocence. (*See id.*) That is, although Crockett argues that the only reason the

Commonwealth did not test the airbag was because it was somehow exculpatory, such an argument is not "new reliable evidence" of actual innocence. *Schlup*, 513 U.S. at 324.

### 13.    **Prosecutorial Misconduct**

Crockett contends that "[d]uring the prosecution's closing arguments in the first trial, it represented to the jury that it did not know who Mr. Crockett had accused of being the real driver until Crockett revealed it that week in court." (ECF No. 1–1, at 45.) Crockett claims that "[t]he truth was that after Mr. Crockett retained counsel, he did relay the accusation that Jacob Palmer was the driver to the authorities." (*Id.* (citing State Habeas Ex. 1, at 17).)

> As support for this assertion, Crockett cites his own affidavit, in which he states:
>
> Around the time of March 2009, my then-attorney John D. Hooker Jr., asked me for permission to tell the Commonwealth about my allegation against Jacob Palmer so that the Commonwealth could "investigate" the matter." I granted him this permission (but later rescinded it in a voicemail some hours later). Mr. Hooker took the information straight to the Commonwealth and told them that my defense was that Jacob Palmer was the driver. This is evidenced by Exhibit #269A, which is an Internal Affairs interview between IA Sergeant D. Fiore and Sergeant Thomas Kellogg. In this recorded interview, Mr. Kellogg confirms that John Hooker told the Commonwealth about my defense (and in particular, about Jacob Palmer), and that the Commonwealth then told him about it is so that he could follow up.

(State Habeas Ex. 1, at 17.)

State Habeas Exhibit 269A, to which Crockett refers in his affidavit and cites in his Memorandum in Support of his § 2254 Petition, is a transcript of an interview of MPO Thomas Kellogg, which Sergeant Dan Fiore conducted on June 18, 2013. (State Habeas Ex. 269A, at 1–3.) In the interview, when asked "[h]ow long after the crash did you find out that the driver the person who had been charged with this crash was now accusing somebody else as being the driver of the car and in fact naming that person," MPO Kellogg stated: "At a minimum months, months and I found out through the Commonwealth Attorney's Office." (*Id.* at 2.) MPO Kellogg does not provide a specific date as to when he learned about the accusation of a third-

party driver, and he states that "[he] was told by the Commonwealth." (*Id.* at 2–3.) MPO

Kellogg's interview does not discuss who informed the Commonwealth's Attorney about the

accusation of a third-party driver. (*See id.*)

> Crockett argues:
>
> Based on this evidence, it is indisputable that the prosecution lied to the 2011 jury when it told them that it had no knowledge of the Palmer accusation prior to trial. It knew about him for years. Its decision to deliberately deceive the jury in this way demonstrates just how desperate the Commonwealth was to secure a conviction.

(ECF No. 1–1, at 45.)

Examining the interview notes that Crockett cites in support of his claim regarding when

MPO Kellogg learned about Crockett's accusation of a third-party driver, Crockett overstates the

conclusiveness of MPO Kellogg's statements. Moreover, Crockett fails to articulate, and the

Court fails to discern, how the Commonwealth's alleged desperation in Crockett's first trial is

"new reliable evidence" to support Crockett's claim of innocence. *Schlup*, 513 U.S. at 324.

### 14. "Dr. Fabian's Report on Crockett's Mental Condition at the Time of His Statements to Police; Proof of Amnesia"

Crockett contends that the report authored by Dr. John M. Fabian, a neuropsychologist,

"show[s] that Crockett's statements [to the police at the hospital] were truly the product of his

amnesia and thus have very little probative value as evidence of guilt." (ECF No. 1–1, at 46,

48.) Crockett explains that "[i]n preparing his habeas petition, Mr. Crockett retained [Dr.

Fabian] . . . to study the voluntariness of his statements to police." (*Id.* at 46 (citing State Habeas

Ex. 411). Crockett submitted Dr. Fabian's report as State Habeas Exhibit 411. (State Habeas

Ex. 411, at 1–6.)

Dr. Fabian's report consists of a letter dated February 8, 2016, which Dr. Fabian sent to

Crockett. (*Id.* at 1.) Dr. Fabian signed the letter and a separate page (which does not include any

portion of the letter), contains a notary's signature, stamp, and oath. (*Id.* at 6.) Specifically, the notary's oath states:

> Before me, Christina Garza-Brown, on this day personally appeared, John Matthew Fabian known to me (or proved to me on the on the [sic] oath of) TX Driver's License or through (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

(*Id.*) In the letter, Dr. Fabian states that Crockett's mother "had sent [him] some discovery and a table of exhibits," which he reviewed. (*Id.* at 1.) Specifically, Dr. Fabian indicates that he reviewed the following materials:

> accident scene photographs, James Kelly Reid testimony, Cameron Crockett medical records, Officer Wallace testimony, James Kelly Reid police interview, Officer Buechner testimony, Officer Bradley testimony, preliminary hearing transcript, Officer Bradley interoffice memorandum, EMT Beth Coulling testimony, hospital interview of Cameron Crockett, Cameron Crockett testimony, toxicologist L. Edinboro testimony, and Commonwealth closing argument.

(*Id.*) With respect to the scope of Dr. Fabian's review, he stated: "Pursuant to your request, you wanted me to address issues related to your mental state at the time of the confession, as well as issues related to traumatic brain injury and amnesia pursuant to your recall of your offenses and your statements to police." (*Id.*)

> Dr. Fabian stated that from his review of the records, it was his understanding that
>
> [Crockett ] [was] admitted to the Sentara Virginia Beach General Hospital on the day of the incident (12/28/2008) and discharged on 12/30/2008. [Crockett] [was] admitted due to a motor vehicle accident (MVA). . . . There was combativeness and questionable loss of consciousness at the scene for [Crockett]. However, Glasgow Coma Scale (an indicator of severity of brain injury) was noted to be 15 en route to the emergency department. . . .
>  . . . CT of the head, cervical spine, and pelvis were completed and were normal. A critical result that was received was [Crockett's] alcohol level BAC of 0.20. It should also be noted that the 0.20 was sometime after the MVA actually occurred. [Crockett's] BAC was likely higher at the time of the MVA.

(*Id.* at 1–2.)  Dr. Fabian noted that he had "requested to be able to talk to [Crockett] over the telephone about the night in question," but Crockett's mother told him that "the prison officials were not cooperating on [Crockett's] end to facilitate a private phone call between [them]."  (*Id.* at 3.)  Dr. Fabian also noted that "[he] continue[d] to reiterate the desire to examine [Crockett] at least by telephone."  (*Id.*)  Dr. Fabian stated:

> After reviewing all the information you sent me and yet, without interviewing you, I do have professional concerns as to your mental state at the time of the offense and your ability to have understood your legal situation and the consequences, specifically of your understanding and appreciating any Miranda rights that were given to you.  I also am concerned about the usefulness and utility of any of the statements you made at that time due to your fragile mental state that was affected by not only alcohol but also the effects of a concussion.

> To those ends, it is my opinion that your interrogation by police was affected by your alcohol intoxicated state.  Especially if you were at a 0.20 BAC level at the time of the MVA, you were at risk of having a blackout.  An alcoholic blackout is amnesia for the events of any part of a drinking episode without loss of consciousness characterized by memory impairment during intoxication. . . .

> . . . .

> Finally, I have major concerns about your mental state at the time of the MVA and following the MVA as it pertains to your statements to the police.  The neurocognitive effects are more substantial due to the forces of both alcohol intoxication and a concussion that occurred at the same time. . . .

> . . . .

> It is very possible that you have a genuine blackout/fragmentary blackout or brownout of the nature of the incident, and when you returned to the MVA site, you were able to recognize, cue, and recall some bits and pieces of the incident and that evening.

> However, I also have concerns at the time of your statement, that you were still intoxicated and you had a blackout or brownout in regards to the nature of the MVA, and you were not in a lucid mental state to appreciate the circumstances of your legal rights and the consequences of making any type of statement. . . .

> . . . .

> In summary, it is my opinion that the effects of alcohol intoxication and the level of your BAC in combination with your TBI [traumatic brain injury] had

significant effects on your recall of the incident as well as your ability to make decisions concerning any potentially incriminating statements.

(*Id.* at 3–5.)

Crockett argues that "[t]his report strips Crockett's statements of any real substance," and "[i]t is readily apparent that he was genuinely at a loss for what had happened to him. His incriminating statements were not an admission of guilt as the Commonwealth would have it, but rather the product of bona fide fragmentary brownout caused by a TBI and excessive alcohol consumption." (ECF No. 1–1, at 47.) Crockett argues that "Dr. Fabian's report . . . goes a long way towards neutralizing what the Commonwealth leaned on as its best evidence at trial." (*Id.*)

However, Crockett overstates the conclusiveness of Dr. Fabian's report because Dr. Fabian acknowledged that he had not had the opportunity to meet with Crockett in person; rather, he couched his opinion as being based on a review of "all the information [Crockett] sent [him] and yet, without interviewing [Crockett]." (State Habeas Ex. 411, at 3.) Further, Dr. Fabian's report does not indicate that Crockett was not the driver of the vehicle, and instead he opines that Crockett likely does not remember the incident due to the combined effects of alcohol and a possible concussion or other brain injury. A lack of memory of an incident is not "new reliable evidence" of actual innocence. *Schlup*, 513 U.S. at 324.

### 15. **"Dr. David Pape's Seatbelt Inspection"**

Crockett next discusses a report that Dr. David Pape authored in December 2012 after Crockett's sentencing counsel retained Dr. Pape "to determine whether the driver's seatbelt was in use at the time of the collision." (ECF No. 1–1, at 48.) Crockett argues that "[Dr.] Pape's determination that the driver was belted during the accident is by far the most powerful evidence of innocence in this case. This is because it has always been crystal clear and completely undisputed that Mr. Crockett was not belted during the crash." (*Id.* at 49.) Crockett claims that

"the back seat/back window position in which Crockett was found unconscious is physically irreconcilable with the notion that he was the belted driver in a sideways collision," and "[Dr.] Pape's report said the belt functioned properly during the collision, so there is no way it broke and allowed the driver to slip out." (*Id.*)

In Dr. Pape's report, which consists of a letter to Crockett's sentencing counsel, Dr. Pape reached the following conclusions:

1. The vehicle damage was consistent with impact with a tree on the right side.
2. The driver's seatbelt latch and retractor functioned properly at the time of our inspection.
3. The driver's seatbelt webbing had been cut in two places during the extraction process.
4. The one section of driver's seatbelt webbing had cupping. This cupping was consistent with loading from occupant forces during the collision and suggested that the seatbelt was being worn by the driver at the time of the collision.

(State Habeas Ex. 407, at 1.)

Crockett claims that Dr. Pape's report is "by far the most powerful evidence of innocence in this case" because it is "completely undisputed that Mr. Crockett was not belted during the crash." (ECF No. 1–1, at 49.) However, as was the case with Dr. Fabian's report, Crockett overstates the conclusiveness of Dr. Pape's report. Specifically, Dr. Pape concluded that the cupping on the driver's seatbelt "*suggested* that the seatbelt was being worn by the driver at the time of the collision;" however, Dr. Paper did not affirmatively conclude that the driver had in fact worn a seatbelt. (State Habeas Ex. 407, at 1 (emphasis added).)

### 16.    **Affidavit of Ron Kirk**

Crockett contends that the affidavit of Ron Kirk, "the Senior Engineer and President of Research Engineers, Inc.," and "a consultant with 45 years of experience in accident

reconstruction," supports his actual innocence claim. (ECF No. 1–1, at 50 (citing State Habeas Ex. 412).) In Mr. Kirk's affidavit, he states, in sum:

1. I, Ronald K. Kirk, am a consulting engineer specializing in the analysis and reconstruction of motor vehicle collisions, which I have been doing for over 45 years. I am presently employed as Senior Engineer and President of Research Engineers, Inc., in Raleigh, North Carolina.

2. In the year 2011, I was requested by Mr. Andrew Sacks, trial attorney for the defendant, Cameron Crockett, to consult on Mr. Crockett's DUI Involuntary Manslaughter case. In February of that year, I performed an inspection of the accident vehicle in the police impound lot and also examined the site of the accident. As part of my preparation, I also reviewed various case documents.

3. While I was engaged in the Crockett matter, and after I viewed the vehicle and the accident site, I expressed my recommendation that the driver's side seat belt in the accident vehicle should be examined and analyzed for signs of use during the collision. I expressed this recommendation to Mr. Sacks, along with the recommendation that a biochemical expert be consulted regarding occupant kinematics. The purpose of these recommendations was to acquire an expert determination regarding whether Mr. Crockett was driving the vehicle at the time of the crash.

4. I am confident, to a reasonable degree of engineering certainty, that Mr. Crockett could not have been found where he was by the first witness to respond to the accident if he had been the belted driver. Although this opinion appears self-evident, I believe that I specifically expressed this opinion to Mr. Sacks.

5. I advised Mr. Sacks that if one were to remove the roof of the accident vehicle, clear the debris therein, and photograph the vehicle from above, this perspective would likely assist in explaining occupant kinematics and would help to determine and to explain whether Mr. Crockett was driving the vehicle.

6. I attest that all of the information in this statement is true and correct to the best of my recollection and knowledge.

(State Habeas Ex. 412, at 1.)[12] Mr. Kirk's affidavit is signed and dated January 28, 2016. (*Id.*)

A separate page (which does not contain any portion of the affidavit), includes a notary's

---

[12] Crockett also submits the affidavit of Michal Bogacki. (ECF No. 19–1.) In the affidavit, Mr. Bogacki states, *inter alia*:

On January 8th of 2016, I visited Research Engineers Inc. in Raleigh, NC to speak with Research Engineer Inc.'s director, Mr. Ronald Kirk, about an affidavit he was considering having notarized and sent to Mr. Cameron Crockett. Although Mr. Ronald Kirk was unavailable that day, Kirk called me on the morning of January 9th, 2018. The conversation was memorialized in a contemporaneous update I had sent by e-mail . . . .

(*Id.* at 1–2.) The remainder of Mr. Bogacki's affidavit sets forth the above-referenced e-mail, which consists of Mr. Bogacki's summary of his conversation with Mr. Kirk, and an unsigned

signature, stamp, and oath. (*Id.* at 2.) Specifically, the notary's oath states: "On this 28 day of January, 2016, Ronald E. Kirk appeared before me and asserted that the above information is true and correct to the best of his recollection and knowledge." (*Id.*) Mr. Kirk attached his resume to his affidavit. (*Id.* at 3–4.)

Crockett explains that his trial counsel "retained Mr. Kirk before the 2011 trial to inspect the vehicle, go over the crash site, and review relevant case documents." (ECF No. 1–1, at 50.) Crockett claims that "[a]t the time of Kirk's inspection, he advised Sacks that someone should examine the driver's seat belt for signs of use. . . . [H]owever, that did not happen until after Mr. Crockett was convicted." (*Id.* (citing State Habeas Ex. 412).) Crockett argues:

> [Mr. Kirk's] "self-evident" opinion is of unsurpassable magnitude. Mr. Kirk's credentials are untouchable, and here he is, drawing upon fifty years of experience in this field to reach an unequivocal scientific conclusion that Mr. Crockett was not the belted driver in this case. And given that the driver was belted, Kirk's opinion is nothing short of a declaration of Mr. Crockett's innocence. Indeed, seeing as how this evidence builds upon Dr. Pape's already impressive findings and takes them another step further, it is difficult to imagine that anything else could be more decisively exonerating than what the Court has before it now.

(*Id.*)

Although Crockett argues that Mr. Kirk "reach[ed] an unequivocal scientific conclusion" that exonerates Crockett, the Court notes that Mr. Kirk's conclusion is not as definitive as Crockett suggests. (*Id.*) Specifically, Mr. Kirk indicates that he based his opinion on Crockett's position in the vehicle as reported "by the first witness to respond to the accident." (State Habeas Ex. 412, at 1.) However, Mr. Kirk provides no information about the witness to whom he refers or the specific position of Crockett's body upon which he based his opinion.

---

proposed affidavit for Mr. Kirk. (*See id.* at 2–10.) Upon review of this affidavit, the substance of the affidavit does not alter the Court's discussion set forth herein regarding Mr. Kirk's affidavit.

Furthermore, although Mr. Kirk indicates that in his opinion, as an engineer, Crockett was not the *belted* driver, Mr. Kirk does not conclusively state that Crockett was not driving the vehicle.

### 17.  **"Counsel's Notes of His 2011 Teleconference with Ron Kirk"**

In addition to citing Mr. Kirk's affidavit as support for his actual innocence claim, Crockett also cites counsel's notes of his 2011 teleconference with Ron Kirk as support for his actual innocence claim. (ECF No. 1–1, at 51 (citing State Habeas Ex. 143).) Crockett claims that "[t]hese notes not only confirm Kirk's opinion seen in the discussion of his affidavit above; they also reflect three additional exculpatory conclusions that Kirk reached when he reviewed the case." (*Id.*)

Specifically, Crockett claims:

First, Kirk explained that the tree's penetration into the passenger side of the vehicle would have forced the driver towards the driver's door and somewhat towards the front – not into the back.  Exhibit #143, p.2.

Second, Kirk told Mr. Sacks that because Mr. Korte's momentum would have thrust him in the direction of the driver's compartment, he would have kept the driver in the driver's seat and prevented him from sliding out of it.  *Id.*

Third, Kirk expounded on the preceding conclusion to opine that the driver definitely could have escaped without significant injury because Mr. Korte's body would have shielded him from the brunt of the impact.  Exhibit #143, p.3.

(*Id.*) State Habeas Exhibit 143, which Crockett references, consists of counsel's handwritten notes of a conversation with Mr. Kirk on February 24, 2011. (State Habeas Ex. 143, at 1–6.) Counsel's notes are difficult to decipher because counsel used abbreviations and sentence fragments rather than complete sentences.  (*Id.*)

Based on the Court's review of counsel's notes, the notes appear to be just that—notes—and Crockett misstates the definitiveness of Mr. Kirk's conclusions as summarized by counsel in his notes.  As such, counsel's handwritten notes are not any of the three types of "new reliable

evidence" contemplated under *Schlup*, and Crockett's arguments regarding these notes does not significantly bolster his actual innocence claim.

### 18. Second Trial Juror Affidavits and Statements

Crockett argues that

> a total of four jurors from the second trial have come forward in one way or another to comment on the case. Some of these juror statements speak on the case as it was presented at trial and how they found the defendant guilty notwithstanding their belief that there was a reasonable doubt as to whether he was the driver. Other juror statements comment on how certain evidence not presented at trial would have changed their verdict had they known about it. Others yet do both.

(ECF No. 1–1, at 51.) Crockett contends that the "affidavits and on-camera remarks" of these jurors "reveal that Mr. Crockett's second trial could have gone the other way with just a whisper of the wind." (*Id.* at 54.) Further, Crockett argues:

> However unjust the original result, though, there is something even more important to take away from these juror statements.
>
> That, of course, is their stance on the seat belt evidence. Sure, the case was close before, which is itself a valuable insight in the actual innocence inquiry, but what matters most here is that these jurors have made one thing perfectly clear: Dr. Pape's testimony absolutely would have precipitated an acquittal. No one can speak more credibly to this fact than the very jurors who tried the case to begin with, and that is what is before us today.

(*Id.*)

#### a. Affidavit of Melvin Velez

First, Crockett discusses the affidavit of Melvin Velez, explaining:

> Melvin Velez was a man who worked with second trial juror Kasiem Breddell. On March 2, 2012, the day after Mr. Crockett was convicted, Velez spoke with Breddell on the phone about a business matter. Breddell at this point told Velez that his recent absence had been due to jury service.

(*Id.* at 51–52 (citing State Habeas Ex. 421.) State Habeas Exhibit 421, which Crockett describes as Melvin Velez's affidavit, consists of a notarized letter from Melvin Velez to "Judge Frederick

Lowe, Mr. Andrew Saks, Virginia Commonwealth Attorney, and Clerk of Virginia Beach Circuit Court." (State Habeas Ex. 421, at 1.) In the notarized letter, Melvin Velez states, in sum:

> My name is Melvin Velez and I am a resident of Virginia Beach. I have information that my wife has given to Mr. Saks previously concerning the recent case of Cameron Crockett. Cameron was convicted in Virginia Beach Circuit Court on 01 March 2012. On 02 March 12, I spoke by phone to one of the jurors on this case in reference to a business matter. At that time this juror mentioned that his recent absence had been due to his jury duty for this case and that he would also need to be off on Monday for the hearing regarding the subsequent sentencing. The juror stated to me the defendant's name and that there was division and indecision amount the jurors and that he, in fact, had believed the defendant to be innocent. But he said a decision had to be made, and they did. He also spoke of the pending sentencing, stating some jurors wanted a great amount of time and that some jurors wanted less time for this defendant. He told me which case he was serving on; he did not know that I was aware of the case and had a remote connection to the defendant.
> I am not sure, but I think this kind of communication may not have been appropriate. I do not believe the juror meant to cause harm, but I do think he violated the instructions given to him by the judge for this case.
> There is so much at stake in this case; one young man's life was lost; the future of another young man's life is now at risk also. I just want to do the right thing myself. I think letting the key persons in charge of this case know that this case might have been jeopardized due to this juror's indiscretion and violation of court instructions. The verdict has been rendered, but the sentencing had not, and the case was not closed nor was it open for discussion.
> The juror in question's first name is Kaseem, and I could identify his second name from a roster. If I am needed, I will help in any way possible. Whether Cameron is guilty or innocent, he deserves a fair trial.

(*Id.*) The letter is dated March 19, 2012, and Melvin Velez and the notary public signed the letter on March 21, 2012. (*Id.*) The letter did not memorialize an oath. (*See id.*)

In Crockett's Memorandum in Support of his § 2254 Petition, Crockett highlights the following portion of Mr. Velez's affidavit: "The juror stated to me the defendant's name and that there was division and indecision amount the jurors and that he, in fact, had believed the defendant to be innocent. But he said a decision had to be made, and they did." (ECF No. 1–1, at 52.)

### b.　"Laurie Simmons's Channel Three Interviews with Barbara Addison and Edward Ruehl"

Crockett next discusses a News Channel Three "investigative report by Laurie Simmons on Mr. Crockett's case," which aired on March 3, 2014.  (*Id.* (citing State Habeas Ex. 382).) State Habeas Exhibit 382 consists of several news articles, including a computer print-out of a news article written by Laurie Simmons, dated March 4, 2014, titled, "Court of Appeals to decide if Cameron Crockett deserves 3rd trial."  (State Habeas Ex. 382, at 6–8.)  Crockett explains that "[t]his report featured interviews of several jurors who gave their perspectives on the trial and on Mr. Crockett's new seatbelt evidence in particular."  (ECF No. 1–1, at 52.)

As support for his actual innocence claim, Crockett points to a quote in the article, which is attributed to juror Barbara Addison ("Juror Addison"):  "I wasn't ready to convict him.  To me, it was so sketchy . . . .  They never proved that he drove the car!"  (State Habeas Ex. 382, at 7; *see* ECF No. 1–1, at 52.)  Crockett points also to quotes in the same article attributed to Juror Addison and juror Edward Ruehl ("Juror Ruehl"):

> "I would have not voted guilty, it would have been a hung jury," said Addison.
> "Certainly there is enough information in my mind that would justify another trial," said Ruehl.  "Whether he is guilty or innocent, that's up for [the] next 12 people to look at."

(State Habeas Ex. 382, at 7, 8; *see* ECF No. 1–1, at 52.)

### c.　Affidavit of Barbara Addison

Further, Crockett discusses the affidavit of Juror Addison, which he contends supports his actual innocence claim.  (ECF No. 1–1, at 52 (citing State Habeas Ex. 420).)  State Habeas

Exhibit 420 contains Juror Addison's affidavit, which is dated October 24, 2015. (State Habeas Ex. 420, at 1–2.) In the affidavit, Juror Addison states, in sum:

> 1. I, Barbara Addison, served as a juror in the trial of Cameron Crockett in February and March of 2012.
> 2. I had a very difficult time arriving at my verdict and I do not feel like there was any justice in the whole thing. It did not feel right because there was just so much that we did not know.
> 3. I would have voted differently if we, the jury, had the new seatbelt report available to us. I also would have voted differently if we had the 911 recordings available to us.
> 4. One of the things that really stood out to me was Mr. Crockett's statement to police. I felt like he was not all there and had a concussion. I brought this up with the other jury members, but they said we could not talk about that because there was no evidence to support that angle.
> 5. One thing that really hurt Mr. Crockett from our perspective was the fact that the person he claimed was driving was not called to the stand. We heard all kinds of rumors and assumed the kid was there in the courtroom. There were a whole lot of other kids there behind Mr. Crockett.
> 6. We gave Mr. Crockett a longer sentence because we wanted his brother to learn a lesson that you have to pay for your mistakes.

(*Id.*) The notarized affidavit contains the following notary public's oath: "This day personally appeared before me, the unsigned Notary Public in and for Virginia Beach, Virginia, Barbara Addison, who after first being duly sworn, deposed and said that the facts contained in the foregoing instrument are true and correct." (*Id.* at 2.)

### d.    Affidavit of Donna Smitter

Crockett also discusses the affidavit of juror Donna Smitter ("Juror Smitter"), which he contends supports his actual innocence claim. (ECF No. 1–1, at 53–54 (citing State Habeas Ex. 418).) Crockett argues that Juror Smitter "is another second trial juror who not only harbored doubt at the time of trial but also would have voted differently had the seat belt evidence been available." (*Id.*)

In the affidavit, which Crockett submitted as State Habeas Exhibit 418, Juror Smitter states, in pertinent part:

5.    During deliberations, one of the biggest questions I had about the case involved the driver's seatbelt.  I frequently asked the other jurors about the seatbelt and why Cameron did not have any seatbelt injuries.  The majority of the jurors who felt Cameron was the driver believed that he did not wear a seatbelt and that was how he got into the backseat of the car.

6.    Since the verdict, I have followed the news in Cameron's case.  In early 2014, there was a Channel Three news story by Laurie Simmons about Cameron's appeal and his newly discovered seatbelt evidence.  This news story focused on how, after the trial, Cameron got a new lawyer and had an engineer examine the driver's seatbelt.  The engineer found that the seatbelt was in use during the collision.

7.    We the jury heard all about Cameron's position in the car at trial and I can say with confidence that this evidence would have definitely changed the verdict.  I really wish that we could have had the benefit of this evidence at trial.  The central position of the jurors who pressured me into finding Cameron guilty was that Cameron was found in the backseat because he, being the "unbelted driver" in their eyes, flew back there during the collision.  This was how they were able to explain the discovery of Cameron in the backseat and the fact that he had no seatbelt injuries in a manner that was consistent with him being the driver.  Evidence showing that the driver was belted would have completely eviscerated this fundamentally flawed belief.  While I obviously can't speak for every single one of us, I do know for a fact, based on the thinking we experienced that motivated the verdict, that this evidence would have changed the minds of the majority of the jurors.  As the posture of the other jurors shows, we were unanimous on at least one thing:  that Cameron was *not* belted.  Had we known the driver *was*, everyone would have been forced to conclude that *Cameron was not the driver*.

8.    All of the information in this statement is true, honest, and accurate.

(State Habeas Ex. 418, at 1–2 (emphasis in original).)  The notarized affidavit, dated August 14, 2015, contains the following notary's oath:  "This day personally appeared before me, the unsigned Notary Public in and for Virginia Beach, Virginia, Donna Smitter, who after first being duly sworn, deposed and said that the facts contained in the foregoing instrument are true and correct."  (*Id.* at 2.)

### e.    Discussion of Juror Affidavits and Statements

Throughout this section, the Court has discussed whether any of the evidence submitted by Crockett constitutes "new reliable evidence."  As discussed above, the Supreme Court has explained that to be credible, three types of "new reliable evidence" may support a petitioner's

allegations of innocence.  *Schlup*, 513 U.S. at 324.  These include "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial."  *Id.*  The juror affidavits and juror statements to the news media do not constitute any of the above-listed types of evidence because any discussion about why jury members voted in a certain manner or whether the introduction of different or new evidence at trial might have caused a juror to vote in a different manner does not constitute evidence of actual, factual innocence.  *See Johnson v. Giles*, No. 1:09CV1149–TMH, 2011 WL 4971967, at *3 (M.D. Okla. Sept. 14, 2011) (explaining that it is questionable "whether an affidavit by which a juror seeks to impeach her [or his] own or the jury's verdict—a generally disfavored tactic—could ever meet *Schlup*'s requirement that *factual*—as opposed to legal—innocence can be demonstrated when one asserts his [or her] 'actual innocence'").

### 19.    **"The Defendant's Vehement Protestations of Innocence"**

Crockett argues:

> From day one, [he] has been highly involved in his own defense and extraordinarily outspoken regarding his innocence.  At times, he has even taken extreme measures to color the record with how he feels about this case.  Owing to just how exceptional Mr. Crockett's actions have been in this respect, they are worthy of consideration in the actual innocence context.

(ECF No. 1–1, at 54 (citations omitted).)  Specifically, Crockett claims that his "flight to Guatemala following his conviction is a prime example of the lengths he went to in order to express himself."  (*Id.* at 55.)  Crockett argues:

> The uninformed would criticize this as evidence of a consciousness of guilt, but such a position fails to credit the fact that Crockett didn't flee before trial, but after. It was only once the jury had, in his eyes, wrongfully decided his fate for the second

time that he was resolved to leave. And even then, it wasn't to duck the gavel; it was, for Mr. Crockett, the only effective means of protest available.

(*Id.*) Crockett also claims that

he shrug[ged] off the chance to plead guilty and face at most six months; he stared down the barrel of two jury trials, testifying in both, and then made a move he knew would earn him extra lashes because to him it was worth trading several years of his life in exchange for being able to resist this injustice on his own defiant terms. That's not madness; that's how far a wrongfully convicted man will go to have his cries of innocence heard.

(*Id.* at 56.) However, in terms of presenting "new reliable evidence" to support his actual

innocence claim, Crockett fails to articulate, and the Court fails to discern, how Crockett's

"vehement protestations of innocence" in this case, which included fleeing the country after

conviction but before the penalty phase of his trial, constitutes "exculpatory scientific evidence,

trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial."

*Schlup*, 513 U.S. at 324; (*see* ECF No. 1–1, at 54–56.)

## 20. "Mr. Crockett's Implacable Desire to Expose Jacob Palmer on the Stand"

Finally, Crockett claims that "[a]nother fact worthy of consideration [in his actual

innocence claim] is just how adamant Crockett has been about having Jacob Palmer face the

crucible of cross-examination and answer for his involvement in the accident." (ECF No. 1–1, at

56 (citation omitted).) Crockett argues that

[he] has relentlessly hounded Palmer, and he has been willing to spite himself to do it. Many criminal defendants have pointed the finger at a mystery third party at trial, but to see one repeatedly accuse a specific individual, in public, with evidentiary support, and over the course of nearly a decade, is another matter entirely. That is the path Crockett has blazed in the present case. Such an

impetuous quest to expose Palmer to the light only makes sense in a world where Crockett really is innocent and Palmer really is guilty.

(*Id.*)

However, Crockett fails to articulate, and the Court fails to discern, how Crockett's desire to have Mr. Palmer "cross-examined" regarding any involvement in the matter constitutes "new reliable evidence" under *Schlup*. (*Id.* at 56–58); *see Schlup*, 513 U.S. at 324. Further, although Crockett claims that there is "evidentiary support" for his allegations against Mr. Palmer, as discussed above in greater detail, Crockett's "evidentiary support" consists largely of statements from witnesses who do not have direct information regarding Mr. Palmer's whereabouts on the night of the accident. Additionally, in presenting such "evidentiary support" in his § 2254 Petition, Crockett has misstated the conclusiveness of many of these statements. As such, Crockett's desire to have Mr. Palmer "cross-examined" does not significantly bolster his claim of actual innocence.

### C. Reliability of Crockett's New Evidence

As noted above, the Supreme Court has explained that to be credible, three types of "new reliable evidence" may support a petitioner's allegations of innocence: "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324.

The Court has thoroughly reviewed all of the evidence identified by Crockett as new evidence in support of his actual innocence claim. However, as set forth above in great detail, the evidence that Crockett has tendered does not constitute "new reliable evidence." Although Crockett has proffered a considerable sum of evidence that he alleges is both new evidence and reliable evidence, the volume of Crockett's evidence does *not* make it new, trustworthy, or reliable. The Court set forth above its reasoning as to why each piece of evidence Crockett

identified does not significantly bolster his actual innocence claim and does not constitute "new reliable evidence," and the Court does not restate its findings in detail in this section.

However, to summarize, the Court observes that in many instances, Crockett vastly overstates, or misstates, the exculpatory nature of the evidence or the conclusiveness of expert findings regarding physical evidence. When the Court's review of the evidence shows that the arguments presented are based on questionable – or even inaccurate or misleading – conclusions or descriptions of evidence, the Court must look to what the evidence itself demonstrates. That is, although Crockett is free to present arguments regarding the evidence that he has identified, it is the evidence, not the arguments, which constitute "new reliable evidence." Here, as explained above in greater detail, the Court finds that the evidence Crockett identified does not constitute "new reliable evidence" as required under *Schlup*. *See id.* As such, Crockett has not met his burden of producing new reliable evidence of his innocence, and the Court need not proceed to the second part of the inquiry for Crockett's gateway actual innocence claim. *See Hill*, 2010 WL 5476755, at *5 (citing *Weeks*, 119 F.3d at 1352–53; *Feaster*, 56 F. Supp. 2d at 610).

Nevertheless, despite the Court's conclusion regarding the evidence Crockett identified, as discussed below, even considering this new evidence, as well as the evidence put forth at trial, many a reasonable juror would have found Crockett guilty. *See Sharpe*, 593 F.3d at 377.

D.     **Consideration of All of the Evidence**

As detailed above, Crockett has proffered a considerable sum of new evidence. However, although Crockett has proffered a considerable sum of such material, in reviewing all of the evidence in the record, the evidence of Crockett's guilt is overwhelming, and the Court does not find compelling the evidence that he proffers in support of his innocence. That is, even though Crockett has identified evidence that he claims shows that he was not driving the vehicle

when it crashed, the evidence, albeit voluminous, fails to sufficiently lend support for Crockett's theory of a third-party driver, which is necessary to overcome the Commonwealth's abundant evidence that Crockett drove the vehicle.

At Crockett's trial, six witnesses testified that on December 28, 2008, they either saw or heard the accident. Five of the six witnesses testified that they lived on Wolfsnare Road near the scene of the accident, and the sixth witness testified that she was walking on Wolfsnare Road at the time of the accident. The six witnesses testified that upon hearing the vehicle strike the tree, some looked almost immediately toward the vehicle and the rest looked toward the vehicle or went outside to the scene of the accident within minutes of the crash. All of the witnesses testified that when they looked toward the crashed vehicle and the surrounding area, they did not see anyone leaving the scene of the accident. Further, five of the six witnesses went over to the crashed vehicle and looked inside, and all of these witnesses testified that as a result of the crash, the vehicle occupants were unconscious or that one of the occupants was starting to regain consciousness. The Court notes that the majority of these five witnesses testified that they did not initially realize that there was a second person in the vehicle on the passenger's side because the vehicle hit the tree on that side and Crockett's body largely obscured their view of the second occupant.

In addition to the above-listed witnesses, three first responders—two police officers and a paramedic—testified about their observations of the two vehicle occupants. The position of Crockett's body after the accident was a key issue at trial and remains a key issue in the new evidence Crockett identified. Although there are slight variations in the witnesses' descriptions regarding Crockett's body position, Crockett does not dispute that he was in the vehicle. Further, no one disputes that Mr. Korte, the individual who was killed in the crash, was in the front

passenger area of the vehicle. With respect to the exact position of Crockett's body in the vehicle, upon review of the witnesses' testimony, there exists a consensus that the upper portion of Mr. Crockett's body was in the backseat area of the vehicle and, at a minimum, some portion of his legs and feet were laying over the driver's seat. When describing Crockett's position in the vehicle, some of the witnesses testified that they observed that the driver's seat appeared to have broken and was flattened out.

Crockett now proffers the affidavit of Ronald Kirk, an engineer, in which Mr. Kirk states: "I am confident, to a reasonable degree of engineering certainty, that Mr. Crockett could not have been found where he was by the first witness to respond to the accident if he had been the belted driver." (State Habeas Ex. 412, at 1.) However, Mr. Kirk provides no information about the witness to whom he refers or the specific position of Crockett's body upon which he based his opinion. Furthermore, Mr. Kirk did not opine that Crockett was not driving the vehicle. Instead, Mr. Kirk opined that Crockett was not the *belted* driver. When reviewing all of the evidence, this distinction is important because Mr. Kirk's opinion would be another issue for the jury to consider in relation to all of the other evidence in this case. However, the report on its own does not outweigh the other substantial and compelling evidence of Crockett's guilt.

With respect to whether Crockett was wearing a seatbelt, some of the witnesses testified that they did not recall whether he was wearing a seatbelt, and some testified that when they observed Crockett, he did not appear to be wearing a seatbelt. None of the witnesses testified that they observed Crockett wearing a seatbelt. Crockett now submits evidence that he contends shows that the driver of the vehicle was wearing a seatbelt. Crockett argues that because the evidence shows that he was not wearing a seatbelt on the night of the accident and that he

routinely did not wear his seatbelt, this new evidence showing that the driver wore a seatbelt demonstrates that he could not be the driver.

Specifically, Crockett submits Dr. Pape's report as support for his assertion that the driver of the vehicle wore a seatbelt. In the report, Dr. Pape concluded, in pertinent part: "The one section of driver's seatbelt webbing had cupping. This cupping was consistent with loading from occupant forces during the collision and suggested that the seatbelt was being worn by the driver at the time of the collision." (State Habeas Ex. 407, at 1.) Crockett argues that the report shows conclusively that he was not the driver. However, Dr. Pape concluded that the cupping of the seatbelt *suggested* that it was worn by the driver at the time of the accident. Dr. Pape did not find conclusively that the driver was in fact wearing a seatbelt.[13] In light of the witnesses' testimony at trial, including testimony that the witnesses did not see any other person exit the vehicle or leave the scene of the accident and that, at a minimum, Crockett's legs were laying over the driver's seat, Dr. Pape's report would be another issue for the jury to consider in relation to all of the other evidence in the case. The report on its face does not outweigh the other substantial and compelling evidence of Crockett's guilt.

In addition to proffering evidence regarding the use of the driver's seatbelt, Crockett also focuses on the lack of testing of the driver's side airbag. Crockett provides an affidavit from Robert Bagnell, a former police investigator, indicating, *inter alia*, that the driver's side airbag should have been preserved for DNA testing and that he disagreed with the Commonwealth's explanation that the airbag was not productively testable. Mr. Bagnell provided similar testimony at Crockett's trial when he was called as a defense witness. Crockett argues that the

---

[13] Furthermore, the Court notes that there is no evidence that shows compellingly that the cupping Dr. Pape identified is necessarily consistent with this accident. That is, there is nothing in the record to suggest that the cupping could not have resulted from some prior incident involving the vehicle.

only reason the airbag was not tested was because it was somehow exculpatory. However, although Crockett may make such an argument, his argument is not evidence. Crockett's evidence regarding the testing, or lack thereof, of the driver's side airbag does not outweigh the substantial and compelling evidence of his guilt.

With respect to the alleged involvement of a third-party driver, this theory was presented as Crockett's defense at trial, and Crockett claims that two newly-submitted affidavits show that the third-party, Mr. Palmer, confessed to being the driver. Upon review of the affidavits, the Court notes that both affiants heard the confession secondhand – one affiant indicates that Mr. Palmer's girlfriend told the affiant, and the other affiant indicates that she was in the hallway at school and overheard Mr. Palmer discussing a case and his involvement in it. Neither affiant provided a specific date as to when Mr. Palmer confessed. Such vague evidence of a potential third-party confession does not outweigh the other substantial and compelling evidence of Crockett's guilt. Furthermore, in evaluating Crockett's current claim of innocence, any reasonable juror would give substantial weight to the witnesses' prior sworn statements at trial and would not give substantial weight to overheard or secondhand recitations of possible statements from an alleged third-party driver.

Looking at all of the evidence, the evidence shows that only Crockett and Mr. Korte were found in the car. Crockett does not dispute this. Mr. Korte passed away at the scene of the accident, and firefighters had to cut the vehicle to remove his body. No other persons were seen leaving the vehicle or the accident scene. The evidence also shows, and Crockett admits, that he was drinking on the night in question, and that he drank, at least, one forty-ounce bottle of Steel Reserve. Crockett submits evidence of a possible third-party confession; however, as discussed above, this evidence is vague in that the alleged third-party driver did not confess to the affiants

directly, and instead the affiants learned of the alleged confession either from another person or by overhearing a conversation. Moreover, it appears that the discussion of a third-party driver was fueled, in part, by rumors, and that at some point shortly after the accident, there were rumors among attendees of the party and other friends that a different third party may have been the driver.[14]

Further, Crockett himself admits that he only vaguely recollects the accident. Crockett testified at trial that he had fragmentary memories of the night in question, and that several memories from that night came back to him as flashbacks weeks later. Crockett's newly identified expert opines that Crockett's fragmentary memories are consistent with heavy alcohol consumption and a subsequent concussion or other brain injury as a result of the accident. However, even considering the new evidence explaining why Crockett has only fragmentary memories of the night of the accident, the Court notes that upon review of Crockett's trial testimony, it appears that Crockett's recollection was oddly vague in some parts (for example, he testified that he could not recall the accident), but specific in other parts (for example, he testified that he remembered clearly giving his car keys to the alleged third-party driver, Mr. Palmer, an event that would have occurred only shortly before the accident). Crockett also remembers he and Mr. Korte "were on the *passenger* side of the car," when an unidentified person asked to borrow a jacket. (Feb. 29, 2012 Tr. 751 (emphasis added).) Crockett testified, however, that he does not remember to whom he lent the jacket; but he further testified that the jacket that was left

---

[14] Additionally, there is nothing in the record to show that Crockett's position in the vehicle or his injuries from the accident were inconsistent with Crockett being the driver of the vehicle. Instead, based on all of the evidence in this case, both old and new, it is common sense that in this case—in which two individuals were found in the car (one of whom was on the front passenger side of the vehicle and the other, Crockett, on the front driver's side), and where witnesses reported to the scene within minutes, if not seconds, of the accident and did not see a third person fleeing the scene—Crockett was the driver of the vehicle.

behind at the scene of the accident (which is depicted in a photograph of the accident scene) belonged to him. (Feb. 29, 2012 Tr. 752.) Crockett simply "believe[s]" the jacket behind the car is the one "[he] gave to someone else who asked for one." (Feb. 29, 2012 Tr. 753.) Further, Crockett remembers that as he and Jack were on the passenger side of the car, he told "Jack to take the front seat because he was taller than me." (Feb. 29, 2012 Tr. 751–52.) In addition to Crockett's testimony regarding his fragmentary memories of the night in question, the jury also heard Crockett's questions to police at the hospital, including Crockett's statement, "I mean, did I hit someone." (Feb. 29, 2012 Tr. 764.) In finding Crockett guilty, the jury found evidence from the Commonwealth's witnesses credible and found Crockett's testimony and evidence that he was not the driver of the vehicle incredible.

Moreover, the Court notes that such a review is based on the all of the *evidence* in this case, rather than the parties' arguments or interpretation of the evidence. Upon reviewing all of the evidence, no truly compelling evidence of Crockett's innocence exists. In fact, the great weight of the evidence is to the contrary, and instead, establishes Crockett's guilt. Furthermore, upon review of the newly-identified evidence, which Crockett contends supports his actual innocence claim, the Court finds that although the newly-identified evidence is voluminous, the evidence is either not exculpatory in nature or not as exculpatory as Crockett claims. For example, Crockett identifies minor variations in some witnesses' initial statements and their trial testimony and argues that these minor variations could have been used to impeach the witness's entire testimony at trial. However, potential impeachment of a witness does not equate to evidence of actual innocence. Although the newly-identified evidence is voluminous, upon review of all of the evidence, the *substance* of the newly identified evidence, which Crockett

contends supports his actual innocence claim, does not outweigh the substantial and compelling evidence of Crockett's guilt.

Given the totality of the evidence, Crockett fails to demonstrate that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Sharpe*, 593 F.3d at 377 (internal quotation marks omitted) (quoting *Schlup*, 513 U.S. at 327). Accordingly, Claim One will be DISMISSED. Further, because Crockett fails to establish that his alleged actual innocence permits the Court to reach the merits of his defaulted claims, Claims Three, Four, Five, and Eight will be DISMISSED. The Court turns to the merits of Crockett's remaining claims: Claims Two, Six, and Seven.

## IV.  Applicable Constraints Upon Habeas Review

In order to obtain federal habeas relief, at a minimum, a petitioner must demonstrate that he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996 further circumscribed this Court's authority to grant relief by way of a writ of habeas corpus. Specifically, "[s]tate court factual determinations are presumed to be correct and may be rebutted only by clear and convincing evidence." *Gray v. Branker*, 529 F.3d 220, 228 (4th Cir. 2008) (citing 28 U.S.C. § 2254(e)(1)). Additionally, under 28 U.S.C. § 2254(d), a federal court may not grant a writ of habeas corpus based on any claim that a state court adjudicated on the merits unless the adjudicated claim:

> **(1)** resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> **(2)** resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The Supreme Court has emphasized that the question "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams v. Taylor*, 529 U.S. 362, 410 (2000)).

Respondent acknowledges that Crockett presented Claims Two and Six in his state habeas petition filed in the Circuit Court,[15] and that he presented these claims to the Supreme Court of Virginia when he appealed the Circuit Court's denial and dismissal of his state habeas petition. (ECF No. 15, at 32, 34–39.) Respondent also acknowledges that Crockett presented Claim Seven on direct appeal. (*Id.* at 39–40.) On direct appeal, the Court of Appeals of Virginia affirmed the Circuit Court's challenged rulings, *Crockett v. Commonwealth*, No. 0119–13–1, 2014 WL 3510715, at *1 (Va. Ct. App. July 15, 2014), and the Supreme Court of Virginia refused the petition for appeal (ECF No. 15–8, at 1).

## V. Claim Two – Ineffective Assistance of Counsel

In Claim Two, Crockett contends that "[t]rial counsel was ineffective for failing to investigate and present evidence involving the driver's seatbelt mechanism." (§ 2254 Pet. 7.) Crockett presented this claim as Claim III in his state habeas petition. (*See* ECF No. 15–13, at 3.) The Circuit Court denied and dismissed Claim III, and the Supreme Court of Virginia affirmed the Circuit Court's denial and dismissal, "albeit for a different reason." (ECF No. 15–13, at 27; ECF No. 15–14, at 2.)

In explaining its affirmance of the Circuit Court's denial and dismissal of Claim III, which is presented here as Claim Two, "albeit for a different reason," the Supreme Court of Virginia explained:

---

[15] Claims Two and Six in the instant § 2254 Petition were presented as Claims III and VIII in Crockett's state habeas petition. (*See* § 2254 Pet. 7, 14; *see also* ECF No. 15–13, at 3–4.)

In [C]laim III, Crocket contended he was denied the effective assistance of counsel because counsel failed to investigate and present evidence related to the driver's seatbelt. The record, including Crockett's habeas exhibits, demonstrates that although counsel pursued the possibility of obtaining an expert to inspect and test the seatbelt in hopes of presenting the expert's testimony at trial to support the theory that the driver was belted while Crockett, according to witnesses, was not, counsel ultimately elected not to pursue this evidence. Counsel claimed he made this decision because the expert was unavailable and because he was concerned any such evidence might be inadmissible accident reconstruction evidence. However, the affidavits of disinterested witnesses, Alan Donker, counsel's investigator, and Paul Lewis, Jr., a biomedical engineer, show that for unknown reasons, counsel simply failed to follow-up with Lewis to have the seatbelt examined before Crockett's second trial.

Notwithstanding counsel's deficient representation, the Court holds Crockett has failed to establish prejudice under *Strickland*. Crockett relies on the report of David A. Pape, Ph.D., an expert engineer retained post-trial by Crockett's sentencing counsel to support his motion for a new trial. Dr. Pape's report however only "suggest[ed] the driver's seatbelt was in use at the time of the crash based on "cupping" on the belt. Thus, based on this report, it cannot be said there is a reasonable probability that the result of the proceeding would have been different had this evidence been obtained and admitted before the jury.

(ECF No. 15–14, at 7–8.)

To demonstrate ineffective assistance of counsel, a convicted defendant must show, first, that counsel's representation was deficient, and second, that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To satisfy the deficient performance prong of *Strickland*, the convicted defendant must overcome the "'strong presumption' that counsel's strategy and tactics fall 'within the wide range of reasonable professional assistance.'" *Burch v. Corcoran*, 273 F.3d 577, 588 (4th Cir. 2001) (quoting *Strickland*, 466 U.S. at 689). The prejudice component requires a convicted defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In analyzing ineffective

assistance of counsel claims, it is not necessary to determine whether counsel performed

deficiently if the claim is readily dismissed for lack of prejudice. *Id.* at 697.

> With respect to *Strickland*'s prejudice prong,
>
> > It is not enough for [Crockett] to show that the errors had some conceivable effect on the outcome of the proceeding,' and 'the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently.

*Jones v. Clarke*, 783 F.3d 987, 992 (4th Cir. 2015) (internal citations omitted). Instead,

"*Strickland* asks whether it is 'reasonably likely' the result would have been different,' and the

'likelihood of a different result must be substantial, not just conceivable.'" *Id.* (quoting

*Harrington v. Richter*, 562 U.S. 86, 111–12 (2011)).

> Here, Crockett claims that the outcome of the trial would have been different if counsel

had investigated and introduced evidence regarding the driver's seatbelt mechanism. (§ 2254

Pet. 7.) Crockett argues that if counsel had introduced evidence regarding the driver's seatbelt,

> > the evidence at trial would have been that while the driver was belted, Mr. Crockett was not. Of course, ample evidence demonstrating the latter fact was already known and out in the open at trial. The jury did not know, however, that the driver was belted; although [Crockett's counsel] argued as much at trial, he presented no evidence to support his argument. Had the jury been presented with such evidence, they would have found themselves constrained to conclude that Mr. Crockett was not the driver. In this sense, the seatbelt amounts to scientific evidence of innocence.

(ECF No. 1–1, at 75 (internal citations omitted).)

> With respect to the specific evidence regarding the seatbelt mechanism to which Crockett

refers, Crockett contends if counsel had investigated the driver's seatbelt mechanism, counsel

would have found exculpatory evidence showing that Crockett could not have been the driver

because the driver was wearing a seatbelt and Crockett was not wearing a seatbelt. (ECF No. 1–

1, at 68.)  As support for this assertion, Crockett proffers Dr. Pape's report, which Crockett's sentencing counsel obtained after his trial.  In the report, Dr. Pape concluded:

1. The vehicle damage was consistent with impact with a tree on the right side.
2. The driver's seatbelt latch and retractor functioned properly at the time of our inspection.
3. The driver's seatbelt webbing had been cut in two places during the extraction process.
4. The one section of driver's seatbelt webbing had cupping.  This cupping was consistent with loading from occupant forces during the collision and suggested that the seatbelt was being worn by the driver at the time of the collision.

(State Habeas Ex. 407, at 1.)  Crockett also submits two e-mails, both of which are dated June 11, 2015, in which Dr. Pape responds to an e-mail from an individual named Stan Crockett.  (State Habeas Exhibit 407, at 10.)  In one of the e-mails, Dr. Pape responded to the following question:  "Specifically would you be comfortable adding that the conclusions were accurate to a reasonable degree of engineering certainty at the time of the inspection?  YES[.]"  (*Id.*)

As an initial matter, Dr. Pape's e-mail stating that his conclusions "were accurate to a reasonable degree of engineering certainty" was not included in his report, and there is no indication that he made this statement under oath, let alone penalty of perjury.  (*Id.*); *see Price v. Rochford*, 947 F.2d 829, 832 (7th Cir. 1991); *Hogge v. Stephens*, No. 3:09CV582, 2011 WL 2161100, at *2–3 & n.5 (E.D. Va. June 1, 2011) (citation omitted).  In his actual report, Dr. Pape indicated that the cupping on the driver's seatbelt "*suggested* that the seatbelt was being worn by the driver at the time of the collision."  (State Habeas Ex. 407 (emphasis added).)  "[T]he determinative question for *Strickland* purposes is whether there is a reasonable probability that the [jury] would have had reasonable doubt respecting [Crockett's] guilt if the [seatbelt] evidence had been [presented]."  *Jones*, 783 F.3d at 992.  Looking at Dr. Pape's report, which Crockett proffers to support his claim that counsel's actions prejudiced him, the Court concludes that there is not a reasonable probability that the jury would have had a reasonable doubt as to

Crockett's guilt if the seatbelt evidence was presented because Dr. Pape's report does not conclusively find that Crockett was not the driver of the vehicle.

In presenting his argument here, Crockett overstates the exculpatory nature of the proffered seatbelt evidence because although Dr. Pape's findings suggest that the driver was wearing a seatbelt at the time of the accident, Dr. Pape did not conclusively find that the driver was in fact wearing a seatbelt, and he made no findings as to whether Crockett was wearing a seatbelt at the time of the accident. (*See* State Habeas Ex. 407.) Further, although the evidence presented at trial showed that no one observed Crockett wearing a seatbelt, no evidence conclusively showed that he was not wearing a seatbelt at the time of the accident. Moreover, in considering expert testimony, such as Dr. Pape's report, the jury would review this testimony in relation to the other testimony presented at trial and would "not [be] required to believe" such testimony. *CVD, Inc. v. Raytheon Co.*, 769 F.2d 842, 853 (1st Cir. 1995) (citation omitted). In this case, at best, Dr. Pape's report contradicts some of the evidence presented at trial, and it is not reasonably likely that the report would outweigh the other evidence of Crockett's guilt that the Commonwealth presented at trial.

Specifically, with respect to the evidence presented at Crockett's trial, the evidence of Crockett's guilt was overwhelming. The evidence showed that only Crockett and Mr. Korte, the victim, were found in the vehicle. No witnesses saw a third person exit the vehicle or flee the scene. The evidence also showed that five witnesses, all of whom lived on Wolfsnare Road near the scene of the accident, arrived at the vehicle within minutes, if not seconds, of the crash, and all five of these witnesses described Crockett's upper body as being in the backseat and, at a minimum, described his legs as being in the driver's seat area. When these five witnesses were asked if they observed Crockett wearing a seatbelt, some testified that they did not observe him

wearing a seatbelt and some testified that they could not recall whether he was wearing a seatbelt. Further, the evidence presented at trial showed that at the hospital Crockett asked the police whether he hit someone. (Feb. 29, 2012 Tr. 764.) At trial, Crockett's defense was that a third party had been driving the vehicle and had fled the scene immediately after the accident. In support of this defense, Crockett testified that he had fragmentary memories of the events leading up to the accident, and that in these fragmentary memories, he is in the back seat of the car, rather than the front seat. Additionally, a family friend testified that Crockett typically "[n]ever" wore his seatbelt. (Feb. 29, 2012 Tr. 629.)

Looking at the sum of the evidence presented at trial and the evidence proffered by Crockett as to the likely result of counsel's investigation of the driver's seatbelt, the Court concludes that it is not "'reasonably likely' the result would have been different," as is required to satisfy the *Strickland* standard. *Jones*, 783 F.3d at 992 (citation omitted). In reaching this conclusion, the Court notes that it does not doubt that evidence regarding the use of the driver's seatbelt would have been relevant at trial. However, based on the evidence Crockett proffered regarding the driver's seatbelt, "[a]lthough it is 'conceivable' that the [jury] may have acquitted [Crockett if Dr. Pape's report had been introduced]," the likelihood of such a result is not "substantial" because overwhelming evidence of Crockett's guilt was presented at trial and the proffered evidence regarding the seatbelt (i) at best, contradicts *some* of the evidence presented at trial, but does not contradict all of the evidence, and (ii) does not repudiate any of the evidence presented at trial. *Id.* at 993 (some internal quotations marks omitted).

Additionally, as support for his claim that the outcome of the trial would have been different if evidence regarding the driver's seatbelt had been introduced, Crockett contends that the statements in the juror affidavits, which he submitted in support of his actual innocence

claim, show that "the seatbelt evidence would have changed [the jury's] verdict at trial." (ECF No. 1–1, at 69.) Crockett does not identify the specific affidavits to which he refers; however, from the Court's review of the juror affidavits, Crockett is likely referring to the affidavits of Juror Addison and Juror Smitter. In Juror Addison's affidavit, she states, in pertinent part:

> I had a very difficult time arriving at my verdict and I do not feel like there was any justice in the whole thing. It did not feel right because there was just so much that we did not know.
>
> I would have voted differently if we, the jury, had the new seatbelt report available to us. I also would have voted differently if we had the 911 recordings available to us.

(State Habeas Ex. 420, at 7 (internal paragraph numbers omitted).) In Juror Smitter's affidavit, she states, in pertinent part:

> Since the verdict, I have followed the news in Cameron's case. In early 2014, there was a Channel Three news story by Laurie Simmons about Cameron's appeal and his newly discovered seatbelt evidence. This news story focused on how, after the trial, Cameron got a new lawyer and had an engineer examine the driver's seatbelt. The engineer found that the seatbelt was in use during the collision.
>
> We the jury heard all about Cameron's position in the car at trial and I can say with confidence that this evidence would have definitely changed the verdict. I really wish that we could have had the benefit of this evidence at trial. The central position of the jurors who pressured me into finding Cameron guilty was that Cameron was found in the backseat because he, being the "unbelted driver" in their eyes, flew back there during the collision. This was how they were able to explain the discovery of Cameron in the backseat and the fact that he had no seatbelt injuries in a manner that was consistent with him being the driver. Evidence showing that the driver was belted would have completely eviscerated this fundamentally flawed belief. While I obviously can't speak for every single one of us, I do know for a fact, based on the thinking we experienced that motivated the verdict, that this evidence would have changed the minds of the majority of the jurors. As the posture of the other jurors shows, we were unanimous on at least one thing: that Cameron was *not* belted. Had we known the driver *was*, everyone would have been forced to conclude that *Cameron was not the driver*.

(State Habeas Ex. 418, at 2 (internal paragraph numbers omitted).)

As an initial matter, the Court doubts whether the juror affidavits, which essentially impeach the jury's verdict, are admissible for purposes of the *Strickland* inquiry. *See, e.g.,*

*Fullwood v. Lee*, 290 F.3d 663, 679–80 (4th Cir. 2002) (citations omitted) (explaining that "[t]he Federal Rules of Evidence impose strict limits on the type of juror testimony that may be used to invalidate a verdict"). Nevertheless, turning to the substance of the affidavits, the jurors' statements regarding the likely outcome of the case had they had the seatbelt report are vague and conclusory, and do not establish that it is "'reasonably likely' the result would have been different," as is required to satisfy the *Strickland* standard. *Jones*, 783 F.3d at 992 (citation omitted). Specifically, the affidavits do not contain any information as to the actual evidence upon which Juror Addison and Juror Smitter base their opinions. For example, Juror Addison states that she would have voted differently if the jury "had the new seatbelt report." (State Habeas Ex. 420, at 1.) However, Juror Addison provides no additional information regarding whether she herself has seen the report or whether her opinion is based on third-party representations as to the contents of the report. Similarly, Juror Smitter indicates that she learned about the seatbelt evidence from a "Channel Three news story by Laurie Simmons." (State Habeas Ex. 418, at 2.) There is no indication that Juror Smitter reviewed Dr. Pape's report, and it appears that her opinion about the evidence is based on media reports of the case. The fact that Juror Addison's and Juror Smitter's opinions regarding the seatbelt evidence are based on secondhand knowledge and secondhand recitation of evidence does not tend to show the reliability of the affidavits. In light of these reliability issues, and due to the vague and conclusory nature of the jurors' statements, the Court concludes that juror affidavits do not establish that it is "'reasonably likely' the result would have been different," as is required to satisfy the *Strickland* standard. *Jones*, 783 F.3d at 992 (citation omitted).

In summary, with respect to Claim Two, the Court concludes that Crockett has failed show any resulting prejudice with respect to counsel's failure to investigate and present evidence

regarding the driver's seatbelt.  *Strickland*, 466 U.S. at 694.  Accordingly, Claim Two will be DISMISSED.

<h2 style="text-align:center"><u>VI.  Claim Six – Cumulative Effect of <em>Brady</em> Violations and the Ineffective<br>Assistance of Counsel</u></h2>

In Claim Six, Crockett argues that "[t]he cumulative effect of the Commonwealth's *Brady*[16] violations and of the ineffective assistance of counsel Crockett received at trial deprived him of a fair trial."  (§ 2254 Pet. 14.)  Crockett presented this claim in his state habeas petition as Claim VIII.  (*See* ECF No. 15–13, at 4.)  In affirming the Circuit Court's denial and dismissal of Crockett's state habeas petition, the Supreme Court of Virginia did not disturb the Circuit Court's reasoning as to this claim.  (*See* ECF No. 15–14, at 2.)

The Circuit Court rejected Claim VIII, which is presented here as Claim Six, explaining:

> [T]he petitioner appears to contend the cumulative effect of alleged non-disclosures by the prosecution coupled with his claims of ineffective assistance served to deny him a fair trial.  However, as articulated above [in the Circuit Court's opinion discussing the cumulative effect of ineffective assistance], the merits of these claims must be considered in isolation, rather than in the aggregate.  As has been demonstrated, there is no merit to Crockett's contention that the prosecution withheld exculpatory and impeachment evidence in accordance with the dictates of *Brady*.  Moreover, as [explained in the Circuit Court's opinion], the petitioner's claims of ineffective assistance are without merit.

(ECF No. 15–13, at 15.)  As explained below, the Court discerns no unreasonable application of the law and no unreasonable determination of the facts.  *See* 28 U.S.C. § 2254(d)(1)–(2).

With respect to the specific ineffective assistance of counsel claims and *Brady* violations that Crockett contends cumulatively deprived him of a fair trial, Claim Two is the sole ineffective assistance of counsel claim presented in Crockett's § 2254 Petition. (§ 2254 Pet. 7).  Crockett identifies a host of alleged *Brady* violations, which are summarized and discussed in detail in the Court's analysis of Crockett's actual innocence claim.  (*See, e.g.*, ECF No. 1–1, at

---

[16] *Brady v. Maryland*, 373 U.S. 83 (1963).

120–29.)  As to the specific *Brady* violations Crockett identified, he contends, *inter alia*, that the Commonwealth did not disclose the following evidence:  the "Pamela Patrick Statement," the "police memoranda," the "Antoine Smith Statement," the "pretrial statements of Joe Daniels, Kolden Dickson, and Holly Dickson," and the "driver's side airbag enigma."  (*See id.*)  In addressing Crockett's cumulative effect claim, which is presented here as Claim Six, the Court first discusses the cumulative effect of the ineffective assistance of counsel, and then discusses the cumulative effect of the undisclosed evidence.  After this discussion, the Court addresses the combined cumulative effect of both the ineffective assistance of counsel and the undisclosed evidence.

In Crockett's instant § 2254 Petition, he presents one claim of ineffective assistance of counsel, which as explained above, the Court concludes lacks merit.  (*See* § 2254 Pet. 7); *see also supra* Part V.  Crockett does not present any additional ineffective assistance of counsel claims in his instant § 2254 Petition, nor does he present any further supporting argument in Claim Six about additional instances of alleged ineffective assistance of counsel.  *See Bassette v. Thompson*, 915 F.2d 932, 940–41 (4th Cir 1990) (requiring proffer of mitigating evidence to state ineffective assistance claim); *see also Sanders v. United States*, 373 U.S. 1, 19 (1963) (finding denial of habeas relief appropriate where petitioner "stated only bald legal conclusions with no supporting factual allegations").  In determining the cumulative effect of any claims of ineffective assistance of counsel, counsel's "acts or omissions 'that are not unconstitutional individually cannot be added together to create a constitutional violation.'"  *Fisher v. Angelone*, 163 F.3d 835, 853 (4th Cir. 1998) (quoting *Wainright v. Lockhart*, 80 F.3d 1226, 1233 (8th Cir. 1996)).  Here, Crockett's sole ineffective assistance of counsel claim lacks merit and does not amount to a constitutional violation.

With respect to Crockett's claim regarding *Brady* violations, *Brady* and its progeny "require[] a court to vacate a conviction and order a new trial if it finds that the prosecution suppressed materially exculpatory evidence." *United States v. King*, 628 F.3d 693, 701 (4th Cir. 2011). Accordingly, to obtain relief under *Brady*, a litigant must "(1) identify the existence of evidence favorable to the accused; (2) show that the government suppressed the evidence; and (3) demonstrate that the suppression was material." *Id.* (citing *Monroe v. Angelone*, 323 F.3d 286, 299 (4th Cir. 2003)). Undisclosed evidence is material when its cumulative effect is such that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433–34 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). A reasonable probability is one sufficient to undermine confidence in the outcome. *Id.* at 434. Nevertheless, "[t]here is no general constitutional right to discovery in a criminal case, and *Brady*, which addressed only exculpatory evidence, did not create one." *Gray v. Netherland*, 518 U.S. 152, 168 (1996) (internal quotation marks omitted) (citation omitted).

In his § 2254 Petition, Crockett identifies, *inter alia*, the following alleged *Brady* violations: the "Pamela Patrick Statement," the "police memoranda," the "Antoine Smith Statement," the "pretrial statements of Joe Daniels, Kolden Dickson, and Holly Dickson," and the "driver's side airbag enigma." (*See, e.g.*, ECF No. 1–1, at 120–29.) The Court has thoroughly reviewed this evidence. As discussed above in the Court's analysis of Crockett's actual innocence claim, upon review of the *substance* of the identified evidence, the Court concludes that Crockett overstates, and in some instances misstates, both the exculpatory nature of the evidence and the extent to which the evidence is impeaching. As such, the Court does not find that the identified evidence meets the first component necessary to establish a *Brady* claim:

that the evidence was "favorable to the accused." *See King*, 628 F.3d at 701 (citation omitted). Therefore, the Commonwealth was not obligated under *Brady* to disclose this evidence. *See Gray*, 518 U.S. at 168 (citation omitted).

For example, the information in Ms. Patrick's initial statement (which is the evidence that Crockett contends was suppressed) is largely *not* exculpatory, and instead, is further evidence of Crockett's guilt. Specifically, in Ms. Patrick's initial statement, she indicates, *inter alia*, that she "ran over to the car" (State Habeas Exhibit 251, at 2) and that the police arrived "probably 2 minutes, maybe 3" after the accident (*id.* at 3). Such statements are hardly exculpatory or even impeaching, and are not consistent with Crockett's tale that a third party had time to crawl through the window of the crashed vehicle and flee the scene of the accident without any neighbors or police seeing the third party.

Furthermore, even assuming that the Commonwealth should have disclosed the evidence Crockett identified, the cumulative effect of the nondisclosure of the identified evidence is not "so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler v. Greene*, 527 U.S. 263, 281 (1999). Specifically, as to the undisclosed evidence, Crockett first identifies the pretrial statements of Pamela Patrick, Antoine, William Daniels, Kolden Dickson, and Holly Dickson. However, rather than providing exculpatory evidence, the pretrial statements of these witnesses largely provide additional evidence of Crockett's guilt. For example, the pretrial statements indicate that the witnesses either looked at the crashed vehicle or went over to the accident scene within minutes, if not seconds, of the crash and that at least some part of Crockett's lower body was in the front driver's portion of the vehicle and that his head and part of his upper body were in the backseat.

Moreover, any inconsistencies between these witnesses' pretrial statements and their later testimony are minimal. For example, most of the inconsistencies Crockett identified involve slight differences between the exact amount of time that the witnesses had reported as passing before they approached the crashed vehicle. Ms. Smith's initial statement is arguably the most inconsistent: at trial she testified that she had seen the vehicle at an intersection on Wolfsnare Road and that when the vehicle went off the road, it had spun several times. But her pretrial statement did not indicate that the vehicle had spun several times, and other witnesses described the vehicle as sliding, rather than spinning. However, at trial, Ms. Smith's credibility was at issue, and Crockett's counsel presented several witnesses, including two individuals who performed a survey, to show that based on Ms. Smith's location on Wolfsnare Road, she would not have been able to see the stoplight or the intersection in question.

Crockett also identifies the police memoranda as additional undisclosed evidence. With respect to the police memoranda, as detailed above in the Court's discussion of Crockett's actual innocence claim, the memoranda from Officers Buechner, Bradley, and Clark contain detailed descriptions of the positions of the bodies in the front of the vehicle. As such, the memoranda are largely *not* exculpatory. Instead, the memoranda present further evidence of Crockett's guilt.

Crockett argues that the memoranda could have been used to impeach Officer Buechner's trial testimony regarding the position of Crockett's feet in relation to the steering wheel. Officer Buechner testified, *inter alia*: "He was on what remained of the driver's side of the vehicle in the front seat[,]" "[h]is feet were under the steering wheel[,] [and] [h]is waist was where the center console would be." (Feb. 28, 2012 Tr. 389.) Officer Buechner also stated: "The seat had broken. He wasn't in what would be considered a seated position in the seat, but he was still in the area[.]" (Feb. 28, 2012 Tr. 389–90.) Crockett is correct that none of the three police

memoranda indicate that Crockett's feet were under the steering wheel; however, reviewing Officer Buechner's trial testimony in its entirety, Crockett vastly overstates how exculpatory and impeaching the memoranda would be in light of the Officer Buechner's description of the rest of Crockett's body.

Crockett next identifies undisclosed evidence that he describes as "the driver's airbag enigma." (ECF No. 1–1, at 129.) Crockett argues that the Commonwealth's determination that the driver's side airbag was not forensically testable inevitably means that forensic testing on the airbag would somehow result in exculpatory evidence. Such a fanciful conclusion is misplaced. As an initial matter, the Commonwealth's determination regarding the forensic viability of the airbag *was* disclosed to Crockett. Furthermore, it seems abundantly reasonable that the Commonwealth disclosed its determination that the airbag was not testable because the airbag was in fact *not* testable. It also seems abundantly reasonable that in a single vehicle accident where witnesses responded to the scene within minutes of the accident, where all of the witnesses saw only two individuals in the vehicle and no one saw a third person fleeing the scene, that the police would store the vehicle in a police station parking lot without immediately testing the airbags for possible forensic material.

Moreover, as the Supreme Court of Virginia observed, based on the record as a whole, a reasonable juror would not give credence to Crockett's contention that:

> J.P. was the belted driver of the car, that during the crash Crockett, who claimed he was sitting in the backseat, was thrown on top of J.P. and the driver's seat, landing on his back with his feet near the steering wheel and his head in the rear of the car, or that after the impact during the approximately thirty seconds to one minute before witnesses arrived at the wrecked car, J.P. managed to unbuckle his seatbelt and extricate himself from under Crockett and from the wrecked car and slip away into the woods, unnoticed by the crowd, and then return, on foot and unscathed, to

a party some distance away that Crockett, Korte, and J.P. had attended earlier in the evening.

(ECF No. 15–14, at 5.)

Thus, looking at the cumulative effect of the undisclosed evidence, all of which is either not exculpatory in nature or is not as exculpatory or impeaching as Crockett suggests, Crockett does not show that including the undisclosed evidence would have "resulted in a different verdict." *Strickler*, 527 U.S. at 281. Therefore, he is unable to establish that the cumulative effect of the undisclosed evidence resulted in any *Brady* violation. *Id.* (explaining that without establishing that the suppressed evidence would have resulted in a different verdict, "there is never a real '*Brady* violation'").

Finally, turning to the combined cumulative effect of the ineffective assistance of counsel and the undisclosed evidence, which is the substance of Claim Six, Crockett fails to show that these non-errors result in any cumulative error.

> Pursuant to the cumulative error doctrine, "[t]he cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." *United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990)[,] *cited with approval in United States v. Martinez*, 277 F.3d 517, 532 (4th Cir. 2002). Generally, however, if a court "determine[s] . . . that none of [a defendant's] claims warrant reversal individually," it will "decline to employ the unusual remedy of reversing for cumulative error." [*United States v.*] *Fields*, 483 F.3d [313,] 362 [(5th Cir. 2007)]. To satisfy this requirement, such errors must "so fatally infect the trial that they violated the trial's fundamental fairness." *United States v. Bell*, 367 F.3d 452, 471 (5th Cir. 2004). When "none of [the] individual rulings work[] any cognizable harm, . . . [i]t necessarily follows that the cumulative error doctrine finds no foothold." [*United States v.*] *Sampson*, 486 F.3d [13,] 51 [(4th Cir. 2007)].

*United States v. Basham*, 561 F.3d 302, 330 (4th Cir. 2009) (omissions and first, third, fourth, eighth, ninth, and tenth alterations in original). This discussion of the cumulative error doctrine is instructive for Crockett's present Claim Six.

Specifically, as discussed above, Crockett's ineffective assistance claim lacks merit and the cumulative effect of the undisclosed evidence is not material and does not show any *Brady* violation. The cumulative effect of meritless claims, even if such meritless claims are numerous, does not result in cumulative error such that Crockett was deprived of a fair trial. *See id.* (citations omitted). Accordingly, Crockett fails to demonstrate any cumulative error from the identified non-errors, and Claim Six will be DISMISSED.

## VII. Claim Seven – *Batson* Violation

In Claim Seven, Crockett contends that "[t]he Commonwealth violated *Batson v. Kentucky*, 476 U.S. 79 (1986), by striking two African-American women from the venire." (§ 2254 Pet. 16.) Crockett raised this claim on direct appeal. *See Crockett v. Commonwealth*, No. 0119–13–1, 2014 WL 3510715, at *4 (Va. Ct. App. July 15, 2014). In rejecting this claim on direct appeal, the Court of Appeals of Virginia explained:

> In his last assignment of error, the defendant maintains the trial court erred in denying his motion based upon *Batson* because the Commonwealth used two peremptory strikes to remove two African-American women from the venire. The defendant argues the trial court erred by ruling that he failed to make a prima facie case of purposeful discrimination.
>
> The Commonwealth struck two African-American women from the venire. There were a total of four or five African-Americans on the venire, and the defendant struck one African-American woman himself. The defendant objected, but he made no attempt at showing a pattern of discrimination. He stated simply that striking the two African-American women established a pattern. The trial judge found that there was no pattern of discrimination and overruled the defendant's objection.
>
> "The fact that the prosecution has excluded African-Americans by using peremptory strikes does not itself establish such a prima facie case under *Batson*. A defendant also must identify facts and circumstances that raise an inference that potential jurors were excluded based on their race." *Johnson v. Commonwealth*, 259 Va. 654, 674, 529 S.E.2d 769, 780–81 (2000) (citations omitted); *see Juniper v. Commonwealth*, 271 Va. 362, 407, 626 S.E.2d 383, 412 (2006); *Yarbrough v. Commonwealth*, 262 Va. 388, 394, 551 S.E.2d 306, 309 (2001).
>
> The fact the Commonwealth excluded African-Americans by using peremptory strikes did not establish a prima facie case of racial discrimination. The defendant made no attempt to identify facts and circumstances that would raise the

> inference that the Commonwealth struck the two females based upon their race. There is no evidence of purposeful discrimination by the Commonwealth in the jury selection process. Thus, the record supports the trial court's ruling that the defendant failed to make a prima facie showing of purposeful discrimination under *Batson*.

(*Id.*)  As explained below, the Court discerns no unreasonable application of the law and no unreasonable determination of the facts.[17]  *See* 28 U.S.C. § 2254(d)(1)–(2).

In *Batson v. Kentucky*, the United States Supreme Court held that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race." *Batson*, 476 U.S. at 89.  Courts use a three-step process to evaluate whether using a peremptory challenge was based on purposeful discrimination.  *Snyder v. Louisiana*, 552 U.S. 472, 476–77 (2008).  First, the defendant must make a prima facie case of racial discrimination.  *Id.* at 476 (citation omitted).  Second, after such showing is made, the state must suggest a race-neutral explanation for the use of the strike.  *Id.* at 476–77 (citation omitted).  Third, after a race-neutral reason is offered, the trial court must decide whether the defendant has shown purposeful discrimination.  *Id.* (citation omitted).  "Whether a peremptory strike was motivated by race is ultimately a question of fact, *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005), and a state court finding is accorded a presumption of correctness under AEDPA, 28 U.S.C. § 2254(e)(1)." *Cole v. Roper*, 623 F.3d 1183, 1188 (8th Cir. 2010) (parallel citations omitted).

Here, the prosecution used two of its five possible peremptory strikes to remove two African American jurors:  Dareeka King and Sylvia Kirkland.  (Feb. 27, 2012 Tr. 197–98.) During voir dire, Ms. King indicated that she worked as an in-home counselor.  (Feb. 27, 2012 Tr. 10.)  When asked if anyone worked or had worked "with the Commonwealth of Virginia or

_____

[17] The decision of the Court of Appeals of Virginia was the last reasoned state court decision addressing these claims, and its reasoning is imputed to the Supreme Court of Virginia, which refused further review without discussing the claim.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).

other state government or any city or county government or any local government," Ms. King indicated that she had worked as "social worker with Virginia Department of Social Services." (Feb. 27, 2012 Tr. 52–53.)  When asked if anyone or their immediate family or close friends "ever lived on or near Great Neck Road, First Colonial Road, or Wolfsnare Road in the City of Virginia Beach," Ms. King answered in the affirmative.  (Feb. 27, 2012 Tr. 68.)  Ms. King also answered in the affirmative when the venirepersons were asked if any panel member or immediate family member had "conducted business at the Citgo station -- it was formerly known as the Robo Wash -- at 2456 Virginia Beach Boulevard."  (Feb. 27, 2012 Tr. 69.)

Ms. Kirkland indicated that she worked as "a senior customer service representative for Citigroup."  (Feb. 27, 2012 Tr. 10.)  When asked whether anyone or any immediate family member had "ever been employed by the federal [government]," Ms. Kirkland indicated that "the company that [she] work[s] for works for Department of Defense" by "supply[ing] their credit cards."  (Feb. 27, 2012 Tr. 48.)

Crockett's counsel challenged the removal of Ms. King and Ms. Kirkland, arguing that the prosecution had "struck two black females for no apparent reason" and "[he] [thought] there's a prima facie case for at least a Batson issue that's been raised."  (Feb. 27, 2012 Tr. 198.) Crockett's counsel argued that he had "established enough of a pattern.  There weren't that many on the jury to begin with."  (Feb. 27, 2012 Tr. 198.)  The Circuit Court denied the *Batson* challenge, explaining, *inter alia*, that the Circuit Court did not "see any pattern here."  (Feb. 27, 2012 Tr. 199.)  After the Circuit Court's ruling, the prosecution noted for the record that Crockett's counsel "also struck a black female."  (Feb. 27, 2012 Tr. 200.)

"A three-step process is used to analyze a *Batson* claim." *United States v. Thompson*, 443 Fed. App'x 770, 771 (4th Cir. 2011).  First, the party opposing the strike must make a prima

facie showing that the opposing party exercised the strike on the basis of race. *Batson*, 476 U.S. at 96-97.

> The burden then shifts to the party exercising the strike to offer a racially neutral explanation for removing the juror in question. Once the neutral explanation is presented, the complaining party must prove purposeful discrimination. A movant may show purposeful discrimination by demonstrating that the opposing party's explanation is a mere pretext for racial discrimination. The party must show both that counsel's stated reasons were merely pretextual and that race was the real reason for the strike.

*Thompson*, 443 Fed. App'x at 771–72 (internal quotation marks and citations omitted). With respect to the first element, "[t]he Supreme Court has modified *Batson* to allow defendants of races different from the excused jurors to have standing to raise *Batson* challenges."[18] *Graham v. Angelone*, No. 99–4, 1999 WL 710385, at *16 (4th Cir. Sept. 13, 1999) (citing *Powers v. Ohio*, 499 U.S. 400, 415 (1991)).

As noted above, at Crockett's trial, counsel argued that the prosecution had "struck two black females for no apparent reason," however, counsel did not identify any "other facts and circumstances surrounding the proceeding [to] raise an inference" of discrimination by the prosecution. (Feb. 27, 2012 Tr. 198); *see Graham*, 1999 WL 710385, at *16 (citation omitted). In Crockett's Memorandum in Support of his § 2254 Petition, he argues that "the Commonwealth exhausted a disproportionate amount of its challenges to get rid of nearly all the qualified African-American women on the venire[,]" and "[b]ecause the defense had struck one, too, the prosecution ousted the last remaining African-American woman overall when it used its third strike." (ECF No. 1–1, at 138.)

However, even in a scenario in which the prosecutor challenges the only potential juror of a particular race, "the mere fact that the prosecutor challenges the only juror of a particular

---

[18] The record reflects that Crockett is Caucasian. (Mar. 1, 2012 Tr. 899.)

race, without more, does not automatically give rise to an inescapable inference of discriminatory intent." *United States v. Bergodere*, 40 F.3d 512, 516 (1st Cir. 1994). Instead, "[a] defendant who advances a *Batson* argument ordinarily should 'come forward with facts, not just numbers alone.'" *Id.* (citations omitted). Crockett has not provided any such facts. (*See, e.g.*, ECF No. 1–1, at 133–40.) Because Crockett has failed to identify "any other facts and circumstances" giving rise to an inference of discrimination in the prosecution's exercise of its peremptory strikes, Crockett has failed to establish a prima facie case of racial discrimination under *Batson*. Accordingly, Claim Seven will be DISMISSED.

## VIII. Crockett's Motions

Crockett has filed a Motion for Discovery (ECF No. 1–1, at 142–152) and attached proposed Interrogatories (ECF No. 1–1, at 153–156), as well as a Supplemental Motion for Discovery (ECF No. 7). Crockett requests an evidentiary hearing on Claims One and Two (ECF No. 19, at 2–3) and on Claim Eight (ECF No. 8). The Court construes Crockett's requests for an evidentiary hearing to be a request for such an evidentiary hearing on all of the claims before the Court in the § 2254 Petition. Crockett also filed an Objection and Motion to Return Case. (ECF No. 24).

### A.      Discovery Motions

In Crockett's Motion for Discovery, he first requests "any and all evidence, documentation, or other tangible or electronic materials in the custody, care, or control of the Director, the Attorney General's Office, the Commonwealth's Attorney Office and/or the Virginia Beach Police Department, that are relevant in any way to the driver's side airbag in this case." (ECF No. 1–1, at 142.) Crockett next requests "discovery of any and all remaining undisclosed exculpatory or impeachment evidence within the custody, case, or control of the

Director, the Attorney General's Office, the Commonwealth's Attorney Office and/or the Virginia Beach Police Department." (*id.* at 143.) Additionally, Crockett requests that the prosecution's "files be surrendered for inspection" because "considering the prosecution's track record of foul play in this case, . . . [he] has reason to suspect that [the prosecution's] files as a whole contain even more undisclosed exculpatory evidence." (*Id.* at 152.)

In Crockett's Supplemental Motion for Discovery, he requests "the Court for its permission to issue a subpoena duces tecum to the [Virginia State] Bar's investigative subcommittee for all of its files and records pertaining to the complaint and its investigation thereof." (ECF No. 7, at 2.) Crockett explains that he seeks this file because, as is relevant to Claim Eight in his § 2254 Petition, "the Virginia State Bar just concluded a four-year-long investigation into a complaint filed by Mr. Crockett against Mrs. Kopnicky-Kolar [the prosecuting attorney]." (*Id.* at 1.) Crockett further explains that although "the Bar's investigative subcommittee acknowledged that there was an appearance of impropriety surrounding the prosecution," the Bar "did not release whatever evidence it might have turned up during its investigation that supported the conclusions it reached." (*Id.* at 1–2 (citation omitted).) Crockett argues that "it is only reasonable to believe that [the Bar] found some evidence of a conflict apart from what it received from Mr. Crockett when the complaint was filed" and "the Bar's investigative records will prove, or at least help to prove, the conflict of interest claim." (*Id.* at 2.)

Rule 6(a) of the Rules Governing Section 2254 Cases provides that "[a] judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure . . . ." Rules Governing § 2254 Cases R. 6(a). Good cause for discovery under Rule 6(a) is shown "where specific allegations before the court show reason to believe that the petitioner

may, if the facts are fully developed, be able to demonstrate that he is[] entitled to relief." *Bracy v. Gramley*, 520 U.S. 899, 908–09 (1997) (citation omitted) (internal quotation marks omitted).

Here, although Crockett attempts to provide some specificity as to the material he requests and why such material would aid in developing allegations for which he believes he would be entitled to relief, it appears that Crockett largely desires to engage in a fishing expedition to locate evidence that he believes might support his *Brady* claim, prosecutorial misconduct claim, and actual innocence claim. Crockett therefore fails to demonstrate good cause to warrant discovery. Accordingly, Crockett's Motion for Discovery (ECF No. 1–1, at 142–152) and Supplemental Motion for Discovery (ECF No. 7) will be DENIED.

## B.     Request for Evidentiary Hearing

As noted above, Crockett requests an evidentiary hearing on Claims One and Two (ECF No. 19, at 2–3) and on Claim Eight (ECF No. 8); however, the Court construes such requests to be a request for an evidentiary hearing for all of the claims presented in the § 2254 Petition.

Prior to the AEDPA, the decision to grant an evidentiary hearing was left to the "sound discretion of district courts." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). In determining whether a case warrants an evidentiary hearing, a federal court must consider whether the evidentiary hearing would provide the petitioner the opportunity to "prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Id.* at 474; *see Mayes v. Gibson*, 210 F.3d 1284, 1287 (10th Cir. 2000). The court must also consider the standards set forth in Section 2254[19] when considering whether an evidentiary hearing is

---

[19] Under this section federal courts are prohibited from granting habeas relief:

unless a state court's adjudication of a claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or the relevant state-court decision "was based on an unreasonable determination of

appropriate. *Schriro*, 550 U.S. at 474. "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id.*

Here, Claims Three, Four, Five, and Eight are defaulted, and Crockett fails to establish that his alleged actual innocence, as presented in Claim One, permits the Court to reach the merits of his defaulted claims. With respect to Claim One, as discussed above in great detail, the Court concludes that given the totality of the evidence, Crockett fails to demonstrate entitlement to relief under the applicable standard for an actual innocence claim. Although the evidence Crockett identified as supporting his actual innocence claim is voluminous, as discussed above, the Court concludes that the *substance* of the newly-identified evidence does not outweigh the substantial and compelling evidence of Crockett's guilt. As such, because the record refutes the factual allegations of this claim, the Court finds that this case does not warrant an evidentiary hearing. *See Schriro*, 550 U.S. at 474. Similarly, as explained above, Claims Two, Six, and Seven lack merit, and an evidentiary is not warranted. *See id.*

Therefore, based on a thorough evaluation of Crockett's claims and the record before the Court, habeas relief under § 2254 is not warranted. Crockett's request for an evidentiary hearing for all claims in the instant § 2254 Petition (*see, e.g.*, ECF No. 8; ECF No. 19, at 2–3) will be DENIED.

---

the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold. *See Williams v. Taylor*, 529 U.S. 362, 410 (2000). AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with "clear and convincing evidence." § 2254(e)(1).

*Schriro*, 550 U.S. at 473–74 (2007).

### C.    Objection and Motion to Return Case

In Crockett's Objection and Motion to Return Case, he states, *inter alia*, that he "respectfully enters his objection, on constitutional and other grounds, to the referral of [his] habeas petition to a staff attorney," and he "moves the Court to return the matter to either the magistrate judge or the district judge." (Obj. & Mot. Return Case 1, ECF No. 24.) The undersigned United States District Judge has thoroughly reviewed this matter and has made all decisions regarding the final outcome of this action. Accordingly, Crockett's Objection (ECF No. 24) will be OVERRULED and his Motion to Return Case (ECF No. 24) will be DISMISSED AS MOOT.

### IX.   Conclusion

For the foregoing reasons, the Court will GRANT Respondent's Motion to Dismiss (ECF No. 13) and DISMISS Crockett's § 2254 Petition (ECF No. 1) and the Amendment to § 2254 Petition (ECF No. 6). The Court further DENIES Crockett's Motion for Discovery (ECF No. 1–1, at 142–152) and Supplemental Motion for Discovery (ECF No. 7), DENIES Crockett's request for an evidentiary hearing for all claims in the instant § 2254 Petition (*see. e.g.*, ECF No. 8; ECF No. 19, at 2–3), OVERRULES Crockett's Objection (ECF No. 24) and DISMISSES AS MOOT his Motion to Return Case (ECF No. 24).

An appropriate Order shall accompany this Memorandum Opinion.

/s/

M. Hannah Lauck
United States District Judge

Date: March 26, 2019
Richmond, Virginia

133